**AKIN GUMP STRAUSS HAUER & FELD LLP**
NEAL R. MARDER (SBN 126879)
REBECCA A. GIROLAMO (SBN 293422)
BRETT M. MANISCO (SBN 318351)
nmarder@akingump.com
bgirolamo@akingump.com
bmanisco @akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:   310.229.1000
Facsimile:   310.229.1001
Attorneys for Defendant
*American Medical Response, Inc.*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MENDELL, individually and on behalf of others similarly situated,<br><br>                              Plaintiffs,<br><br>              v.<br><br>AMERICAN MEDICAL RESPONSE, INC.,<br><br>                              Defendant. | CASE NO. 3:19-cv-01227-BAS-KSC<br><br>[Judge:  Hon. Cynthia Bashant]<br><br><u>CLASS ACTION</u><br><br>**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>**REDACTED**<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT**<br><br>Date Action Filed: July 1, 2019 |

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   STATEMENT OF FACTS .............................................................................3

    A.    Overview of AMR's Business and Billing Practices ..........................3

        1.    AMR's Billing and Collections Cycle ....................................3

        2.    LiveVox Dialing System ........................................................4

    B.    Policies and Procedures for Call Center Operations ...........................4

    C.    Plaintiff's Use of AMR's Medical Transport Services and Related
        Communications..................................................................................6

III.  LEGAL STANDARD .....................................................................................8

IV.   ARGUMENT...................................................................................................9

    A.    Plaintiff Fails To Establish Commonality or that Common Issues
        Predominate Over Fact Intensive Individual Ones .............................9

        1.    Plaintiff Improperly Conflates Penal Code Sections 632 and
            632.7....................................................................................11

        2.    Individualized Issues Related To Confidentiality Predominate12

        3.    Individualized Issues Related to Consent Predominate...........16

    D.    Plaintiff Fails To Meet Rule 23(a)'s Typicality Requirement.............25

    E.    Plaintiff Is Not An Adequate Class Representative.............................28

        1.    Plaintiff is not able to prosecute the action vigorously on
            behalf of the class.................................................................29

        2.    Plaintiff has conflicting interests with other class members ....30

    F.    A Class Action Is Not the Superior Method for Adjudicating This
        Dispute...............................................................................................31

    G.    An Injunctive Relief Class Cannot Be Certified ................................33

V.    CONCLUSION..............................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs.*,
  731 F.3d 952 (9th Cir. 2013) .......................................................... 9

*Ades v. Omni Hotels Mgmt. Corp.*,
  No. 2:13-CV-02468-CAS, 2014 WL 4627271 (C.D. Cal. Sept.
  8, 2014) ................................................................................... 10, 25

*Brinkley v. Monterey Fin. (cont'd) Servs., LLC*,
  No. 16-cv-1103-WQH-WVG, 2020 WL 1929023 (S.D. Cal.
  Apr. 21, 2020) ............................................................................. 12

*Civil Rights Educ. & Enforcement Ctr. v. Hospitality Props. Trust*,
  317 F.R.D. 91 (N.D. Cal. Apr. 15, 2016) *aff'd*, 867 F.3d 1093
  (9th Cir. 2017).............................................................................. 35

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) .............................................. 9

*In re Countrywide Fin. Corp. Mortg. Mktg. and Sales Practices
  Litig.*,
  277 F.R.D. 586 (S.D. Cal. 2011) ..................................................... 9

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)...................................................................... 31

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .......................................................... 9

*Faulkner v. ADT Sec. Servs., Inc.*,
  706 F.3d 1017 (9th Cir. 2013) ...................................................... 13

*Flanagan v. Flanagan*,
  27 Cal. 4th 766 (2002) ............................................................ 12, 14

*Franklin v. Ocwen Loan Servicing, LLC*,
  No. 18-CV-03333-SI, 2020 WL 3316058 (N.D. Cal. June 18,
  2020) ............................................................................................ 11

*Gen. Tel of Sw. v. Falcon*,
  457 U.S. 147 (1982)........................................................................ 9

ii

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998), *overruled on other grounds by
Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)....................................28

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ...............................................................25, 28

*Harris v. Vector Mktg. Corp.*,
753 F. Supp. 2d 996 (N.D. Cal. 2010)........................................................28

*Hataishi v. First Am. Home Buyer's Protection Corp.*,
223 Cal. App. 4th 1454 (2014) .............................................................12, 16

*Jovel v. Boiron, Inc.*,
No. 11-CV-10803-SVW-SHX, 2014 WL 1027874 (C.D. Cal.
Feb. 27, 2014) ..................................................................................29

*Kamar v. RadioShack Corp.*,
375 F. App'x 734 (9th Cir. 2010) ..............................................................26

*Kassover v. Computer Depot, Inc.*,
691 F. Supp. 1205 (D. Minn. 1987)...........................................................30

*Kearney v. Salomon Smith Barney*,
39 Cal. 4th 95 (2006) ...............................................................16, 17, 18

*Kevari v. Scottrade, Inc.*,
No. CV 18-819-JFW(GJSx), 2018 WL 6136822 (C.D. Cal.
Aug. 31, 2018) ..................................................................................26

*Kight v. Cashcall, Inc.*,
200 Cal. App. 4th 1377 (2011) ...............................................................13

*Kight v. CashCall, Inc.*,
231 Cal. App. 4th 112 (2014) .............................................................12, 20

*Lubin v. Sybedon Corp.*,
688 F. Supp. 1425 (S.D. Cal. 1988)...........................................................30

*Maghen v. Quicken Loans Inc.*,
94 F. Supp. 3d 1141 (C.D. Cal. 2015) ....................................................16, 18

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*,
No. 12-cv-01685-BAS (JLB), 2016 WL 2610107 (S.D. Cal.
May 6, 2016), *aff'd*, 926 F.3d 528 (9th Cir. 2019)................................*passim*

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*,
  No. 12-cv-01685-BAS (JLB), 2016 WL 4886933 (S.D. Cal.
  Sept. 15, 2016) .............................................................24

*In re Netflix, Inc. Sec. Litig.*,
  No. 12-0225 SC, 2012 WL 1496171 (N.D. Cal. Apr. 27, 2012).............25, 26

*Olagues v. Russoniello*,
  770 F.2d 791 (9th Cir. 1985) .........................................34

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .........................................34

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
  No. CV 92-3970-DWW(GHKX), 1993 WL 623310 (C.D. Cal.
  Sept. 30, 1993) .......................................................30, 31

*Raffin v. Medicredit, Inc.*,
  2017 WL 131745 (C.D. Cal. Jan. 3, 2017) ........................18, 19, 25

*Reyes v. Educ. Credit Mgmt. Corp*,
  322 F.R.D. 552 (S.D. Cal. 2017), *vacated on other grounds by*
  773 F. App'x 989 (9th Cir. 2019) .................................10, 34

*Reyes v. Educ. Credit Mgmt. Corp.*,
  773 F. App'x 989 (9th Cir. 2019) .................................28

*Romero v. Securus Techs., Inc.*,
  331 F.R.D. 391 (S.D. Cal. 2018) .................................25

*Saulsberry v. Meridian Fin. Servs., Inc.*,
  No. CV146256JGBJPRX, 2016 WL 3456939 (C.D. Cal. Apr.
  14, 2016) ...............................................................*passim*

*Savino v. Computer Credit, Inc.*,
  164 F.3d 81 (2d Cir. 1998) .........................................29

*Searcy v. eFunds Corp.*,
  No. 08 C 985, 2010 WL 1337684 (N.D. Ill. Mar. 31, 2010).........................28

*Smith v. LoanMe, Inc.*,
  43 Cal. App. 5th 844, 855 (2019), *review granted*, No.
  S260391, 2020 WL 1608928 (Cal. Apr. 1, 2020) ............................11, 12, 35

*Torres v. Nutrisystem, Inc.*
  289 F.R.D. 587 (C.D. Cal. 2013)...........................................*passim*

iv

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...............................................................8, 9, 10

*Zaklit v. Nationstar Mortgage LLC*,
    No. 515CV2190CASKKX, 2017 WL 3174901 (C.D. Cal. July
    24, 2017) ...............................................................18, 19, 25

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) .........................................................9

**Statutes**

2 Data Sec. & Privacy Law § 12:10 (2019)........................................15

2 Data Sec. & Privacy Law § 12:12 (2019)........................................15

California Penal Code § 632 ........................................................*passim*

California Penal Code § 636 ........................................................25

California's Rosenthal Fair Debt Collection Practices Act ...........................8, 31

HIPAA...............................................................................*passim*

**Other Authorities**

45 C.F.R. § 164.501 .................................................................15

45 C.F.R. § 164.502 .................................................................15

Fed. R. Civ. P. 23 ................................................................*passim*

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# I.    INTRODUCTION

No class should be certified in this case for a multitude of reasons, each of which alone is sufficient to warrant denial of Plaintiff's motion.

First, Plaintiff Michael Mendell has failed to establish that common issues related to the key elements of his California Penal Code Section 632 or 632.7 claims—particularly confidentiality and consent—predominate over individual ones.  As the record demonstrates, the opposite is true.  In fact, AMR has provided overwhelming evidence including a sample of 20 call recordings demonstrating that numerous individual fact issues related to those key elements permeate the entire putative class of potentially tens of thousands of members.  For example, for each class member, the Court will need to determine, *inter alia*: (1) whether the putative class member reasonably expected that the call would be recorded based on numerous factors; (2) which script was used on the call; (3) whether the putative class member consented either expressly or impliedly to the call recording; (4) whether the putative class member had a previous relationship with AMR; and (5) whether the putative class member received a call from one of AMR's third-party debt collection agencies.  Moreover, a review of just a few of the recordings from Plaintiff's own so-called "semi-random sample" analysis proves the point that individual issues predominate on the issue of consent because they show that multiple call scripts—each of which included a recording disclosure—were in use throughout the class period.  In fact, as the evidence shows, call recipients in several of these recordings ***affirmatively consent*** to having that call recorded.  Simply put, individual issues of confidentiality and consent will overwhelm and predominate over common issues in this case, requiring the Court to conduct potentially endless mini-trials and resulting in a manageability nightmare.

Second, Plaintiff is neither a typical nor an adequate class representative.  Indeed, he suffers from numerous incurable defects.  Incredibly, he has been put forth as a class representative even though he is not even a member of his own class.  Plaintiff tries to minimize and conceal this fatal deficiency in a footnote by claiming it is irrelevant that

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

he received an outbound call to resolve an unpaid balance for AMR's services in 2017, *a year before the class period*, during which he was *immediately* advised that the call was being recorded.  But this undisputed fact establishes that Plaintiff cannot represent a class that he is not even a part of.  Further, his conflicting accounts of what transpired on the calls he did receive during the class period, not to mention his many statements under oath that were either patently untrue or established that the allegations in his pleadings are, in fact false, demonstrate his fundamental untrustworthiness to adequately represent the class.  Worse still, Plaintiff is pursuing claims in a separate state court action based on similar facts to those alleged here, and is putting his own interests ahead of the class, raising intraclass conflicts and unique defenses to his claims.  As a result, Plaintiff's claims are not typical of the class and he is inadequate to represent their interests.

And last, but certainly not least, a class action is simply not the superior method for adjudicating the claims here.  Aside from the numerous obstacles discussed above, Plaintiff has no workable solution for determining class membership or which of the potentially tens of thousands of class members consented to calls being recorded, which is an intensive fact issue.  His expert declares that class membership and consent can be determined by using call records data produced by non-party LiveVox and by using IBM Watson transcription.  Hansen Decl. ¶ 19.  But this is simply not true.  As LiveVox has declared under oath, the LiveVox data does not contain that information and Plaintiff's expert fails to account for the error rate associated with IBM Watson (which is not even HIPAA compliant).  Siegel Decl. ¶¶ 5-6, Tatos Decl. ¶ 107-18.

Plaintiff's request to certify an injunctive relief class under Rule 23(b)(2) fares no better. AMR modified its procedures well before this litigation commenced and Plaintiff has not shown any reasonable expectation that the practice will recur.  The practice complained of (a purportedly "delayed" notification of recording) is therefore moot.

For these reasons, and the reasons discussed in detail below, the Court should deny Plaintiff's Motion for Class Certification.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## II.     STATEMENT OF FACTS

### A.     Overview of AMR's Business and Billing Practices

AMR provides quality medical care, primarily in the areas of emergency medical transport and patient relocation services.  Its emergency medical professionals and healthcare teams work with cities, counties, fire departments, and others to ensure they receive service with the highest level of care.

AMR's Revenue Cycle Management team oversees the billing practices arising from a customer's use of AMR's transportation services.  Marder Decl., Ex. 8 at 10:25-11:7.  The Revenue Cycle Management team has engaged Centrex Revenue Solutions LLC, a subsidiary of Integra Connect, LLC ("Integra"), as the entity that manages billing and collections operations on behalf of AMR, which includes correspondence and communications with AMR's customers.  *Id.* at 16:16-17:3; *id.*, Ex. 7 at 18:7-11. Integra, in turn, has engaged Omega Healthcare Management Services ("Omega") to manage call center operations related to AMR's billing practices.  *Id.*, Ex. 7 at 53:3-10.

### 1.     AMR's Billing and Collections Cycle

A typical billing cycle begins once an individual's transport is complete, at which time his or her Patient Care Report ("PCR") is electronically provided by AMR to Integra—which will then upload the PCR into a proprietary billing system, Jaguar, for coding purposes and bill plan assignment.  *Id.* at 17:20-18:25; *id.*, Ex. 8 at 17:21-19:3. The PCR contains certain information, including name, insurance information (if any), and trip details.  *Id.*, Ex. 8 at 17:21-19:3.  It also includes a notification identifying the many ways used by AMR to resolve outstanding balances.  *Id.*  The Jaguar system is thus the repository for an individual's full record, including name, phone number, trip details, and comments.  *See* Marder Decl., Ex. 9 at 143:3-144:3.

Once an account is assigned a billing plan, correspondence is sent to AMR customers seeking insurance information and/or payment information.  *Id.* at 34:7-34:25.  If an individual's unpaid balance has not been resolved via correspondence, the account may be assigned to one of the call centers run by Omega and added to an

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

outbound dialer list for follow up.  *See id.*, Ex. 7 at 52:14-53:2.  Generally, once a phone number is in the outbound dialer, several call attempts are made to individuals to obtain insurance information or otherwise resolve unpaid balances for use of AMR's services. Patil Decl. ¶ 5.

If it is determined that payment cannot be collected, an individual's account is closed and then transferred to one of AMR's collection agencies, including (as relevant here) Credence Resource Management ("Credence"), Bay Area Credit Services, Inc., and Wakefield & Associates, Inc.  Marder Decl., Ex. 7 at 51:15-19; *id.*, Ex. 8 at 47:17-48:19; Patil Decl. ¶ 5.

### 2.   LiveVox Dialing System

The call centers use LiveVox technology to dial and record calls made on behalf of AMR as part of the billing cycle.  Marder Decl., Ex. 7 at 55:4-22; *id.*, Ex. 9 at 37:10-38:7.  LiveVox stores only limited information like an individual's phone number and the time of the call, but it does not contain any other personal information; that exists only in the Jaguar system.  *Id.* at 37:14-38:13, 68:22-69:17.  As a result, when making an outbound call, a representative first selects a phone number in LiveVox's queue, then looks up the individual's phone number in Jaguar to obtain account details.  *Id.* at 44:8-20.

### B.   Policies and Procedures for Call Center Operations

Integra and Omega maintain robust practices and procedures for the call centers, ensuring both compliance with relevant laws and AMR's high standard for customer service.  *See* Patil Decl. ¶ 6.  They account for a number of different topics, including but not limited to: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Swigart Decl, Ex. 4.  Call representatives are trained extensively on each of these subjects during a multi-week classroom and practical education schedule, and periodically for any significant procedural changes after the initial training.  *Id.*

In addition to training, representatives are provided standardized scripts for all

4

calls to ensure that the representatives are complying with all relevant laws and AMR's high standard for customer service.  For outbound calls, the standardized scripts comprise various parts, including, *inter alia*: (1) a standard call opening; (2) specific language for obtaining insurance information; (3) specific language for each payment plan; and (4) a standard call closing.  Swigart Decl., Exs. 1-3.

As relevant here, one of the many important features in the outbound call scripts used by representatives is that the standard call opening contains at the outset of every call: (1) a notification that the call is being recorded;[1] and (2) a verification of an individual's identity prior to the exchange of any information potentially protected under HIPAA ("PHI").  Marder Decl., Ex. 9 at 166:7-16.  During the class period, between July 1, 2018 and July 31, 2019, three slightly different versions of the standard opening script were used by call representatives as follows:

Patient Business Services Script 1 (PBS1) was in use for all outbound calls made prior to July 1, 2018 through roughly July 31, 2018.  *Id.* at 127:16-20.  The standard language used in PBS1 contained: (1) a notification that the call was being recorded, (2) an announcement that the call was being made from Patient Business Services, and (3) verification of an individual's identity.  Swigart Decl., Ex. 1.  Sometime around July 1, 2018, a decision was made to modify the opening script and reverse the order of the notification with the identity verification.  Marder Decl., Ex. 9 at 127:23-25, 128:23-129:1.

Call representatives were trained on the revised script, Patient Business Services Script 2 ("PBS2"), in groups starting on July 15, 2018.  Patil Decl. ¶ 7.  PBS1 was thus phased out (but still in use) between July 15, 2018 and July 31, 2018 as representatives were trained on PBS2.  Marder Decl., Ex. 7 at 85:12-25; *id.*, Ex. 9 at 131:7-13.  PBS2

---

[1] Representatives also utilize similar scripts for receiving inbound calls.  One key difference is that the call opening for an inbound call does not contain a notification that the call is recorded because a caller receives an automated notification that the call is being recorded prior to connecting to a representative on every inbound call.  Defs.' Response to Interrog. No. 12.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

was in use from roughly July 1, 2018 to July 31, 2019.  *See id.*, Ex. 9 at 127:23-128:20. In other words, there was an overlap in times during the class period where both PBS1 and PBS2 were in use.  Patil Decl. ¶ 7.  In Spring 2019, a decision was made to modify the opening script and once again reverse the notification and identity verification.  *See* Marder Decl., Ex. 9 at 166:1-4; Patil Decl. ¶ 8.

Accordingly, in April 2019, groups of call representatives began training on a third opening script, Customer Care Script ("CC").  Marder Decl., Ex. 9. at 166:4-6. That script began with reading the notification and an announcement that the representative was calling from "Customer Care" prior to identity verification.  Swigart Decl., Ex. 3.  PBS2 was therefore phased out (but still in use) while CC was phased in, starting in April 2019.  *See* Marder Decl., Ex. 9 at 166:4-6.  Again, there was an overlap in the class period where PBS2 and CC were in use.  *Id.*  Since April 2019, no further changes to the opening script have been made.  Patil Decl. ¶ 9.

Notably, although revisions were made to the standard opening scripts used by call representatives, the script always contained both the notification of recording and the identity verification.  *See* Marder Decl., Ex. 9 at 166:7-16.

## C.    Plaintiff's Use of AMR's Medical Transport Services and Related Communications

On January 19, 2017, Plaintiff received an emergency medical transport from AMR.  Marder Decl., Ex. 5 at 122:22-123:23; *id.*, Ex. 11.  Following this service, and unable to resolve Plaintiff's unpaid balance for the trip, AMR referred Plaintiff's account to Credence, a debt collection agency.  Marder Decl., Ex. 13, at 74:9-75:9. Credence placed seven calls unsuccessfully in its efforts to reach Plaintiff and resolve the outstanding balance with AMR.  Two calls were made on May 15, 2017 and May 17, 2017 to Plaintiff's phone number ███████[2]  Marder Decl., Ex. 13 at 79:24-81:1; *see also id.*, Ex. 14 at CRM000005-6.  On May 15, Credence reached Plaintiff's

---

[2] Plaintiff has testified that this is his phone number, and that the calls Credence made to this number connected to his phone.  *See* Marder Decl., Ex. 5 at 137:5-19.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

voicemail.  *Id.*, Ex. 16; *id.*, Ex. 13 at 82-83; 85:8-13; *id.*, Ex. 5 at 124:19-21.

Two days later, on May 17, 2017, a Credence representative, on behalf of AMR, called Plaintiff to resolve his outstanding balance with AMR; this time making a live connection. *Id.*, Ex. 17; *id.*, Ex. 13 at 85-88.  ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████  *Id.*, Ex. 17; *id.*, at 85: 3-7; *id.*, Ex. 5 at 127:22-128:13.  Plaintiff has since repeatedly testified that ████████████████████

███████████████████████████████████  *Id.*, Ex. 5 at 131:24-132:25; *id.* at 137:22-25.  But Plaintiff also testified that ███████████████

████████████████████████████████████████████

████████  *Id.* at 128:14-16, 157:1-12.

On October 28, 2018, Plaintiff received his second emergency medical transport from AMR.  *Id.*, Ex. 10.  On November 12, 2018, a representative from Omega made an outbound call on behalf of AMR to Plaintiff to confirm certain demographic and insurance information.  Patil Decl., Ex. P1A.  ████████████████████████

█████████████████████████████████████████  *Id.*

████████████████████████████████████████████

████████████████████  *Id.*  During the November 12 call, neither Plaintiff nor the representative discussed anything about the medical assistance provided by AMR, or about health or medical information.  *Id.*  Indeed, contrary to the allegations in the SAC,[3] Plaintiff testified that █████████████████████████████

████████████████████████████████  *Id.*, Ex. 5 at 112:21-113:7.

Shortly after the November 12 call, Plaintiff's bankruptcy counsel, Daniel Shay, called AMR on Plaintiff's behalf and learned via an automated message that is played on all inbound calls that AMR records its calls.  *Id.*, at 92:19-93:5; *see also* Patil Decl.,

---

[3] *See* SAC ¶34 ("Defendant covertly recorded telephone calls with Plaintiff, in which [he] proffered … information considered [HIPAA protected] PHI […]")

Ex. P1B.  Then, at 12:44 p.m. PST that same day, Mr. Shay sent a letter to two generic AMR email addresses, which provided that Plaintiff, ██████████████████████ ███████████████████  Marder Decl., Ex. 6.  Mr. Shay attached to this letter a "Third Party Authorization Limited Power of Attorney" signed by Plaintiff on October 26, 2018.  *Id.*; *see also*, *id.*, Ex. 5 at 115:12-23.

On November 14, 2018, not having received Mr. Shay's November 12 letter, a call representative called Plaintiff a final time.  Patil Decl., Ex. P1D.  During this call, the representative stated that she was calling for AMR and informed Plaintiff the call was regarding the October 28 transport.  *Id.*; Marder Decl., Ex. 5 at 77:17-21.  Pursuant to AMR's procedures, the representative sought to confirm Plaintiff's identity and notify him that the call was being recorded.  Before she could do so, Plaintiff angrily responded, "████████████████████████████████████████████ ████████████████████████████████████████████████ ████████" and ended the call.  *Id.* at 78:16-20; Patil Decl., Ex. P1D.  As confirmed by the recording of that phone call, no PHI was discussed on this call, nor did the representative ever threaten Plaintiff or suggest she would contact his employer, notwithstanding Plaintiff's unfounded testimony to the contrary.  *Id.*

Plaintiff filed for bankruptcy in February 2019, and AMR discharged his debts shortly thereafter.  Marder Decl., Ex. 3 at 40:12-23.  Making good on his November 14, 2018 threat, Plaintiff filed this lawsuit against AMR on July 1, 2019.[4]

## III.  LEGAL STANDARD

A class action suit is an exception to the general rule that litigation is conducted by and on behalf of individual named parties only.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  To justify departing from that rule, "a class representative must

_____

[4] On July 19, 2019, Plaintiff also filed an action against AMR for alleged violations of California's Rosenthal Fair Debt Collection Practices Act in the Superior Court for the State of California County of San Diego, Case No.: 37-2019-00037628-CU-MC-CTL.  Marder Decl., Ex. 1.  Plaintiff's causes of action in the state court matter arise from the same set of operative facts at issue in this litigation.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

be part of the class 'and possess the same interest and suffer the same injury' as the class members." *Id.* at 348-49 (citation omitted).

A named plaintiff must therefore meet two sets of class-certification requirements under Federal Rules of Civil Procedure 23(a) and (b).  First, Rule 23(a) provides four necessary prerequisites that must be satisfied to certify a class: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 956 n.4 (9th Cir. 2013).  And a named plaintiff must establish that one or more grounds for maintaining the action are met under 23(b), including: (1) risk of substantial prejudice; (2) injunctive relief; and/or (3) common issues predominate over individual ones.  *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 937 (C.D. Cal. 2015).

Rule 23 is not a "mere pleading standard."  *Dukes*, 564 U.S. at 350.  Indeed, the named plaintiff bears the burden of affirmatively demonstrating compliance with the rule.  *Id.*; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). The Court must therefore engage in a "rigorous analysis," often requiring some evaluations of the merits of the underlying claims prior to determining whether a class can be certified.  *Dukes*, 564 U.S. at 351; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011).  "If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, certification should be refused."  *In re Countrywide Fin. Corp. Mortg. Mktg. and Sales Practices Litig.*, 277 F.R.D. 586, 594 (S.D. Cal. 2011) (citing *Gen. Tel of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

Here, Plaintiff has failed to satisfy his burden with respect to Rule 23's requisite elements[5] and class certification should therefore be denied.

## IV.   ARGUMENT

### A.   Plaintiff Fails To Establish Commonality or that Common Issues Predominate Over Fact Intensive Individual Ones

Rule 23(a) requires Plaintiff to show that there are questions of law or fact

---

[5] Defendant AMR does not challenge the numerosity element.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

common to the class.  Fed. R. Civ. P. 23(a)(2).  "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349 (citation omitted).  Properly interpreted, "[w]hat matters…is not the raising of common 'questions'…, but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Id*. at 350 (citation omitted).  A "common contention" "capable of classwide resolution" thus "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

The predominance test under Rule 23(b) is similar but "far more demanding" than the commonality test: it focuses on the "relationship between the common and individual issues" and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  *Reyes v. Educ. Credit Mgmt. Corp*, 322 F.R.D. 552, 559-60 (S.D. Cal. 2017), *vacated on other grounds by* 773 F. App'x 989, 989-90 (9th Cir. 2019); *see also NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*, No. 12-cv-01685-BAS (JLB), 2016 WL 2610107, at *6 (S.D. Cal. May 6, 2016), *aff'd*, 926 F.3d 528 (9th Cir. 2019).  This ensures that there is "clear justification" for resolving the issues in a single adjudication.  *NEI Contracting*, 2016 WL 2610107, at *6.  Importantly, common issues do not predominate if the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.  *Reyes*, 322 F.R.D. at 360 (internal citation omitted).  In other words, a class cannot be certified even where common questions of law exist, but are outbalanced by individual questions.  *Ades v. Omni Hotels Mgmt. Corp.*, No. 2:13-CV-02468-CAS, 2014 WL 4627271, at *8 (C.D. Cal. Sept. 8, 2014).

Here, individualized issues will overwhelm the Court as numerous fact-specific questions related to confidentiality (section 632) and consent (sections 632 and 632.7) must be resolved for each of the potentially tens of thousands of class members.  Given the overwhelming number of individual issues related to confidentiality and consent, as

we demonstrate below, certification should be denied on that critical element alone.

### 1. Plaintiff Improperly Conflates Penal Code Sections 632 and 632.7

Plaintiff seeks to certify two classes under Cal. Pen. Code sections 632 and 632.7. In his Motion, Plaintiff's arguments concerning commonality and predominance are misleading, *inter alia*, in one fundamental respect: Plaintiff presents those arguments as though only one standard applies to both penal code sections. Mem. at 9-10. That is simply not the case. The standards for certifying a class under sections 632 and 632.7, while overlapping in some respect, do not co-exist in others. First, with respect to Plaintiff's claim under section 632, that statutory provision applies to all phones and prohibits the intentional recording of a "confidential communication" without the consent of all parties. *Id.* § 632(a). Section 632.7, on the other hand, applies only to cell phones and cordless phones and similarly prohibits the intentional recordation of a communication without the consent of all parties. *Id.* § 632.7. Although Plaintiff seeks certification of a class under both statutes, section 632.7 arguably does not even prohibit companies like AMR from recording conversations with their customers, given the legislative history that demonstrates it was intended to establish criminal penalties for eavesdroppers. Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 1431 (1985-1986 Reg. Sess.) Aug. 19, 1985, p. 1; Legis. Analyst, analysis of Sen. Bill No. 1431 (1985-1986 Reg. Sess.) as amended Aug. 27, 1985). Indeed, a Court of Appeal recently held that the two parties to a call cannot violate section 632.7 for that very reason: holding the section applies ***only*** to third-party eavesdroppers. *Smith v. LoanMe, Inc.*, 43 Cal. App. 5th 844, 855 (2019) ("The Legislature was not interested in recording by parties. The Legislature was targeting recording by eavesdroppers[.]"), *review granted*, No. S260391, 2020 WL 1608928, at *1 (Cal. Apr. 1, 2020).[6]

---

[6] The *Smith v. LoanMe* order from the Court of Appeal may be outcome determinative of Plaintiff's section 632.7 claim. If the Supreme Court affirms the order, Plaintiff cannot state a claim as a matter of law because the outbound calls at issue would be between only parties to a call, and thus incapable of violating section 632.7. Accordingly, to the extent that the Court may be inclined to grant certification of the 632.7 class here, which we respectfully submit would be improper, AMR requests a stay

11

In any event, even assuming Plaintiff can seek certification of a class under section 632.7, it is notable that, while both sections 632 and 632.7 prohibit the intentional recordation of a call without the consent of all parties, only section 632 requires that the communications be "confidential."  AMR will, therefore, first address why a class cannot be certified under section 632 because of the numerous individual issues that predominate with respect to confidentiality, and then address the issue of consent under both sections.

2.   <u>Individualized Issues Related To Confidentiality Predominate</u>

The California Supreme Court has made clear that for a conversation to qualify as "confidential" under section 632, a party to a recording must have an "objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 778 (2002).  Whether a party has an objectively reasonable expectation is generally a "question of fact" concerning the "particular circumstances" surrounding each call and assesses "numerous specific factors," such as the "length of the customer-business relationship, the customer's prior experiences with business communications, and the nature and timing of the recorded disclosures."  *See Hataishi v. First Am. Home Buyer's Protection Corp.*, 223 Cal. App. 4th 1454, 1466 (2014); *Kight v. CashCall, Inc.*, 231 Cal. App. 4th 112, 130 (2014) ("[A] trier of fact would have to determine whether a person ***under the particular circumstances and given the background and experience of each plaintiff*** would have understood that [a] particular call was [being recorded].") (emphasis in original).  Because this fact-specific

---

of that claim pending the outcome of the Supreme Court's review.  *See, e.g., Franklin v. Ocwen Loan Servicing, LLC*, No. 18-CV-03333-SI, 2020 WL 3316058, at *1 (N.D. Cal. June 18, 2020) (staying putative class action pending Supreme Court's resolution of *Smith v. LoanMe* on the grounds that it will simplify the issues in the case without prejudicing either party ); *Brinkley v. Monterey Fin. (cont'd) Servs., LLC*, No. 16-cv-1103-WQH-WVG, 2020 WL 1929023, at *5-6 (S.D. Cal. Apr. 21, 2020) (staying putative class action  because "the outcome of the California Supreme Court's decision in *Smith* has a decisive effect on the viability of one of [plaintiff's] two remaining claims, potentially narrowing the issues for trial and simplifying the issues in this case").

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

analysis focuses on a ***party's*** objectively reasonable expectation, the content of a call does not necessarily determine its confidentiality.  *See Flanagan*, 27 Cal. 4th at 776.

In the Ninth Circuit, courts rarely certify claims arising under section 632, finding that individualized issues predominate.  *See, e.g., Saulsberry*, 2016 WL 3456939, at *16 ("The individual nature of the objective expectations inquiry precludes the Court from being able to resolve any potential common issues involving those putative [] [c]lass members.");  *Torres v. Nutrisystem, Inc*. 289 F.R.D. 587, 593 (C.D. Cal. 2013) (citing *Kight v. Cashcall, Inc*., 200 Cal. App. 4th 1377, 1396 (2011)); *see also Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1020 (9th Cir. 2013).  In *Torres*, for example, the Court found that individual inquiries required to resolve confidentiality (and consent) issues would "dominate" the litigation and denied certification on that basis.  *Torres*, 289 F.R.D. at 594-95 (holding that neither commonality nor predominance requirements were met).  The court's analysis also set forth a host of different issues illustrating the "detailed factual inquiry" required to determine whether a class member had a reasonable expectation that a call would be recorded, including: whether class members would have an expectation that their calls would be recorded given common business practices; the length of a putative class member's relationship with the defendant; and/or whether a class member previously heard a recording notification from the defendant.  *Id.* at 592-93.  And, the Court further observed that individual fact issues would predominate ***even if*** the class were limited to those persons who never previously called Defendant.  *Id.* at 593.

Plaintiff tries to circumvent *Torres* and the numerous other decisions denying certification of section 632 claims by arguing that all conversations of outbound calls made on behalf of AMR "involve Protected Health Information [(PHI)]" and are confidential "as a matter of law" by virtue of the enactment of HIPAA.  *See* Mem. at 1. Tellingly, Plaintiff cites no authority whatsoever to support this proposition.  Without any legal support, Plaintiff argues that the recordings at issue here are confidential under section 632 because (1) the recordings may contain PHI; (2) AMR maintains a Notice of

13

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Privacy Practices; (3) AMR "shares" PHI of its patients with Integra and Omega; and (4) AMR designated the recordings confidential under the protective order in this action. Mem. at 1-2. But this argument ignores the governing case decisions which focus on objective expectations—that is, a class member's own reasonable expectations in the particular circumstances of his or her call.

Under an objective test based on reasonable expectations, the fact that outbound calls made on behalf of AMR may have involved PHI does not alone render the call "confidential" under section 632. *See Flanagan*, 27 Cal. 4th at 776 (holding that section 632 "protects against intentional, nonconsensual recording of telephone conversations ***regardless of the content of the conversation***") (emphasis added). At best, it is just one of "numerous specific factors" the Court may analyze to resolve whether a call was "confidential."

Here, to determine whether a class member had a reasonable expectation that a call was being recorded and was confidential under section 632, the Court would have to conduct individual mini-trials to resolve, among other things, fact issues as to: (1) whether an AMR customer understood the notification that the call would be recorded; (2) whether an AMR customer understood from a PCR that the calls would be recorded, given the lengthy disclaimer about the many ways in which AMR may resolve unpaid balances; (3) whether an AMR customer had previously used its services; and/or (4) whether an AMR customer understood that recordings of calls related to payments is a common business practice.[7] And, as noted, a trier-of-fact would also have to resolve whether PHI was actually exchanged on each class member's call. Plaintiff's own testimony illustrates the fact-intensive nature of this inquiry. Indeed, Plaintiff was unable to identify any exchange of PHI in any of the recordings of his conversations with representatives making calls on behalf of AMR. Marder Decl., Ex. 5 at 112:21-

---

[7] For instance, Plaintiff testified that ██████████████████████████████
████████████████████ Marder Decl., Ex. 3 at 147:1-148:2.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

113:7.  This testimony belies any claim that Plaintiff himself, let alone *all* putative class members necessarily exchanged HIPAA-protected PHI with AMR during outbound calls.

Moreover, Plaintiff's unsupported claim that the calls at issue contain PHI (and are therefore common to the putative class) and are confidential is also contradicted by the exceptions set forth in the regulations implementing HIPAA.  First, HIPAA is not violated where information deemed PHI is only shared with the patient himself.  *See* 45 C.F.R. § 164.502.  Second, HIPAA is not violated where, as here, such information is shared for the purpose of billing services.  The regulations implementing HIPAA define "payment" as including activities undertaken by a healthcare provider, like AMR, to obtain or provide reimbursement for the provision of health care and to determine insurance coverage and "*[b]illing, claims management,* **[and]** *collection activities*…." 45 C.F.R. § 164.501 (emphasis added); *see also* 2 Data Sec. & Privacy Law § 12:10 (2019) ("HIPAA … recognize[s] … disclosures to which an individual … consents by entering the health care system, such as the use of his or her information … to seek reimbursement for that treatment").[8]

And, finally, AMR's designation of the audio recordings in this matter as confidential pursuant to the protective order on file does not constitute an admission, express or implied, that the information or exchange of information during those recordings necessarily means that the information was PHI, or that the calls are "confidential" for the purposes of section 632.  *See Torres*, 289 F.R.D. at 594 (noting it would be "nonsensical to conclude" that defendant's designation of recordings as

---

[8] Plaintiff also misses the mark by making a vague and irrelevant argument that HIPAA was somehow violated by virtue of information having been shared with Integra and Omega during the course of AMR's business.  Mem. at 5.  But HIPAA is not violated where such information is shared with agents of AMR that are designated Business Associates—as both Integra and Omega are here.  *See, e.g., also* 2 Data Sec. & Privacy Law § 12:12 (2019) ("[A] covered provider may disclose [PHI] to a collection agency, so that the collection agency is able to resolve a dispute as to payment amount, without first obtaining an authorization from the individual because such an activity is considered a payment activity").

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

confidential meant they were confidential under 632—where confidentiality is based on the *caller's* expectation).

In sum, Plaintiff's claim that the calls at issue are confidential "as a matter of law" and therefore not reasonably expected to be recorded by every single class member holds no water. As in *Hataishi* or *Torres*, when making a determination on the critical element of confidentiality, "numerous specific factors" must be assessed to determine each class member's reasonable expectation as to whether a call made on behalf of AMR would be overheard or recorded. Because individualized issues predominate as to that issue, Plaintiff's claims under section 632 must be denied on that basis alone.

### 3.   Individualized Issues Related to Consent Predominate

Individualized issues similarly predominate with respect to a key element of both sections 632 and 632.7 claims: consent. Whether a class member has consented, expressly or implicitly, to the recording of an outbound call made on behalf of AMR is a fact-intensive issue that must be analyzed in light of the surrounding circumstances of each call to determine whether the parties to the call knowingly agreed to the recording. *NEI Contracting*, 2016 WL 2610107, at *7; *Torres*, 289 F.R.D. at 594-95.

Consent can be established in myriad ways. For example, a business that adequately advises or notifies "all parties to a telephone call, at the outset of the conversation, of its intent to record the call" would not violate sections 632 or 632.7. *Kearney v. Salomon Smith Barney*, 39 Cal. 4th 95, 118 (2006). But such notification is "not necessary . . . in every circumstance." *Maghen v. Quicken Loans Inc.,* 94 F. Supp. 3d 1141, 1145 (C.D. Cal. 2015). Thus, consent may also be established where, among other things: a party is aware of common business practices concerning recordings; a party heard a notification of recording and stayed on the line to finish a call; a party heard a notification of recording on one call and placed or received subsequent calls. *See Torres*, 289 F.R.D. at 594; *NEI Contracting*, 2016 WL 2610107, at *7-8.

Here, there is no question but that individualized issues related to consent predominate given (1) the individual fact scenarios presented above that run through the

16

class; and (2) evidence submitted by AMR in support of its opposition illustrating the prevalence of those scenarios.

> a)   *AMR's policies and procedures provide notification at the outset of its outbound calls*

As an initial matter, as Plaintiff admits, there are no violations of sections 632 or 632.7 where notification that a call is recorded is provided at the "outset of a call." *Kearney*, 39 Cal. 4th at 118; Mem. at 3, 8.  Procedures employed by Integra on AMR's behalf meet this requirement: representatives must provide a verbal notification that the call is being recorded as part of the "opening script" on every outbound call.  *See, e.g.*, Marder Decl., Ex. 12 at AMR_MEN_VOL000014 (Outbound training PP, "Outbound Opening Script"); *Id.*, Ex. 9 at 166:7-16.  And, critically, AMR provides this notification in the opening script regardless of which of the number of scripts is used by a representative at any given time.  *See, e.g.*, Swigart Decl., Ex. 1 (PBS1) (identifying as part of opening script, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.*, Ex. 2 (PBS2) (identifying as part of opening script, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"; *id.*, Ex. 3 (CC) (identifying as part of the opening script, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").  This practice is also consistent with those collection agencies making calls to patients on AMR's behalf seeking payment from those who have used AMR's services.  Marder Decl., Ex. 18 at BACS0000125 (identifying as part of opening script, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id.*, Ex. 19 at WAKEFIELD-1(identifying as part of opening script, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *id.*, Ex. 15 at CMR000066 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

Significantly, Plaintiff himself concedes that this notification appears in each call script used during the class period.  *See, e.g.*, Mem at 2, 6.  And, for the purpose of determining the class, even Plaintiff's own expert testified that it is irrelevant where the notification takes place in the call.  Marder Decl., Ex. 20 at 73:22-74:2 (stating that it is "completely irrelevant" whether the notification was in "the first paragraph or the fourth

17

paragraph" to identify the class); *id.* at 92:16-93:1.  In fact, Plaintiff's expert testified that he would exclude any AMR customer who received a notification, regardless of timing, which would essentially eliminate virtually the entire class.  *Id.*; *See also*, Tatos Decl. ¶ 30.  Despite notification being given during the opening of the scripts, Plaintiff nevertheless claims that AMR has violated sections 632 and 632.7, because the recording was "delayed" when call representatives were using the PBS2 script.  Mem. at 6-7.  According to Plaintiff, there is "substantial case law" interpreting "outset" as used in *Kearney* and a few non-binding case decisions to require that notification be the very first thing stated on a recorded call.  *See* Mem. at 3, 8.

Notably, "outset" is not defined in *Kearney* or subsequent California cases. Plaintiff therefore relies on two Central District cases to manufacture his own definition of "outset" to track the PBS2 script, claiming that notification of recording after verification of identity is not at the outset.  Mem. at 8, 15-16, 21 (citing *Zaklit v. Nationstar Mortgage LLC*, No. 515CV2190CASKKX, 2017 WL 3174901 (C.D. Cal. July 24, 2017); and *Raffin v. Medicredit, Inc.*, 2017 WL 131745 (C.D. Cal. Jan. 3, 2017)).  But to adopt Plaintiff's interpretation of "outset" in reliance on *Zaklit* and *Raffin* would yield absurd results.  For example, under that interpretation, a violation of the CIPA would occur even if the call recipient was explicitly notified a call was recorded after verifying his or her identity and even if the recipient ***expressly consented*** to that recording.  That result plainly contradicts the purpose of sections 632 and 632.7 and is, in any event, not supported by case law in the Ninth Circuit or this District.[9]

> b)    *Individualized Fact Scenarios Related To Consent Run Through The Putative Class*

During the class period as defined by Plaintiff, it is undisputed that more than one script was used to call class members, including the PBS1 and CC scripts, which

---

[9] Indeed, the *Raffin* court noted that its analysis was inconsistent with other Ninth Circuit cases, such as *Maghen v. Quicken Loans Inc.*, 94 F. Supp. 3d 1141, 1146 (C.D. Cal. 2015), but disagreed with *Maghen* and disregarded any conflicting position in its analysis.  *Raffin*, 2017 WL 131745, at *8 n.8.

18

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

required *immediate* notification that the call was being recorded.  Thus, even assuming *arguendo* that the PBS2 script could be considered a "delayed" notification, a threshold individual issue would still need to be addressed for each of the potentially tens of thousands of class members: that is, determining which script was used on each call. Relying on *Raffin* and *Zaklit*, Plaintiff argues that this is a common issue that does not require individualized proof, but both of those non-binding decisions are factually distinct.[10]  The courts there found that common issues predominated because the defendants had a "***uniform policy*** of recording a conversation without first informing the individual …." *Zaklit*, 2017 WL 3174901, at *8 (emphasis added).  But AMR utilized ***three*** scripts during the class period.  Indeed, despite Plaintiff's oversimplification of the usage of various scripts, *see* Mem. at 3, AMR's 30(b)(6) witnesses testified that the PBS2 script was used ***concurrently*** with other scripts at various times during the class period which provided immediate notice of call recording. *See, e.g.*, Marder Decl., Ex. 9, at 166:4-6.  Moreover, Plaintiff's own so-called "semi-random" sample illustrates that those three scripts were in use during this time.  Mem. at 20; Decl. of J. Swigart, Exs. 10, 11.  Because AMR did not utilize the kind of "uniform" procedure for notification of recording like in *Zaklit* and *Raffin*, these decisions are entirely inapposite.

Further, in addition to determining which call script was used to call each class member, numerous other individual fact issues run through the class.  For example, to determine whether consent was obtained, ***at least*** seven (7) questions must be asked of each of the potentially tens of thousands of class members:

- When was the putative class member called?
- Which script was used on the outbound call for each putative class members?

---

[10] *Saulsberry* is additionally distinguishable on the basis that plaintiffs' class definition there identified putative class members as those who did not receive notification within the first 30 seconds of a call.  2016 WL 3456939, at *13.  No such requirement has been made here.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

- Did the putative class member have a previous relationship with AMR and/or previous ambulance trips with AMR?
- Who placed the outbound call to each putative class member?
- Did any given putative class member make or receive multiple calls to or from AMR during the class period?
- Did a putative class member give explicit consent following a notification that a call was being recorded – regardless of which script was employed at the time of the call?
- Did a putative class member stay on the recorded call after receiving the notification?

In sum, individualized issues concerning the particular circumstances surrounding each call to a putative class member will result in mini-trials on the issue of consent as to each of the potentially tens of thousands of class members creating major obstacles for this Court to efficiently manage this litigation.

### c) *Individualized Issues of Consent Predominate Where Evidence of Consent Is Provided*

Where, as here, substantial evidence of consent is submitted in support of an opposition, this Court and others have often denied certification based on a finding that individualized issues predominate. *NEI Contracting*, 2016 WL 2610107, at *3; *see also Saulsberry*, 2016 WL 3456939, at *15; *Torres*, 289 F.R.D. at 592-93 (finding individualized issues of consent predominated where defendant provided evidence of detailed call histories for several putative class members); *Kight*, 231 Cal. App. 4th at 130.

*NEI Contracting* is directly on point. There, the defendant moved to decertify a section 632.7 class, *inter alia*, based on evidence comprising nine examples of customers who had "actual knowledge" of the defendant's recording practice and then placed additional orders with defendant during the class period. 2016 WL 2610107, at *3-4. This Court found that individualized issues of consent predominated because the

20

totality of the evidence submitted, including the nine examples of consent provided, "illustrate[d] the type and number of individualized inquiries that may be necessary to resolve [that] issue…." *Id.* at *7.   Plaintiff's extensive discussion of the *NEI Contracting* decisions in the Motion acknowledges the point.  *See* Mem. at 11 (arguing "specific concrete non-speculative evidence of consent" would justify denying class certification).  But to try and distinguish *NEI Contracting*, Plaintiff claims "there is no such evidence of consent… in this case."  Mem. at 11.  Plaintiff is mistaken.

In support of its opposition, AMR has submitted 20 examples of recordings it has produced during discovery demonstrating how individualized issues of consent predominate in a multitude of scenarios.  The evidence submitted includes examples of:

- o Patients who affirmatively consented to the calls being recorded after notification. Patil Decl., Exs. P1J (AMR_MEN_VOL008736), P1K(AMR_MEN_VOL016083), P1L (AMR_MEN_VOL022006), P1M (AMR_MEN_VOL003688).[11]

- o Patients who received multiple recording notifications during calls made at any point during the class period.  *Id.,* Exs. P1E (AMR_MEN_VOL019685); P1F (AMR_MEN_VOL000225); P1G (AMR_MEN_VOL000386); P1H (AMR_MEN_VOL011214).

- o Patients who received calls between April 2019 and July 31, 2019—during which time the PBS2 script and the CC scripts simultaneously were in use as call representatives were trained on the latter.  *Id.*, Exs. P1G (AMR_MEN_VOL000386); P1M (AMR_MEN_VOL003688); P1Q (AMR_MEN_VOL000888); Marder Decl., Ex. 9 at 166:4-6.

- o Patients who received calls between Sept. 1, 2018 and July 31, 2019 using the PBS 2 script that Plaintiff claims is at issue in which a caller received

---

[11] The AMR representative on AMR_MEN_VOL003688 identifies themselves as calling on behalf of Rural Metro San Diego.  Rural Metro San Diego is wholly owned by AMR.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

notification of call recording prior to verification. Patil Decl., Exs. P1I (AMR_MEN_VOL005817); P1U (AMR_MEN_VOL008493).

o  Patients who stayed on the line following the notification of recording at any point during the class period. *See, e.g.*, Patil Decl., Exs. P1E-X.

o  Patients who received multiple calls during class period and stayed on the line. *See NEI Contracting*, 2016 WL 3456939 at *7; Patil Decl., Exs. P1N (AMR_MEN_VOL000889), P1O (AMR_MEN_VOL000891), P1P (AMR_MEN_VOL000890), P1Q (AMR_MEN_VOL000888) (calls all made to the same Patient); *see also* P1R (AMR_MEN_VOL001714), P1S (AMR_MEN_VOL001712), P1T (AMR_MEN_VOL001713) (same).

Moreover, several of the calls from Plaintiff's own eighty-four (84) cherry-picked "semi-random" sample also illustrate these various consent scenarios.[12]  For example, at least four recordings from Plaintiff's so-called random sample, whose methodology even Plaintiff's own expert could not understand, (Marder Decl., Ex. 20 at 57:19-20), are calls in which the recipients receive notification that the call is being recorded under the various scripts and then ***affirmatively consent*** to it before continuing with the call. *See* Patil Decl., Ex. P1F (AMR_MEN_VOL000225) (PBS2, ██████████ ██████████████████████████; *Id.*, Ex. P1G (AMR_MEN_VOL000386) (CC, ████████████████████████████); *Id.*, Ex. P1V (AMR_MEN_VOL013787) (PBS2, ████████████████████████); Swigart Decl., Ex. 12 at AMR_MEN_VOL000388 (CC, ████████████ ██████████████.  Additionally, in over half of the calls identified in Plaintiff's sample, recipients received notification of recording on various scripts and

---

[12] As pointed out by AMR's expert, Ted Tatos, Plaintiff's assertion that this sample of 84 call recordings can be used to extrapolate to the experiences of class members on a class-wide basis is unsupportable.  In fact, Plaintiff makes no attempt whatsoever to explain how the 84 calls were selected, or why they are of statistical significance.  *See* Tatos Decl. ¶ 36 ("I do not find any valid statistical basis for extrapolating the results of this "semi-random analysis" to the set of 22k records"); *see also* Marder Decl., Ex. 20 at 57:19-20 ("I don't know what semi-random sampling means.").

stay on the line to complete the call.  *See, e.g.*, *id.*, Ex. P1H (AMR_MEN_VOL011214) (PBS2, receiving notification during first minute of over eight minute call); *see generally*, Swigart Decl., Exs. 10, 11.

Accordingly, like the defendants in *NEI Contracting* who submitted just nine examples of customers actually consenting to the recording of the calls at issue, AMR has provided substantial evidence of consent—along with evidence of consent contained within Plaintiff's semi-random sample—during the class period to show that individualized issues predominate.

### d)    *Plaintiff's remaining arguments are unavailing*

Plaintiff's remaining arguments are irrelevant and otherwise fundamentally flawed.  For example, Plaintiff tries to anticipate a consent defense that was rejected in *Reyes*: that AMR's notification on a prior call can establish a customer's awareness of recording practices and implicit consent on later calls ("prior awareness defense").[13] However, Plaintiff misses the mark when he claims that (1) ambulance services do not lend themselves to ongoing prior relationships, and (2) the class definition limited to first time call recipients excludes instances where prior awareness is an issue.  Mem. at 13.

Plaintiff's own experience demonstrates that ambulance relationships can and do lend themselves to ongoing relationships: he used AMR services in 2017 and 2018.  Marder Decl., Exs. 10, 11.  And, as the record shows, many patients like Plaintiff regularly use such services for ongoing health issues or for transport to and from residential facilities.  For example, Plaintiff's "semi-random" sample contains such a recording; there, the patient stated ███████████████████████  Swigart Decl., Ex. 12 at AMR_MEN_VOL005775.

---

[13] Plaintiff's discussion of a "hold time" defense in *Reyes* is irrelevant here; AMR does not argue that individualized issues predominate based on a "hold time" defense. Mem. at 14.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Plaintiff also tries to skirt the "prior awareness defense" by limiting the class to "first time" call recipients.  To do so, Plaintiff's expert, Mr. Hansen, suggests that the data obtained from LiveVox allows Plaintiff to determine which class members received first-time outbound calls during the class period and, therefore, the class can be so identified and limited.  Hansen Decl. ¶ 18.  But the sworn declaration of Laurence Siegel, the Executive Vice President of Product Development for LiveVox, demonstrates that this is patently false.  Siegel Decl. ¶¶ 5-6 ("LiveVox does not have any … information in its call records that would show whether a call made by a customer was the first call to any particular … phone number.").  Nor does AMR maintain records that would enable identification of class members who received their first call during the class period without reviewing every class member's individual account.  Patil Decl. ¶ 10.  Thus, without a system to identify "first time" call recipients, the Court will need to determine on an ***individual*** basis whether each of the potentially tens of thousands of class members received his or her first call during the class period.

Moreover, Plaintiff fails to address the many other situations in which a putative class member may have consented to a call being recorded, including:

- o  Class members who understood that calls would be recorded by way of experience with bill collection or with other companies;

- o  Class members who understood they may be recorded as a result of the PCR notification. Swigart Decl., Ex. 8.

- o  Class members who receive notification of the recording and continue the conversation without terminating the call.  *See, e.g.*, *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*, No. 12-cv-01685-BAS (JLB), 2016 WL 4886933, at *3 (S.D. Cal. Sept. 15, 2016) ("In the typical implied in fact consent scenario, a party is informed that his call will be recorded, and he continues to use the communication system …").

- o  Class members with an established history with AMR.

Plaintiff fails to acknowledge these situations and dismisses them whole cloth by

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

citing a handful of cases in which courts certified classes by holding that the determination of implied consent did not require individualized inquiries.  Mem. at 14-17, 21-22.  But Plaintiff's cited cases are inapposite.  In several, no notification was given at all during the recorded conversation.  *See, e.g.*, *Ades*, 2014 WL 4627271, at * 2 ("[Defendant] did not have a policy during the Class Period of warning callers that their calls would be recorded."); *see also Romero v. Securus Techs., Inc.*, 331 F.R.D. 391, 399 (S.D. Cal. 2018).[14]  And, in other cases like *Raffin* and *Zaklit*, the defendants had a "uniform" policy regarding notification of recording during the class period—which is not the case here.  *See supra* IV.A.3.b.  In fact, as Plaintiff acknowledges, notification was part of every standardized opening script.  *See* Mem. at 6; Marder Decl., Ex. 9 at 166:7-16.  Thus, limiting the class definition to "first" calls as in *Zaklit* and *Raffin* does not render the treatment of class members "uniform" here.

In sum, AMR has identified numerous fact-specific consent scenarios and provided "concrete" evidence of class members' consent to the recording of calls made on behalf of AMR—all of which would have to be addressed on an individual basis, creating insurmountable obstacles to an efficient adjudication.

### D.    Plaintiff Fails To Meet Rule 23(a)'s Typicality Requirement

While certification should be denied on predominance issues alone, Plaintiff should not be given a "get out of jail free" card on his failure to also establish that his claims are typical of the class.  Under Rule 23(a)(3), typicality is satisfied if a class representative's claims are reasonably co-extensive with those of absent class members, and generally requires that a class representative be a part of the class.  *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV146256JGBJPRX, 2016 WL 3456939, at *12 (C.D. Cal. Apr. 14, 2016).  However, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)

---

[14] *Romero* is, in any event, inapposite as it concerns a claim arising Cal. Pen. Code § 636—which is not at issue here.

(quotation omitted).  "The point of this requirement is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole."  *In re Netflix, Inc., Sec. Litig.*, No. 12-0225 SC, 2012 WL 1496171, at \*5 (N.D. Cal. Apr. 27, 2012).  Significantly, "[t]here is no requirement at this early stage to ***prove a defense***, only to show a degree of likelihood that a unique defense might play a significant role at trial."  *Id.* (emphasis added).  Here, Plaintiff is subject to such a unique defense: he is not a member of the class that he purports to represent.

In his Motion, Plaintiff asks the Court to certify two classes, both of which require that the "***first*** call from Defendant [to their cellular phone] was recorded without their consent by Defendant and/or its agent/s from July 1, 2018 through July 31, 2019[.]"  Mot. at 4 (emphasis added).[15]  Plaintiff argues that "typicality exists here" because, like the class, he is a California patient of AMR whose "first call" about unpaid balances was received during the class period, and he never called AMR.  But this is patently false.  In fact, Plaintiff received and answered a (recorded) call ***in 2017*** related to a previous AMR transport, and Plaintiff's attorney called AMR on his behalf on November 12, 2018.  Marder Decl., Ex. 13. at 82-83; 85:8-13; *id.*, Ex. 5 at 124:19-21; 92:19-93:5; *id.*, Ex. 17; Patil Decl., Ex. P1B.

Plaintiff seeks to bury this critical fact in a cryptic footnote stating that the 2018 ambulance service he received from AMR was his "second contact" with AMR.  Mem. at 5, n.2.  Without more, Plaintiff makes the conclusory assertion that the first recorded

---

[15] Notably, Plaintiff's proposed class definitions are impermissible fail-safe classes.  A fail-safe class is one that requires a determination of liability before class members can be identified.  *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010).  Such a class is both "palpably unfair" to the defendant and "unmanageable…."  *Id.*; *Kevari v. Scottrade, Inc.*, No. CV 18-819-JFW(GJSx), 2018 WL 6136822, at \*9 (C.D. Cal. Aug. 31, 2018) ("Because class members are identified only by a finding of liability, this is an invalid 'fail safe' class.").  Here, each class is limited to those individuals "whose first call from Defendant" (or first call to their cell phone) was recorded "without their consent …."  Mem. at 4.  Class membership thus cannot be determined without an adjudication of a key merits issue—consent—in the class members' favor.

call he received in May 2017 is somehow "not relevant" to the claims here. *Id.* But his 2017 trip with AMR and the subsequent call to Plaintiff seeking resolution of payment for those services could not be more relevant.[16] In fact, Credence, one of AMR's collection agencies, placed two calls to Plaintiff's phone number ████████ on May 15, 2017 and May 17, 2017 in an effort to collect the unpaid balance due from Plaintiff's 2017 trip.[17] Marder Decl., Exs. 16, 17; *id.*, Ex. 13 at 79:24-81:1; *see also id.* Ex. 14, at CRM000005-6. The first went to Plaintiff's voicemail. The second call, on May 17, connected with Plaintiff. The representative immediately stated █████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ Marder Decl., Ex. 17; *id.*, Ex. 13, at 85:3-7; *id.*, Ex. 5 at 127:22-128:13. During deposition, Plaintiff admitted that it was his voice on the call, and has repeatedly testified that ███████████████████ ████████████████████████████████████████████ , thereby acknowledging that he was aware the call was being recorded. *Id.*, Ex. 5 at 131:24-132:25; 37:22-25. Plaintiff also testified ███████████████████████████████ ███████████████████████ *Id.* at 157:1-12. Whatever the reason Plaintiff terminated the call, it was unquestionably the "first" recorded call to Plaintiff. Consequently, he is not a member of the class.

Plaintiff's proposed class is also limited to those "persons in California, that ***never called***" AMR. Mem. at 4 (emphasis added). Here, too, Plaintiff suffers from an incurable defect relating to his membership in the class; his counsel, Mr. Shay, called AMR on November 12, 2018 specifically seeking confirmation that AMR recorded its calls. Patil Decl., Ex. P1B; Marder Decl., Ex. 5 at 92:19-93:5; *see also* Compl. ¶22;

---

[16] Beyond disqualifying Plaintiff from serving as a class representative, as discussed in detail *infra* Section IV.C, the services that Plaintiff received in 2017 illustrate the individual inquiries this Court will need to make to determine whether each class member received multiple services and calls from AMR or its agents, and whether these experiences impacted each class member's expectations of confidentiality during the class period.

[17] Plaintiff has testified ████████████████████████████████████████████████ ███████████████████████████████ *See* Marder Decl., Ex. 5 at 137:5-19.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

FAC ¶14.  Thus, Plaintiff, through Mr. Shay, who was acting on his behalf, called AMR. He therefore cannot be a member of a class of individuals "that never called defendant."

Under these circumstances, "it is predictable that a major focus of the litigation will be on a defense unique to [the class representative]. Thus, [the class representative] fails to satisfy the typicality requirement of Rule 23(a)."  *Hanon*, 976 F.2d at 509;  *see also Reyes v. Educ. Credit Mgmt. Corp.,* 773 F. App'x 989, 989-90 (9th Cir. 2019) (observing that "the district court [must] ensure that the named plaintiff is a member of the class he seeks to represent" and vacating the district court's order certifying a class).

### E.    Plaintiff Is Not An Adequate Class Representative

Plaintiff is also an inadequate class representative.[18]  Rule 23(a)(4) permits the certification of a class only if "the representative parties will fairly and adequately protect the interests of the class."  To determine whether the representation meets this standard, courts in this circuit ask two questions: (1) whether the named plaintiff is able to prosecute the action vigorously through counsel; and (2) whether they have conflicting interests with other class members.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. at 338. Further, the credibility of a class representative is relevant to determining whether he or she is adequate because "an untrustworthy Plaintiff could reduce the likelihood of prevailing." *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (quoting *Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 1337684, at *4 (N.D. Ill. Mar. 31, 2010)).  Here, Plaintiff (1) lacks credibility on material issues and is thus incapable of vigorously prosecuting the action; and (2) has relinquished control of the litigation to his counsel, which creates an unacceptable risk of conflicting interests with other class

---

[18] From the outset of this litigation, the undersigned counsel for AMR has repeatedly expressed serious concerns to Plaintiff's counsel over the inadequacy of Mr. Mendell to represent the class and encouraged Plaintiff's counsel to find a substitute a class representative if one existed. Marder Decl. ¶5.  Indeed, Plaintiff's counsel was advised months ago that Defendant would be challenging Mr. Mendell's adequacy as a class representative.  *Id.*  Yet they never attempted to replace him.  They should not be permitted to do so now.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

members.

### 1. Plaintiff is not able to prosecute the action vigorously on behalf of the class

Courts find that class representatives are unable to prosecute an action vigorously where they lack credibility on material issues in the case. *See e.g., Jovel v. Boiron, Inc*., No. 11-CV-10803-SVW-SHX, 2014 WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014) (plaintiff was an inadequate class representative where he gave inconsistent deposition testimony on material issues); *Savino v. Computer Credit, Inc*., 164 F.3d 81, 87 (2d Cir. 1998) (upholding a finding of inadequacy based on the proposed representative's "differing accounts about the letters that form the very basis for his lawsuit" because they "surely would create serious concerns as to his credibility at any trial"). Here, Plaintiff lied numerous times during his deposition, has made patently false allegations, and has provided conflicting testimony about what occurred on the calls at the heart of this lawsuit. His lack of credibility will undoubtedly jeopardize the interests of the class, making him unable to vigorously prosecute claims on their behalf.

First, Plaintiff has ***repeatedly*** claimed that during the November 12, 2018 call, AMR's representative "was insistent, threatening, and spoke aggressively towards Plaintiff[,]" and that she "threatened Plaintiff saying she would contact his employer". Compl. ¶ 17; FAC ¶ 9; *see also* Compl. ¶ 21, FAC ¶ 13. These allegations are unequivocally false, as reflected in the recordings themselves—AMR's representative never even mentioned contacting Plaintiff's employer. Patil Decl., Exs. P1A, P1D. While these allegations were removed from the SAC after the recordings were produced by AMR to Plaintiff's counsel, Plaintiff nevertheless stuck to this story during deposition even after being presented concrete evidence to the contrary. Marder Decl. ¶ 4; *id.*, Ex. 3 at 82:18-25; 139:1-5; 147:11-148:6; 194-95; 197:12-198:14.

Plaintiff also repeatedly lied about his conduct during the May 17 phone call, during which he lied to the representative by saying ███████████████ He first claimed █████████████████████████████████████████

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  Marder Decl., Ex. 5 at 156:19-157:1; 128:2-11.  Yet, he also *repeatedly* testified ███

2  ████████████████████████████████████████  *Id.* at 132:2-16.  And, Plaintiff

3  later acknowledged that, ████████████████████████████████████████████

4  ██████████████████████  *Id*. at 157:9-12.  Plaintiff's incredible testimony about

5  whether he heard a notification and why he hung up are central to a determination of his

6  claims in this case.

7      In addition, Plaintiff's ability to vigorously prosecute this action will be

8  hamstrung by his lack of knowledge about key aspects of the litigation.  He could not

9  articulate the differences among his various complaints. *Id*. at 35:17-39:5.  He is not

10  aware of the discovery that has taken place to date or any aspect of the pre-trial

11  schedule.  *Id.* at 42:19-44:18.  He does not recall reviewing his answers to AMR's

12  interrogatories, and has no recollection of serving responses to AMR's document

13  requests.  *Id.* at 40:25-41:11.  And, at the time of his deposition only a few months ago,

14  he had not even spoken to lead counsel Joshua Swigart about the case. *Id.* at 16:7-20.

15      Further, he lacks basic knowledge of key players—he has never heard of

16  LiveVox, which hosts all of AMR's call recordings and which produced data in this

17  action, and he is completely unfamiliar with both Integra and Omega.  *Id*. at 42:3-18.

18  He could not identify any other depositions that have been taken and he is unaware of

19  the subpoenas that have been issued in this matter, including the subpoena that his

20  counsel served on LiveVox.  *Id.* at 41:12-42:2.  Given Plaintiff's dearth of knowledge

21  about key aspects of this litigation, there is no question that he will be unable to

22  vigorously prosecute this action.  *See, e.g., Lubin v. Sybedon Corp.,* 688 F. Supp. 1425,

23  1462 (S.D. Cal. 1988).

24          2.    Plaintiff has conflicting interests with other class members

25      Where, as discussed above, a class representative has permitted his attorneys to

26  direct the litigation, courts have found that "Plaintiff's abdication of his responsibility

27  for direction of this action creates an unacceptable possibility of conflict of interest."

28  *Kassover v. Computer Depot, Inc.,* 691 F. Supp. 1205, 1213-14 (D. Minn. 1987) (named

30

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

plaintiff was inadequate where he was "unfamiliar with several critical aspects of [the] litigation[,]" and relied entirely upon his attorney's direction); *see also In re Quarterdeck Office Sys., Inc. Sec. Litig.*, No. CV 92-3970-DWW(GHKX), 1993 WL 623310, at *6 (C.D. Cal. Sept. 30, 1993) (named plaintiffs were inadequate where they lacked knowledge of key aspects of the litigation and failed to actively pursue the case).

For the reasons discussed above, Plaintiff's abdication of his responsibility to direct the action has created an impermissible conflict of interest. Moreover, concerns about potential conflicts are significantly heightened because Plaintiff is simultaneously pursuing his own individual action in San Diego Superior Court against AMR for alleged violations of California's Rosenthal Fair Debt Collection Practices Act, which arises from the same set of operative facts at issue here. Marder Decl., Exs. 1-2. As a result, there is a risk that Plaintiff and his attorneys may impermissibly advance his own individual goals in the state court action ahead of the interests of the class in this action. Plaintiff is therefore inadequate to represent the class here.

## F. A Class Action Is Not the Superior Method for Adjudicating This Dispute

To establish superiority, Plaintiff must show that the difficulties in managing a class action can be overcome, an inquiry that assesses the whole range of practical problems that could make class treatment inappropriate. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Here, a class action is not a superior method for adjudicating this controversy given that individual issues of confidentiality and consent (as discussed *supra*) would predominate. And, further, Plaintiff's proposed method for identifying class members is both flawed and will create additional obstacles for the Court's efficient management of this case, resulting in countless mini-trials for each class member.

Plaintiff has not proposed a workable solution for identifying class members. Indeed, Mr. Hansen has set forth a flawed methodology that fails to account for the limitations of the data at Plaintiff's disposal. Tatos Decl. ¶¶ 39-51. Mr. Hansen

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

suggests that data from LiveVox can be generated to provide "more than enough information needed to ascertain class members." Hansen Decl. ¶17. He further states that "[b]y utilizing Call Record Detail reports … from the LiveVox system, it is a comparatively straightforward process to identify **which of the Call Records were first time outbound calls, to patients that never called AMR,** and identify the subset of first-time outbound calls to wireless numbers." *Id.* at 18 (emphasis added). Mr. Hansen's statement is incorrect and based on inaccurate assumptions about the fields available in LiveVox. Siegel Decl. ¶¶ 5-6; Tatos Decl., ¶¶ 45-51. Indeed, as LiveVox's Executive VP of Product Development points out, LiveVox does not maintain such information. Siegel Decl. ¶¶ 5-6 ("LiveVox does not have any system-created data markers or other information in its call records that would show whether a call made by a customer was the first call to any particular call recipient or phone number."). Moreover, short of reviewing individual files for every class member (as it did for Plaintiff), AMR does not maintain any records in any system that would enable efficient identification of class members who received their first call from AMR during the class period. Patil Decl. ¶ 10. Nor does AMR have a way to determine which class members who received a call during the class period never called AMR. Patil Decl. ¶ 11.

And, though unacknowledged by Plaintiff or his expert, this issue is further complicated by the fact that AMR does not have access to a searchable database that would indicate whether a putative class member was contacted by a collection agency seeking resolution of unpaid balances related to AMR's services prior to the class period. Patil Decl. ¶ 12. Thus, short of deposing every class member, or engaging in additional burdensome discovery (including for non-party collection agencies), neither Plaintiff nor AMR can determine who is a member of the putative class.

Moreover, even assuming that there was a way to efficiently determine whether a particular call during the class period was the "first" call that individual received ***and*** that the individual never called Plaintiff (which there is not), Plaintiff has still not articulated a feasible method of determining whether a particular call was recorded

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

without a class member's consent as discussed *supra*.  Mr. Hansen's proposed method of "employing IBM Watson" to create a "full transcription of the all the call recordings" that he can then search for certain key words is problematic to say the least.  Tatos Decl. ¶¶ 107-118; *see also* Hansen Decl. ¶19.  For instance, Mr. Hansen failed to address the threshold matter of whether IBM Watson is HIPAA-compliant and suitable for the storage of PHI.  Tatos. Decl. ¶ 123.  And, in fact, Mr. Hansen testified that he could not say whether IBM is HIPAA-compliant.  Marder Decl., Ex. 20 at 102:13-20.  The answer is simple: it is not; it utilizes the IBM cloud and IBM explicitly instructs users to "not include [PHI] in data that you pass to the service."[19]  Tatos Decl. ¶ 123. And Mr. Hansen improperly assumes that the IBM Watson technology will have an error rate of nearly zero.[20]  Tatos Decl. ¶¶ 115-116 (scientific literature on the industry-leading speech-to-text transcription technology has determined that the average error rate for IBM Watson was 38.1%).  More troubling, however, is that Mr. Hansen fails to offer any proposal for checking for errors, and as such, has identified no means of ascertaining the error rate. *Id.* at ¶ 111; Marder Decl., Ex. 20 at 136:19-22.

In sum, Plaintiff has failed to articulate any meaningful methodology for determining key elements necessary to efficiently and effectively identify members of the class.  Tatos Decl. ¶¶ 18-21.  Thus, in addition to the manageability hurdles that arise from the individual issues that predominate with respect to confidentiality and consent, the lack of any methodology advanced by Plaintiff will add another layer of inefficiency trying to identify members of the class.

## G.    An Injunctive Relief Class Cannot Be Certified

Plaintiff claims to seek injunctive relief from the Court requiring AMR to update

---

[19] https://cloud.ibm.com/docs/speech-to-text?topic=speech-to-text-information-security.

[20] Marder Decl., Ex. 20 at 98:22-99:4 ("I'm confident that the system will give in the high nineties for what we're looking at…You know, keeping in mind I'm not interested in what the recipient says. All right. I'm looking at what the things that would be transcribed clearly. So high nineties. Close to 100 percent.")

its call script to include notification at the "outset" of the call.  Mem. at 24.  But Plaintiff does not sufficiently demonstrate that such relief is necessary here.  Indeed, the practice complained of is moot and, in any event, such relief is impermissibly vague and cannot be enforced.

First, claims for injunctive relief under Rule 23(b) are moot where subsequent events show that the activities could not reasonably be expected to recur.  *Torres*, 289 F.R.D. at 595 (citing *Olagues v. Russoniello*, 770 F.2d 791, 794 (9th Cir. 1985)).  Plaintiff admits that AMR has "correct[ed] an error in its script." Mem. at 25.  However, citing *Reyes*, Plaintiff also claims that injunctive relief is not mooted because there is "no assurance AMR will not revert to its prior conduct."  *Id.*  Plaintiff's reliance on *Reyes* is misplaced.  In *Reyes*, the Court found that the injunctive relief requested was not moot because the technical programming features at issue in the litigation could have recurred and because Defendant merely committed a previously verbal policy to writing (and that policy was not followed prior to the litigation).  *Reyes*, 322 F.R.D. at 569-70.  However, AMR's script change was made and transitioned into use starting well before this litigation commenced and there are no plans to modify it.  Patil Decl. ¶¶ 8-9.  Put simply, there is nothing to enjoin here and Plaintiff has not established a "reasonable expectation" that AMR will revert to the complained of practice.  *See Torres*, 289 F.R.D. at 595 (finding injunctive relief moot where there was no reasonable expectation that the defendant would continue to allow callers to bypass a recording disclosure).

Second, the injunctive relief class cannot be enforced as requested: the potential injunctive relief sought by Plaintiff is unconstitutionally vague.  In the Ninth Circuit, injunctive relief is unconstitutionally vague when it is no more than a "bare injunction to follow the law."  *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014).  Here, Plaintiff seeks an order seeking to change AMR's policies and procedures to include a notification that a call is being recorded "at the outset of the call."  Mem. at 25.  But Plaintiff ignores the underlying difficulty of ever being able to clearly determine what

34

"at the outset of a call" means.  *See supra* at IV.A.1.  The Court would therefore have to insert its own interpretation of "outset" to identify the corrective action to be taken. This is exactly the kind of "bare injunction" that warrants denial of class certification. *Civil Rights Educ. & Enforcement Ctr. v. Hospitality Props. Trust*, 317 F.R.D. 91, 105 (N.D. Cal. Apr. 15, 2016) *aff'd*, 867 F.3d 1093 (9th Cir. 2017).

## V.      CONCLUSION

For the foregoing reasons, the Plaintiff's Motion should be denied.  However, to the extent that the Court is inclined to grant certification of a section 632.7 class, AMR respectfully requests a stay of the litigation related to that claim pending the Supreme Court's decision in *Smith v. LoanMe.*

Dated: August 4, 2020

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Neal Ross Marder
Rebecca A. Girolamo
Brett M. Manisco


By: _____/s/ Neal R. Marder_____
                            Neal Ross Marder
                       Attorneys for Defendant
                       nmarder@akingump.com

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION