**AKIN GUMP STRAUSS HAUER & FELD LLP**
NEAL ROSS MARDER (SBN 126879)
REBECCA A. GIROLAMO (SBN 293422)
BRETT M. MANISCO (SBN 318351)
nmarder@akingump.com
bgirolamo@akingump.com
bmanisco@akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:   310.229.1000
Facsimile:   310.229.1001
*Attorneys For Defendant*
*American Medical Response, Inc.*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MENDELL, individually and on behalf of others similarly situated,<br><br>             Plaintiffs,<br><br>   v.<br><br>AMERICAN MEDICAL RESPONSE, INC.,<br><br>             Defendant. | CASE NO. 3:19-cv-01227-BAS-KSC<br><br>[Judge:  Hon. Cynthia Bashant]<br><br><u>CLASS ACTION</u><br><br>**COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**REDACTED**<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT**<br><br>Date Action Filed: July 1, 2019 |

| Description | | Page |
|---|---|---|
| **Declaration of Neal Marder** | | 3 |
| **Exhibit 1:** | Complaint filed in San Diego Superior Court by Michael Mendell against American Medical Response, Inc. ("AMR"), dated July 19, 2019, Case No. 37-2019-00037628. | 8 |
| **Exhibit 2:** | First Amended Complaint filed in San Diego Superior Court by Michael Mendell against AMR, dated August 29, 2019, Case No. 37-2019-00037628. | 16 |
| **Exhibit 3:** | Lodged with the Court Conditionally Under Seal | 24 |
| **Exhibit 4:** | Email Agreement with Plaintiff's counsel re Mendell deposition testimony. | 25 |
| **Exhibit 5:** | Lodged with the Court Conditionally Under Seal | 26 |
| **Exhibit 6:** | Letter from Plaintiff to Defendant dated November 12, 2018. | 27 |
| **Exhibit 7:** | Lodged with the Court Conditionally Under Seal | 30 |
| **Exhibit 8:** | Lodged with the Court Conditionally Under Seal | 31 |
| **Exhibit 9:** | Lodged with the Court Conditionally Under Seal | 32 |
| **Exhibit 10:** | Lodged with the Court Conditionally Under Seal | 33 |
| **Exhibit 11:** | Lodged with the Court Conditionally Under Seal | 34 |
| **Exhibit 12:** | Lodged with the Court Conditionally Under Seal | 35 |
| **Exhibit 13:** | Lodged with the Court Conditionally Under Seal | 36 |
| **Exhibit 14:** | Lodged with the Court Conditionally Under Seal | 37 |
| **Exhibit 15:** | Lodged with the Court Conditionally Under Seal | 38 |
| **Exhibit 16:** | Lodged with the Court Conditionally Under Seal | 39 |

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**COMPENDIUM OF EVIDENCE REDACTED PAGE 1**

**Exhibit 17:** Lodged with the Court Conditionally Under Seal ... 40

**Exhibit 18:** Lodged with the Court Conditionally Under Seal ... 41

**Exhibit 19:** Lodged with the Court Conditionally Under Seal ... 42

**Exhibit 20:** Cited Excerpts from the Deposition Transcript of Jeffrey A. Hansen, dated July 3, 2020. ... 43

**Declaration of Ted P. Tatos** ... 127

**Exhibit 1:** Curriculum Vitae of Ted P. Tatos. ... 174

**Declaration of Dr. Bhaskar Patil** ... 183

**Exhibit P1:** Lodged with the Court Conditionally Under Seal ... 187

**Declaration of Laurence Siegel** ... 192

Dated: August 4, 2020

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Neal Ross Marder
Rebecca A. Girolamo
Brett M. Manisco


By: _____/s/ Neal R. Marder_____
Neal Ross Marder
Attorneys for Defendant
nmarder@akingump.com

COMPENDIUM OF EVIDENCE IN SUPPORT OF DEFENDANT'S
OPPOSITION TO MOTION FOR CLASS CERTIFICATION
**COMPENDIUM OF EVIDENCE REDACTED PAGE 2**

**DECLARATION OF NEAL ROSS MARDER**

I, Neal Ross Marder, declare:

1. I am an attorney duly licensed to practice law in the State of California and I am a Partner with the law firm Akin Gump Strauss Hauer & Feld LLP, attorneys of record for Defendant American Medical Response, Inc. ("AMR").

2. I have personal knowledge of the facts set forth herein and, if called upon as a witness, I could and would testify competently thereto under oath.

3. On July 19, 2019, Plaintiff Michael Mendell ("Plaintiff") filed a separate lawsuit against AMR in San Diego Superior Court for alleged violations of California's Rosenthal Fair Debt Collections Practices Act ("State Court Action"). Attached hereto as **Exhibit 1** is a true and correct copy of the Complaint Plaintiff filed in the State Court Action. Also attached hereto as **Exhibit 2** is a true and correct copy of the First Amended Complaint Plaintiff filed in the State Court Action on August 29, 2019.

4. On August 21, 2019, to facilitate settlement discussions, my office sent to then Plaintiff's counsel Abbas Kazerounian and Yana Hart ("Ms. Hart") the recordings of Plaintiff's call with AMR dated November 14, 2018. Similarly, on December 9, 2019, my office sent to then Plaintiff's counsel the recordings for Plaintiff's calls with AMR dated November 12 and November 13, 2018.

5. Throughout the course of this litigation, I have repeatedly advised Plaintiff's counsel of my serious concerns over Plaintiff's adequacy to represent the class and encouraged them to promptly replace him if they had someone to substitute for Mr. Mendell as class representative. But they have failed to do so.

6. I also reiterated that AMR would be challenging Plaintiff's adequacy as a class representative during a June 5, 2020 meet and confer call with Mr. Swigart.

7. On March 3, 2020, I commenced the deposition of the Plaintiff in his State Action, and I concluded that deposition on May 29, 2020. A true and correct

copy of cited excerpts from the deposition of Plaintiff in the State Court Action are attached hereto as **Exhibit 3**.

8.     On May 29, 2020, before commencing Plaintiff's deposition in this matter, I asked Mr. Shay if he would agree that AMR could use Plaintiff's testimony in the State Court Action in the federal case so that I did not have to repeat the same questions. Mr. Shay agreed that AMR could use Plaintiff's testimony from the State Court Action in this action. A true and correct copy of our email exchange is attached hereto as **Exhibit 4.**

9.     I deposed Plaintiff for the federal case on May 29, 2020. A true and correct copy of cited excerpts from Plaintiff's deposition in the federal case are attached hereto as **Exhibit 5**. Plaintiff's deposition was designated as confidential under the protective order.

10.    Attached hereto as **Exhibit 6** is a true and correct copy of a document produced by Plaintiff in this litigation, which is bates numbered Plaintiff000001-Plaintiff000003.

11.    On February 19, 2020, Plaintiff's counsel deposed AMR's first designated 30(b)(6) witness, John Connolly, then Vice President of Client Services for Integra Connect, LLC, the company engaged by AMR to oversee its billing and collections operations. A true and correct copy of the cited excerpts from the 30(b)(6) deposition of Mr. Connolly is attached hereto as **Exhibit 7**. The deposition of Mr. Connolly was designated confidential under the protective order.

12.    AMR's second designated 30(b)(6) witness, Suzanne Robinson, Vice President of Revenue Cycle Management for AMR, was deposed by counsel for Plaintiff on February 27, 2019. A true and correct copy of the cited excerpts from the 30(b)(6) deposition of Suzanne Robinson is attached hereto as **Exhibit 8**. The deposition of Ms. Robinson was designated confidential under the protective order.

DECLARATION OF NEAL ROSS MARDER IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION
FOR CLASS CERTIFICATION

**COMPENDIUM OF EVIDENCE REDACTED PAGE  4**

1          13.    AMR's third designated 30(b)(6) witness, Dr. Bhaskar Patil, Vice Vice

2    President of Global Services for Omega Healthcare, Investors, Inc., was deposed by

3    counsel for Plaintiff on May 21, 2020.  A true and correct copy of the cited excerpts

4    from the 30(b)(6) deposition of Bhaskar Patil is attached hereto as **Exhibit 9**.  The

5    deposition of Dr. Patil was designated confidential under the protective order.

6          14.    Attached hereto as **Exhibit 10** is a true and correct copy of a Patient

7    Care Report, dated October 28, 2018, relating to the ambulance services Plaintiff

8    received from AMR on that same day.  This document was produced by AMR in

9    this    litigation,    and    is    marked    confidential    and    bates    numbered

10   AMR_MEN_VOL000106- AMR_MEN_VOL000111.

11         15.    Attached hereto as **Exhibit 11** is a true and correct copy of a Patient

12   Care Report, dated January 19, 2017, relating to ambulance services Plaintiff

13   received from AMR on that same day.  This document was produced by AMR in

14   this    litigation    and    is    marked    confidential    and    bates    numbered

15   AMR_MEN_VOL000099-AMR_MEN_VOL000105.

16         16.    Attached hereto as **Exhibit 12** is a true and correct copy of the

17   "Outbound Training Process" PowerPoint presentation used to train AMR's

18   representatives on outbound call procedures.  This document was produced by AMR

19   in    this    litigation,    and    is    marked    confidential    and    bates    numbered

20   AMR_MEN_VOL000010-AMR_MEN_VOL000040.

21         17.    On April 28, 2020, I deposed Karan Negi ("Mr. Negi"), the founder,

22   president and CEO of non-party Credence Resource Management ("Credence"),

23   who Negi appeared for deposition as the person most knowledgeable from Credence.

24   Attached hereto as **Exhibit 13** is a true and correct copy of the cited excerpts from

25   the deposition of Mr. Negi.  The deposition of Mr. Negi was designated confidential

26   under the protective order.

27

28

DECLARATION OF NEAL ROSS MARDER IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION
FOR CLASS CERTIFICATION

**COMPENDIUM OF EVIDENCE REDACTED PAGE  5**

18.     Attached hereto as **Exhibit 14** is a true and correct copy of a document produced by Credence, which was marked confidential and bates numbered CRM000001-CRM000038.

19.     Attached hereto as **Exhibit 15** is a true and correct copy of call scripts used by Credence call representatives making outbound calls related to the collection of unpaid balances related to the provision of AMR services, which was produced by Credence in this litigation, marked confidential and bates numbered CRM000054 - CRMS000067.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of a May 15, 2017 call recording between a representative from Credence and Plaintiff.  This recording was produced by Credence, marked confidential, and is bates numbered CRM000048.  Both Plaintiff and Karan Negi acknowledged the authenticity of this recording in their respective depositions.  *See*, Marder Decl., Ex. 13, 79:24-85; Marder Decl., Ex, 5, 124:17-125:21.

21.     Attached hereto as **Exhibit 17** is a true and correct copy of a May 17, 2017 call recording between a representative from Credence and Plaintiff.  This recording was produced by Credence, marked confidential, and is bates numbered CRM000050.  Both Plaintiff and Karan Negi acknowledged the authenticity of this recording in their respective depositions.  *See*, Marder Decl., Ex. 13, 85:3-7; Marder Decl., Ex. 5, 127:12-128:13.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of a call script and procedures used by Bay Area Credit Services representatives making outbound calls related to the collection of unpaid balances relating to the provision of AMR services, which was produced by Bay Area Credit Services in the litigation, marked confidential and bates numbered BACS0000119- BACS0000156.

23.     Attached hereto as **Exhibit 19** is a true and correct copy of a call script used by Wakefield & Associates call representatives making outbound calls related

to the collection of unpaid balances related to the provision of AMR services, which was produced by Wakefield & Associates in this litigation, marked confidential, and bates numbered Wakefield-1.

24.     I deposed Plaintiff's expert, Jeffrey A. Hansen ("Mr. Hansen") on July 3, 2020.  Attached hereto as **Exhibit 20** is a true and correct copy of cited excerpts from the deposition of Mr. Hansen.

I declare under penalty of perjury and the laws of the United States of America and of the State of California that the foregoing is true and correct.

Dated: August 3, 2020                    **AKIN GUMP STRAUSS HAUER & FELD LLP**
                                         Neal Ross Marder
                                         Rebecca A. Girolamo
                                         Brett M. Manisco


                                         By: _____/s/ Neal R. Marder_____
                                                        Neal Ross Marder
                                                     Attorneys for Defendant
                                                   nmarder@akingump.com

DECLARATION OF NEAL ROSS MARDER IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION
FOR CLASS CERTIFICATION

**COMPENDIUM OF EVIDENCE REDACTED PAGE  7**

# Exhibit 1

F I L E D
Clerk of the Superior Court
JUL 19 2019
Deputy
By:
2019 JUL 19 P 1: 14
CLERK-SU
SAN DIEG:

**HYDE & SWIGART, APC**
Yana A. Hart, Esq. (SBN: 306499)
yana@westcoastlitigation.com
2221 Camino Del Rio, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile: (619) 297-1022

**LAW OFFICE OF DANIEL G. SHAY**
Daniel G. Shay (SBN: 250548)
danielshay@tcpafdcpa.com
2221 Camino Del Rio South, Suite 308
San Diego, CA 92108
Telephone: (619) 222-7429
Facsimile: (866) 431-3292

*Attorneys for Plaintiff,*
Michael Mendell

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

# SUPERIOR COURT FOR THE STATE OF CALIFORNIA
## COUNTY OF SAN DIEGO

| | |
|---|---|
| MICHAEL MENDELL,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN MEDICAL RESPONSE, INC.,<br><br>Defendant. | Case No.: 37-2019-00037625-CU-MC-CTL<br><br>**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, CAL. CIV. CODE § 1788, ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT FOR DAMAGES

COMPENDIUM OF EVIDENCE REDACTED PAGE 8

## INTRODUCTION

1.  The California Legislature has determined that the banking and credit system and grantors of credit to consumers are dependent upon the collection of just and owing debts and that unfair or deceptive collection practices undermine the public confidence that is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers. The Legislature has further determined that there is a need to ensure that debt collectors exercise this responsibility with fairness, honesty, and due regard for the debtor's rights and that debt collectors must be prohibited from engaging in unfair or deceptive acts or practices.

2.  Michael Mendell ("Plaintiff"), through Plaintiff's attorneys, brings this action to challenge the conduct of American Medical Response, Inc. ("Defendant") with regard to attempts by Defendant, to unlawfully and abusively collect a debt allegedly owed by Plaintiff in violation of the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code § 1788 *et seq*. Defendant's conduct caused Plaintiff damages.

3.  Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

4.  While many violations are described below with specificity, this Complaint alleges violations of the Rosenthal Act cited in its entirety.

5.  Unless otherwise stated, all the conduct engaged in by Defendant took place in California.

6.  Any violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

7.  Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs,

HYDE & SWIGART, APC
2221 Camino Del Rio South Suite 101
San Diego, CA 92108

| | |
|---|---|
| 1 | successors, assigns, principals, trustees, sureties, subrogees, representatives, |
| 2 | and insurers of Defendant's named. |
| 3 | **JURISDICTION & VENUE** |
| 4 | 8. Jurisdiction of this Court arises pursuant to general state jurisdiction. |
| 5 | 9. This action arises out of Defendant's violations of the Rosenthal Fair Debt |
| 6 | Collection Practices Act, Cal. Civ. Code §§ 1788-1788.32. |
| 7 | 10. Defendant is authorized to and regularly conducts business in the State of |
| 8 | California, and thus, personal jurisdiction is established. |
| 9 | 11. Venue is proper under state law Code of Civil Procedure § 395 because the |
| 10 | injury to Plaintiff occurred in the County of San Diego, State of California. |
| 11 | Furthermore, Defendant is subject to liabilities in the County of San Diego, |
| 12 | State of California, where it willfully and knowingly made unwanted and |
| 13 | unlawful telephone calls to Plaintiff. |
| 14 | **PARTIES** |
| 15 | 12. Plaintiff is, and at all times relevant was, a natural person who resides in the |
| 16 | County of San Diego, State of California. Plaintiff is a "debtor" as that term |
| 17 | is defined by California Civil Code § 1788.2(h). |
| 18 | 13. Defendant is a Delaware corporation located in the Greenwood Village, |
| 19 | Colorado, and is authorized to conduct business in the State of California. |
| 20 | 14. Defendant, in the ordinary course of business, regularly, on behalf of itself, |
| 21 | or others, engages in debt collection as that term is defined by California |
| 22 | Civil Code § 1788.2(b), and is therefore a debt collector as defined in |
| 23 | California Civil Code § 1788.2(c) and a "person" as defined by Cal. Civ. |
| 24 | Code § 1788.2(g). |
| 25 | 15. This case involves money, property, or their equivalent, due or owing or |
| 26 | alleged to be due or owing from a natural person by reason of a consumer |
| 27 | transaction. As such, this action arises out of a consumer debt and "consumer |
| 28 | credit" as those terms are defined by Cal. Civ. Code § 1788.2(f). |

HYDE & SWIGART
San Diego, California

COMPLAINT FOR DAMAGES          - 2 of 7 -

16. Sometime prior to November 14, 2018, Plaintiff allegedly incurred certain financial obligations to Defendant (the "Debt").

17. These alleged obligations were for ambulance services and were thus money, property, or their equivalent, which is due or owing, or alleged to be due or owing, from a natural person to another person and are therefore a "debt" as that term is defined by California Civil Code § 1788.2(d), and a "consumer debt" as that term is defined by California Civil Code § 1788.2(f).

18. Sometime thereafter, but before November 14, 2018, Plaintiff allegedly fell behind in the payments owed on the Debt. As a result, and in an attempt to collect on the Debt, Defendant started calling Plaintiff from the phone number (800) 913-9106.

19. Plaintiff then retained the legal services of Daniel G. Shay, Esq.

20. On or around November 14, 2018, Defendant called Plaintiff's cellphone attempting to collect on the Debt.

21. During the November 14, 2018 conversation, Plaintiff unequivocally and explicitly informed Defendant's representative, agent, or employee that Plaintiff was represented by Attorney Shay regarding the Debt and that Plaintiff intended to file for bankruptcy. As such, Plaintiff demanded Defendant cease all contact and communication with him directly.

22. However, in response to Plaintiff's admonishments, Defendant's representative proceeded to attempt to collect on the Debt. The representative responded that Defendant would continue its collection efforts against Plaintiff until the Debt was paid in full. Further, Defendant's representative stated she would "embarrass" Plaintiff and threatened to contact Plaintiff's employer regarding the Debt.

23. The statements made by Defendant caused Plaintiff to panic and hang up the phone.

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

COMPENDIUM OF EVIDENCE REDACTED PAGE 11

1  24. Plaintiff was personally affected because he was frustrated and distressed that

2      Defendant continued its debt collection efforts despite Plaintiff's disclosure

3      of his legal representation and pending bankruptcy.

4                          **15 U.S.C. §1692c(a)**

5                **Incorporated by Cal. Civ. Code § 1788.17**

6  25. Rosenthal incorporates its federal counterpart, Fair Debt Collection Practices

7      Act ("FDCPA"), through Cal. Civ. Code § 1788.17. This incorporation

8      includes 15 U.S.C. § 1692c(a)(2), which states as follows:

> Without the prior consent of the consumer given directly
> to the debt collector or the express permission of a court
> of competent jurisdiction, a debt collector may not
> communicate with a consumer in connection with the
> collection of any debt if the debt collector knows the
> consumer is represented by an attorney with respect to
> such debt and has knowledge of, or can readily ascertain,
> such attorney's name and address, unless the attorney
> fails to respond within a reasonable period of time to a
> communication from the debt collector or unless the
> attorney consents to direct communication with the
> consumer

16 26. Defendant communicated with Plaintiff, a consumer, in connection with the

17      collection of a debt after receiving express notice from Plaintiff that Plaintiff

18      was represented by Attorney Shay.

19 27. Defendant completely disregarded Plaintiff's disclosure of legal

20      representation and pending bankruptcy by continuing its communications and

21      further threatening Plaintiff in paying on the Debt.

22 28. Also, Defendant's continued communication was not intended as a result of a

23      failure to reach Attorney Shay within a reasonable period of time.

24 29. Consequently, because the Rosenthal Act incorporates the FDCPA,

25      Respondent violated Cal. Civ. Code § 1788.17.

26 ///

27 ///

28 ///

**HYDE & SWIGART**
San Diego, California

---

COMPLAINT FOR DAMAGES          - 4 of 7 -

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

1                   **15 U.S.C. § 1692e**

2         **Incorporated by Cal. Civ. Code § 1788.17**

3   30.   Under 15 U.S.C. § 1692e, "[a] debt collector may not use any false,

4         deceptive, or misleading representation or means in connection with the

5         collection of any debt." This includes, but is not limited to, "[t]he threat to

6         take any action that cannot legally be taken or that is not intended to be

7         taken," and "the use of any false representation or deceptive means to collect

8         or attempt or collect any debt or to obtain information concerning a

9         consumer." 15 U.S.C. § 1692e, subds. (5) & (10).

10   31.   After speaking with Plaintiff who confirmed he was represented by an

11         attorney and would be seeking to discharge the Debt through bankruptcy,

12         Defendant threatened it would contact Plaintiff's employer with the intent to

13         embarrass Plaintiff. Defendant thus falsely represented that it had the legal

14         right to contact Plaintiff's employer to embarrass Plaintiff into disregarding

15         his rights and paying Defendant.

16                 **15 U.S.C § 1692d**

17         **Incorporated by Cal. Civ. Code § 1788.17**

18   32.   Rosenthal through incorporation of 15 U.S.C. § 1692d, states as follows:

19            A debt collector may not engage in any conduct the
20            natural consequence of which is to harass, oppress, or
               abuse any person in connection with the collection of a
21            debt.

22   33.   In response to Plaintiff's request to be left alone, Defendant stated it would

23         continue to pursue its debt collection efforts and would "embarrass" Plaintiff.

24         Accordingly, Defendant's conduct and intentions were to deliberately harass

25         and oppress Plaintiff into paying on the Debt in violation of 15 U.S.C. §

26         1692d incorporated by Cal. Civ. Code § 1788.17.

27   34.   As a direct and proximate result of Defendant's unfair, unlawful, oppressive,

28         and abusive collection practices, Plaintiff has suffered mental anguish by

---

COMPLAINT FOR DAMAGES       - 5 of 7 -

1     way of embarrassment, shame, anxiety, fear, and feelings of despair over

2     Defendant's unlawful collection efforts.

**CAUSE OF ACTION**

**ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**

**CAL. CIV. CODE §§ 1788-1788.32**

6 35.    Plaintiff repeats, re-alleges, and incorporates by reference, all other

7       paragraphs.

8 36.    The foregoing acts and omissions constitute numerous and multiple

9       violations of the Rosenthal Act, including but not limited to each and every

10      one of the above-cited provisions of the FDCPA and Rosenthal Act.

11 37.    As a result of each and every violation of the Rosenthal Act, Plaintiff is

12       entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a);

13       statutory damages for a knowing or willful violation in the amount up to

14       $1,000 pursuant to Cal. Civ. Code § 1788.30(b); and reasonable attorney's

15       fees and costs pursuant to Cal. Civ. Code § 1788.30(c) from Defendant.

**PRAYER FOR RELIEF**

17     WHEREFORE, Plaintiff prays that judgment be entered against Defendant,

18 and Plaintiff be awarded damages from Defendant as follows:

19     • An award of actual damages pursuant to California Civil Code §

20       1788.30(a);

21     • An Award of statutory damages of $1,000.00 pursuant to Cal. Civ.

22       Code § 1788.30(b);

23     • An award of costs of litigation and reasonable attorney's fees,

24       pursuant to Cal. Civ. Code § 1788.30(c); and

25     • Any other relief the Court may deem just and proper.

26 ///

27 ///

28 ///

HYDE & SWIGART
San Diego, California

COMPLAINT FOR DAMAGES     - 6 of 7 -

## TRIAL BY JURY

Plaintiff is entitled to, and demands, a trial by jury.

Date: July 15, 2019

Respectfully submitted,

**Hyde & Swigart, APC**

By: _____

Yana A. Hart, Esq.
*Attorneys for Plaintiff*

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

COMPENDIUM OF EVIDENCE REDACTED PAGE 15

# Exhibit 2

**HYDE & SWIGART, APC**
Yana A. Hart, Esq. (SBN: 306499)
yana@westcoastlitigation.com
2221 Camino Del Rio, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile: (619) 297-1022

**LAW OFFICE OF DANIEL G. SHAY**
Daniel G. Shay (SBN: 250548)
danielshay@tcpafdcpa.com
2221 Camino Del Rio South, Suite 308
San Diego, CA 92108
Telephone: (619) 222-7429
Facsimile: (866) 431-3292

*Attorneys for Plaintiff,*
Michael Mendell

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| MICHAEL MENDELL,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN MEDICAL RESPONSE, INC.,<br><br>Defendant. | Case No.: 37-2019-00037628-CU-MC-CTL<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT, CAL. CIV. CODE § 1788, ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

FIRST AMENDED COMPLAINT
FOR DAMAGES                    37-2019-00037628-CU-MC-CTL

COPY

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

## INTRODUCTION

1. The California Legislature has determined that the banking and credit system and grantors of credit to consumers are dependent upon the collection of just and owing debts and that unfair or deceptive collection practices undermine the public confidence that is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers. The Legislature has further determined that there is a need to ensure that debt collectors exercise this responsibility with fairness, honesty, and due regard for the debtor's rights and that debt collectors must be prohibited from engaging in unfair or deceptive acts or practices.

2. Michael Mendell ("Plaintiff"), through Plaintiff's attorneys, brings this action to challenge the conduct of American Medical Response, Inc. ("Defendant") with regard to attempts by Defendant, to unlawfully and abusively collect a debt allegedly owed by Plaintiff in violation of the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code § 1788 *et seq*. Defendant's conduct caused Plaintiff damages.

3. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

4. While many violations are described below with specificity, this Complaint alleges violations of the Rosenthal Act cited in its entirety.

5. Unless otherwise stated, all the conduct engaged in by Defendant took place in California.

6. Any violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

7. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs,

---

**COMPENDIUM OF EVIDENCE REDACTED PAGE 17**

HYDE & SWIGART
San Diego, California

1   successors, assigns, principals, trustees, sureties, subrogees, representatives,
2   and insurers of Defendant's named.

**JURISDICTION & VENUE**

4   8.   Jurisdiction of this Court arises pursuant to general state jurisdiction.
5   9.   This action arises out of Defendant's violations of the Rosenthal Fair Debt
6        Collection Practices Act, Cal. Civ. Code §§ 1788-1788.32.
7   10.  Defendant is authorized to and regularly conducts business in the State of
8        California, and thus, personal jurisdiction is established.
9   11.  Venue is proper under state law Code of Civil Procedure § 395 because the
10       injury to Plaintiff occurred in the County of San Diego, State of California.
11       Furthermore, Defendant is subject to liabilities in the County of San Diego,
12       State of California, where it willfully and knowingly made unwanted and
13       unlawful telephone calls to Plaintiff.

**PARTIES**

15  12.  Plaintiff is, and at all times relevant was, a natural person who resides in the
16       County of San Diego, State of California. Plaintiff is a "debtor" as that term
17       is defined by California Civil Code § 1788.2(h).
18  13.  Defendant is a Delaware corporation located in the Greenwood Village,
19       Colorado, and is authorized to conduct business in the State of California.
20  14.  Defendant, in the ordinary course of business, regularly, on behalf of itself,
21       or others, engages in debt collection as that term is defined by California
22       Civil Code § 1788.2(b), and is therefore a debt collector as defined in
23       California Civil Code § 1788.2(c) and a "person" as defined by Cal. Civ.
24       Code § 1788.2(g).
25  15.  This case involves money, property, or their equivalent, due or owing or
26       alleged to be due or owing from a natural person by reason of a consumer
27       transaction. As such, this action arises out of a consumer debt and "consumer
28       credit" as those terms are defined by Cal. Civ. Code § 1788.2(f).

---

**FIRST AMENDED COMPLAINT**
**FOR DAMAGES**                    - 2 of 9 -                37-2019-00037628-CU-MC-CTL

## FACTUAL ALLEGATIONS

16. Sometime prior to November 14, 2018, Plaintiff allegedly incurred certain financial obligations to Defendant (the "Debt").

17. These alleged obligations were for ambulance services and were thus money, property, or their equivalent, which is due or owing, or alleged to be due or owing, from a natural person to another person and are therefore a "debt" as that term is defined by California Civil Code § 1788.2(d), and a "consumer debt" as that term is defined by California Civil Code § 1788.2(f).

18. Sometime thereafter, but before November 14, 2018, Plaintiff allegedly fell behind in the payments owed on the Debt. As a result, and in an attempt to collect on the Debt, Defendant started calling Plaintiff from the phone number (800) 913-9106.

19. Plaintiff then retained the legal services of Daniel G. Shay, Esq.

20. On or around November 14, 2018, Defendant called Plaintiff's cellphone attempting to collect on the Debt.

21. During the November 14, 2018 conversation, Plaintiff unequivocally and explicitly informed Defendant's representative, agent, or employee that Plaintiff was represented by Attorney Shay regarding the Debt and that Plaintiff intended to file for bankruptcy. As such, Plaintiff demanded Defendant cease all contact and communication with him directly.

22. However, in response to Plaintiff's admonishments, Defendant's representative stated that they cannot contact the attorney directly.

23. The statements made by Defendant caused Plaintiff to panic and hang up the phone. Plaintiff understood Defendant's agent remark to mean that Defendant would not stop contacting Plaintiff despite Plaintiff's request to contact his attorney.

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

COMPENDIUM OF EVIDENCE REDACTED PAGE 19

1    24.    Plaintiff was personally affected because he was frustrated and distressed that

2          Defendant continued its debt collection efforts despite Plaintiff's disclosure

3          of his legal representation and pending bankruptcy.

4                     **15 U.S.C. §1692c(a)**

5             **Incorporated by Cal. Civ. Code § 1788.17**

6    25.    Rosenthal incorporates its federal counterpart, Fair Debt Collection Practices

7          Act ("FDCPA"), through Cal. Civ. Code § 1788.17. This incorporation

8          includes 15 U.S.C. § 1692c(a)(2), which states as follows:

9
10
11
12
13
14
15
> Without the prior consent of the consumer given directly
> to the debt collector or the express permission of a court
> of competent jurisdiction, a debt collector may not
> communicate with a consumer in connection with the
> collection of any debt if the debt collector knows the
> consumer is represented by an attorney with respect to
> such debt and has knowledge of, or can readily ascertain,
> such attorney's name and address, unless the attorney
> fails to respond within a reasonable period of time to a
> communication from the debt collector or unless the
> attorney consents to direct communication with the
> consumer.

16    26.    Defendant communicated with Plaintiff, a consumer, in connection with the

17          collection of a debt after receiving express notice from Plaintiff that Plaintiff

18          was represented by Attorney Shay. In fact, after Plaintiff notified that he is

19          being represented, Defendant's agent indicated that Defendant cannot contact

20          Plaintiff's attorney directly.

21    27.    Defendant completely disregarded Plaintiff's disclosure of legal

22          representation and pending bankruptcy by continuing its communications and

23          further pressuring Plaintiff in paying on the Debt.

24    28.    Also, Defendant's continued communication was not intended as a result of a

25          failure to reach Attorney Shay within a reasonable period of time.

26    29.    Consequently, because the Rosenthal Act incorporates the FDCPA,

27          Respondent violated Cal. Civ. Code § 1788.17.

28

**COMPENDIUM OF EVIDENCE REDACTED PAGE 20**

HYDE & SWIGART, APC
2221 CAMINO DEL RIO SOUTH SUITE 101
SAN DIEGO, CA 92108

1 | **15 U.S.C. § 1692e**

2 | **Incorporated by Cal. Civ. Code § 1788.17**

3 | 30. | Under 15 U.S.C. § 1692e, "[a] debt collector may not use any false,

4 | deceptive, or misleading representation or means in connection with the

5 | collection of any debt." This includes, but is not limited to, "[t]he threat to

6 | take any action that cannot legally be taken or that is not intended to be

7 | taken," and "the use of any false representation or deceptive means to collect

8 | or attempt or collect any debt or to obtain information concerning a

9 | consumer." 15 U.S.C. § 1692e, subds. (5) & (10).

10 | 31. | After speaking with Plaintiff who confirmed he was represented by an

11 | attorney and would be seeking to discharge the Debt through bankruptcy,

12 | Defendant yet falsely indicated that it would not contact Plaintiff's attorney

13 | with the intent to embarrass Plaintiff.

14 | 32. | Further Defendant's representations that Defendant could not contact

15 | Plaintiff's attorney directly were false and misleading. Defendant could

16 | easily search Mr. Shay's information on the state bar profile and should have

17 | immediately ceased communicating with Plaintiff upon learning that Plaintiff

18 | is represented.

19 | **15 U.S.C § 1692d**

20 | **Incorporated by Cal. Civ. Code § 1788.17**

21 | 33. | Rosenthal through incorporation of 15 U.S.C. § 1692d, states as follows:

22 | A debt collector may not engage in any conduct the
23 | natural consequence of which is to harass, oppress, or
 | abuse any person in connection with the collection of a
24 | debt.

25 | 34. | In response to Plaintiff's request to contact his attorney, Defendant stated it

26 | would not do so. Accordingly, Defendant's conduct and intentions were to

27 | deliberately harass and oppress Plaintiff into paying on the Debt in violation

28 | of 15 U.S.C. § 1692d incorporated by Cal. Civ. Code § 1788.17.

---

FIRST AMENDED COMPLAINT     - 5 of 7 -     37-2019-00037628-CU-MC-CTL
FOR DAMAGES

1  35.  As a direct and proximate result of Defendant's unfair, unlawful, oppressive,
2       and abusive collection practices, Plaintiff has suffered mental anguish by
3       way of embarrassment, shame, anxiety, fear, and feelings of despair over
4       Defendant's unlawful collection efforts.

5                          **CAUSE OF ACTION**
6       **ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**
7              **CAL. CIV. CODE §§ 1788-1788.32**

8  36.  Plaintiff repeats, re-alleges, and incorporates by reference, all other
9       paragraphs.

10 37.  The foregoing acts and omissions constitute numerous and multiple
11      violations of the Rosenthal Act, including but not limited to each and every
12      one of the above-cited provisions of the FDCPA and Rosenthal Act.

13 38.  As a result of each and every violation of the Rosenthal Act, Plaintiff is
14      entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a);
15      statutory damages for a knowing or willful violation in the amount up to
16      $1,000 pursuant to Cal. Civ. Code § 1788.30(b); and reasonable attorney's
17      fees and costs pursuant to Cal. Civ. Code § 1788.30(c) from Defendant.

18                        **PRAYER FOR RELIEF**
19      WHEREFORE, Plaintiff prays that judgment be entered against Defendant,
20 and Plaintiff be awarded damages from Defendant as follows:

21      • An award of actual damages pursuant to California Civil Code §
22        1788.30(a);
23      • An Award of statutory damages of $1,000.00 pursuant to Cal. Civ.
24        Code § 1788.30(b);
25      • An award of costs of litigation and reasonable attorney's fees,
26        pursuant to Cal. Civ. Code § 1788.30(c); and
27      • Any other relief the Court may deem just and proper.
28

HYDE & SWIGART
San Diego, California

1                                **TRIAL BY JURY**

2       Plaintiff is entitled to, and demands, a trial by jury.

3

4 Date: August 22, 2019                                 Respectfully submitted,

5                                     **Hyde & Swigart, APC**

6                                   By: _____

7                                     Yana A. Hart, Esq.

8                                   *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HYDE & SWIGART, APC
2221 Camino Del Rio South Suite 101
San Diego, CA 92108

FIRST AMENDED COMPLAINT      - 7 of 7 -      37-2019-00037628-CU-MC-CTL
FOR DAMAGES

**COPY**

**Exhibit 3**

# MARDER DECL. "
# EXHIBIT 5

# LODGED WITH
# THE COURT"

EQP F KVKQP CNN[  ""'

WP F GT "UGCN

# Exhibit 4

| | |
|---|---|
| **From:** | Marder, Neal |
| **To:** | Daniel G. Shay, Esq. |
| **Cc:** | Joshua Swigart; Manisco, Brett |
| **Subject:** | Re: Question |
| **Date:** | Friday, May 29, 2020 11:14:55 AM |

Ok

I may still need to go into certain areas but this will make things go faster and so I don't have to repeat things.

Thank you

Sent from my iPhone

> On May 29, 2020, at 11:13 AM, Daniel G. Shay, Esq. <DanielShay@sandiegobankruptcynow.com> wrote:
>
>
>
> **EXTERNAL Email**
>
>
> Yes, agreed.
>
> Daniel G. Shay
> Law Office of Daniel G. Shay
> 2221 Camino Del Rio South, Suite 308
> San Diego, CA  92108
> Phone:  619-222-7429
> Fax:      866-431-3292
>
> The information contained in this email may be confidential and/or legally
> privileged. It has been sent for the sole use of the intended recipient(s).
> If the reader of this message is not an intended recipient, you are hereby
> notified that any unauthorized review, use, disclosure, dissemination,
> distribution, or copying of this communication, or any of its contents, is
> strictly prohibited. If you have received this communication in error,
> please contact the sender by reply email and destroy all copies of the
> original message. Thank you.
>
> -----Original Message-----
> From: Marder, Neal <nmarder@akingump.com>
> Sent: Friday, May 29, 2020 11:02 AM
> To: Daniel G. Shay <danielshay@sandiegobankruptcynow.com>
> Subject: Question
>
> To try and move things along can we agree that I can use his testimony in
> the state case for the federal case so I don't have to answer the same
> questions
>
> Sent from my iPhone
> The information contained in this e-mail message is intended only for the
> personal and confidential use of the recipient(s) named above. If you have
> received this communication in error, please notify us immediately by
> e-mail, and delete the original message.

# Exhibit 5

# MARDER DECL. "
# EXHIBIT 5

# LODGED WITH
# THE COURT"

# EQP F KVKQP CNN[ ""'
# WP F GT "UGCN

# Exhibit 6


**Daniel Shay**

| | |
|---|---|
| **From:** | Daniel G. Shay, Esq. |
| **Sent:** | Monday, November 12, 2018 12:44 PM |
| **To:** | info@amr-sandiego.com; amr.denver@amr.net |
| **Cc:** | Daniel G. Shay, Esq. |
| **Subject:** | Michael Angel Mendell - SSN Ending ▮ |
| **Attachments:** | Mendell POA.pdf |

CEASE AND DESIST LETTER
NOTIFICATION OF REPRESENTATION, REVOCATION OF CONSENT, DEBT DISPUTE & ADDRESS CHANGE LETTER

November 12, 2018

American Medical Response
3465 Camino Del Rio S, Ste 410
San Diego, CA 92108

Re:    Michael Angel Mendell
       Partial Social Security Number: xxx-xx-▮

Greetings,

Please cease and desist all communications with our client named above ("Client"). Please direct all future communications with Client to our attention. This includes all accounts Client may have with you. This notice must be given and transferred from you to any and all debt collectors or successors-in-interest, agents, etc. They will be deemed to have received this notice too.

Client hereby revokes any prior express consent that may have been given to receive telephone calls, especially to Client's cellular telephone, from an automated telephone dialing system or an artificial or pre-recorded voice, as outlined in the Telephone Consumer Protection Act, 47 USC. § 227 *et seq* and Client also revokes any applicable business relationship.

Client has retained the Law Office of Daniel G. Shay to stop creditor harassment and to discharge your claim(s) through bankruptcy. Whether you are an original creditor, or a collector, you must cease and desist all communication with Client as required by Cal. Civ. Code §1788.17 via 15 U.S.C. 1692.

Client hereby revokes any consent that may have been given for any contact including calls at work. Client's employer expressly prohibits such calls. Client also revokes consent to record Client's telephone conversations.

Client disputes the debt(s) and validity of your claim(s) and refuses to pay in light of basic contract law. Please provide our office with a copy of the original signed contract that proves your claim(s) are enforceable. Otherwise you must report the claim(s) as "disputed" to all you report to per 15 USC 1692(e)8, Cal. Civ. Code 1788.17 and 1782.25(a) and 15 USC 1601. This includes identifying the accounts as "disputed" to all credit reporting agencies and entering compliance code "XB" in base segment field 20 when uploading Metro 2 automated data reporting.

Pursuant to the FCBA and the TILA, Client hereby demands that the address for any future "billing statements" be changed to our address at 409 Camino Del Rio South, Ste 101B, San Diego, California 92108 per the Official Staff Commentary on Regulation Z 226.2(a)(22)-1. Please see In re *Wright* (1981) 11 BR 590, 592 for more explanation.

Any more contact with Client is now "willful and knowing" and is a violation of multiple consumer protection laws.

NOTICE - This letter changes the terms of any agreement to arbitrate or mediate that may exist between you and Client. Any dispute between you and Client shall be resolved in Federal or State Court and Client may be lead plaintiff in

1

COMPENDIUM OF EVIDENCE REDACTED PAGE 27

a Class Action against you. If you object to this change in terms, please notify our office in writing within 30 (thirty) days.

The undersigned affirms the foregoing.
This letter is from both me and my attorney.

/s/ Michael Mendell
     Debtor


Thank you,
/s/ Daniel Shay
Daniel Shay, Esq.

Daniel G. Shay
Law Office of Daniel G. Shay
409 Camino Del Rio South, Ste 101B
San Diego, CA 92108
Phone: 619-222-7429
Fax:    866-431-3292

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank you.

Plaintiff000002

**COMPENDIUM OF EVIDENCE REDACTED PAGE 28**

## Third Party Authorization
## Limited Power of Attorney

The undersigned hereby designate Daniel G. Shay, Esq. (Mr. Shay) as an authorized legal representative for matters relating to bankruptcy and possible related cases of Client(s) named below.

Client(s) instructed Mr. Shay to send Cease and Desist Letters to all applicable creditors and collection companies.

The Cease and Desist Letter includes a Notice of Representation, a Dispute of the Debt and a Change of Address for Client. It also includes a Revocation of Consent regarding The Telephone Consumer Protection Act, The California Invasion of Privacy Act, The Fair Debt Collection Practices Act, The Rosenthal Fair Debt Collection Practices Act and any other applicable law.

This designation is valid for 5 (five) years.

Mr. Shay is fully authorized to communicate and negotiate with all creditors of Client(s).

Mr. Shay may also sign for Client(s) to obtain due diligence products like tax information, credit reports, appraisals, etc.

Consent is hereby given by Client(s) to allow creditors to release information to Mr. Shay.

Sign: _____
Daniel Shay, Esq.

Date: 10/26/18

Sign: _Michael A. Mendell_
Client / Debtor

Print: _MICHAEL A. Mendell_
Client / Debtor

Date: 10/26/2018

Sign: _____
Client / Co-Debtor

Print: _____
Client / Co-Debtor

Date: _____

Plaintiff000003

# Exhibit 7

# MARDER DECL.

## "EXHIBIT 7

## LODGED WITH THE COURT"""

## EQP F KVKQP CNN[ """

## WP F GT "UGCN

# Exhibit 8

# MARDER DECL.

# "EXHIBIT 8

# LODGED WITH
# THE COURT""

# EQP F KVKQP CNN[  ""
# WP F GT "UGCN

# Exhibit 9

# MARDER DECL.
# "EXHIBIT 9

# LODGED WITH
# THE COURT""
# EQP F KVKQP CNN[  ""
# WP F GT "UGCN

# Exhibit 10

# MARDER DECL.
# "EXHIBIT 10

# LODGED WITH
# THE COURT""

# EQP FKVKQP CNN[ ""
# WP FGT "UGCN

# Exhibit 11

MARDER DECL.
"EXHIBIT 11

LODGED WITH
THE COURT""

EQP F KVKQP CNN[ ""
WP F GT "UGC N

# Exhibit 12

# MARDER DECL. "EXHIBIT 12

# LODGED WITH THE COURT""

# EQP F KVKQP CNN[ ""
# WP F GT "UGCN

**Exhibit 13**

MARDER DECL.
"EXHIBIT 33

LODGED WITH
THE COURT'""'
EQP F KVKQP CNN[ '"'
WP F GT "UGCN

**Exhibit 14**

MARDER DECL.

"EXHIBIT 34

LODGED WITH
THE COURT"""

EQP F KVKQP CNN[ ""
WP F GT "UGCN

# Exhibit 15

# MARDER DECL.
## "EXHIBIT 35

# LODGED WITH
# THE COURT""'
# EQP F KVKQP CNN[ ""'
# WP F GT "UGCN

# Exhibit 16

MARDER DECL.
EXHIBIT 36

LODGED WITH
THE COURT
CONDITIONALLY
UNDER SEAL

# Exhibit 17

MARDER DECL.
EXHIBIT 37

LODGED WITH
THE COURT
CONDITIONALLY
UNDER SEAL

# Exhibit 18

MARDER DECL.
"EXHIBIT 38

LODGED WITH
THE COURT'""'
EQP F KVKQP CNN[ ""'
WP F GT "UGCN

**Exhibit 19**

MARDER DECL.
"EXHIBIT 39

LODGED WITH
THE COURT'""'
EQP F KVKQP CNN[  '"'
WP F GT "UGCN

**Exhibit 20**

Videotaped Deposition of

# Jeffrey A. Hansen

(Federal)

July 03, 2020

Mendell

vs.

American Medical Response, Inc.

**Confidential**



www.aptusCR.com / 866.999.8310

1          UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    MICHAEL MENDELL,

5    individually and on behalf

6    of others similarly

7    situated,

8          Plaintiffs,

9      vs.                    No. 3:19-cv-01227-BAS-KSC

10   AMERICAN MEDICAL RESPONSE,

11   INC.,

12         Defendant.
     _____

13

14                   CONFIDENTIAL

15        VIDEO DEPOSITION OF JEFFREY A. HANSEN

16                    (FEDERAL)

17      Reported Remotely through Videoconference

18                  July 3, 2020

19

20

21   Reported by:

22   Margaret A. Smith

23   RPR, CRR, CSR No. 9733

24

25   Job No.:    10070248

COMPENDIUM OF EVIDENCE REDACTED PAGE 44

 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   MICHAEL MENDELL,

 5   individually and on behalf

 6   of others similarly

 7   situated,

 8          Plaintiffs,

 9     vs.                          No. 3:19-cv-01227-BAS-KSC

10   AMERICAN MEDICAL RESPONSE,

11   INC.,

12          Defendant.

13   _____

14

15

16

17

18

19

20

21   Video Deposition of JEFFREY A. HANSEN taken on behalf of

22   Defendant, reported remotely through videoconference,

23   beginning at 9:02 a.m. PDT, and ending at 2:50 p.m., on

24   Friday, July 3, 2020, before Margaret A. Smith, RPR,

25   CRR, Certified Shorthand Reporter No. 9733.

**COMPENDIUM OF EVIDENCE REDACTED PAGE 45**

```
 1    APPEARANCES

 2

 3    For Plaintiff:

 4         SWIGART LAW GROUP

 5         BY:  JOSHUA SWIGART, ESQUIRE

 6              (via videoconference)

 7         2221 Camino Del Rio South, Suite 308

 8         San Diego, California  92108

 9         866.219.3343

10         josh@swigartlawgroup.com

11

12    For Defendant:

13         AKIN GUMP STRAUSS HAUER & FELD LLP

14         BY:  NEAL R. MARDER, ESQUIRE

15              (via videoconference)

16         BY:  BRETT M. MANISCO, ESQUIRE

17              (via videoconference)

18         1999 Avenue of the Stars, Suite 600

19         Los Angeles, California  90067

20         310.229.1000

21         nmarder@akingump.com

22         bmanisco@akingump.com

23

24

25
```

COMPENDIUM OF EVIDENCE REDACTED PAGE 46

1    APPEARANCES (continued):

2

3    THE VIDEOGRAPHER:

4    APTUS COURT REPORTING

5    BY:  JOHN TISA

6         (via videoconference)

7

8    ALSO PRESENT:

9    Taunia Rogers

10   (via videoconference)

11   Ted Tatos

12   (via videoconference)

13

14

15

16

17

18

19

20

21

22

23

24

25

**COMPENDIUM OF EVIDENCE REDACTED PAGE 47**

```
 1                    I N D E X

 2

 3  WITNESS                              EXAMINATION

 4  JEFFREY A. HANSEN

 5                  BY MR. MARDER                  8

 6

 7                    EXHIBITS

 8  Defendant's                                PAGE

 9  Exhibit 1 -   Defendant's Notice of Taking      11

10                Deposition of Expert Jeffrey A.

11                Hansen and Request for

12                Documents;7 pages

13  Exhibit 2 -   Declaration of Jeffrey A. Hansen in   14

14                Support of Motion for Class

15                Certification; 48 pages

16  Exhibit 3 -   Document entitled "Initial Demand    71

17                Verbiage"; 1 page

18  Exhibit 4 -   Document headed "AMR mp3 Recording";  150

19                1 page

20  Exhibit 5 -   Document headed "AMR mp3 Recording";  150

21                1 page

22  Exhibit 6 -   Document headed "AMR mp3 Recording";  152

23                1 page

24  Exhibit 7 -   Document entitled "Hansen Legal       35

25                Technologies, Inc."; 4 pages
```

www.aptusCR.com

```
1                    I N D E X (continued)

2                            EXHIBITS

3    Defendant's                                          PAGE

4    Exhibit 8 -    Document entitled "Fees and Expenses    17

5                   by Matter"; 1 page

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**COMPENDIUM OF EVIDENCE REDACTED PAGE 49**

1      Reported Remotely; July 3, 2020; 9:02 a.m. PDT;

2

3      VIDEOGRAPHER:  We are now on the record.

4   Today's date is July 3rd, 2020, and the entitlement is

5   9:02 a.m.

6      This is the video deposition of Jeff A. Hansen

7   being taken in the matter of Michael Mendell versus

8   American Medical Response, Case No.

9   3:19-cv-01227-BAS-KSC.

10      My name is John Tisa of Aptus Court Reporting,

11   located at 600 West Broadway, Suite 300, San Diego,

12   California.

13      Will counsel please identify yourselves and

14   state whom you represent.

15      MR. MARDER:  Neal Marder, Akin Gump, for the

16   defendant, American Medical Response.  With me is Brett

17   Manisco of my offices.

18      MS. ROGERS:  Taunia Rogers with American

19   Medical Response.

20      MR. SWIGART:  My turn.  Josh Swigart on behalf

21   of Michael Mendell and Mr. Hansen this morning.

22      VIDEOGRAPHER:  The court reporter today is

23   Maggie Smith, and she may now swear in the witness.

24      THE REPORTER:  If there is no objection to the

25   reporter administering the oath remotely, the reporter

1  will ask the witness, Mr. Hansen, please raise your

2  right hand to be administered the oath.

3

4                    JEFFREY A. HANSEN,

5  having been first duly sworn, was examined and testified

6  as follows:

7                    EXAMINATION

8  BY MR. MARDER:

9      Q    Good morning, Mr. Hansen.  Could you please

10  state and spell your name for the record.

11      A    Jeffrey Allan Hansen, middle name, A-l-l-a-n,

12  last name, Hansen, H-a-n-s-e-n.

13      Q    Thank you, Mr. Hansen.  Nice to meet you in

14  these undoubtedly challenging times for all of us.  I

15  appreciate you taking time out and visiting with us

16  today about the -- the litigation between Michael

17  Mendell and American Medical Response.  I'll be asking

18  you questions about that case today.

19          Your declaration that you put in in connection

20  with Plaintiff's motion for class certification and some

21  other various issues.

22          Just, for the record, when we announced the

23  appearances, just one other person is listening in.  As

24  I mentioned, that is Ted Tatos.  He's our engaged

25  litigation counsel in this matter who has signed a

1   engagement letter that has been marked as Exhibit 7, and

2   it looks like an invoice to Mr. Swigart's firm from you

3   that's been marked as Exhibit 8.

4           Are there any other documents that you're aware

5   of that are responsive to our requests, other than the

6   engagement letter and the invoice and perhaps the

7   exhibits that are attached to your declaration, which

8   weren't produced?  And I understand why.  We already

9   have them.

10          Is there anything else that, given your review

11  of the notice of deposition, the request for documents,

12  that are responsive to our requests?

13      A    Yeah, there's nothing else.

14      Q    Okay.  Did -- did you -- did you review

15  anything at all other than what is attached to your

16  declaration and what's been provided to us in connection

17  with the preparation of your declaration?

18      A    No.  Everything that I reviewed was attached or

19  referred to by my declaration.

20      Q    Okay.  Did you do anything this morning to

21  prepare for the deposition?

22      A    No.

23      Q    You didn't review any documents?

24      A    I glanced over my declaration.

25      Q    Okay.  How much time did you spend doing that?

**COMPENDIUM OF EVIDENCE REDACTED PAGE  52**

1    A couple minutes?

2        A    Yeah.  A couple of minutes.

3        Q    **And you didn't talk to Mr. Swigart at all?**

4        A    No.  Not about -- not about the case.

5        Q    **Did you -- did you -- did you strike that.**

6             **Is anyone assisting you at all in this**

7    **engagement?  A lot of experts have staff, assistance.**

8    **Are you doing this on your own, or do you have anyone**

9    **assisting you?**

10       A    It's just me.

11            MR. MARDER:  Okay.  Let's go ahead and mark

12   next your declaration in the case, which is -- we'll

13   have marked as Exhibit 2.

14            (Exhibit 2 was marked for identification.)

15            MR. MARDER:  If we can call that up for the

16   witness, please.

17   BY MR. MARDER:

18       Q    **This is -- this is the declaration that you've**

19   **submitted on behalf of the plaintiffs in the Mendell**

20   **versus AMR case, Mr. Hansen?**

21       A    Yes.

22       Q    **And did you -- did you personally draft this**

23   **declaration?**

24       A    Yes.

25       Q    **Did anyone assist you?**

 1      A    I might have -- I believe I had Plaintiffs

 2  counsel help me check it for errors, typos and such.

 3      Q    Okay.  And who are you referring to as

 4  Plaintiffs' counsel?

 5      A    That would be Joshua Swigart and Daniel Shay.

 6      Q    And did you provide them with a draft of the

 7  declaration so they could review it for errors?

 8      A    I believe so.

 9      Q    And did you send that to them in hard copy, or

10  electronically, or both?

11      A    That would have been electronically.

12      Q    And did -- did either of them indicate or point

13  out anything in your declaration that they thought

14  needed to be changed or modified in any way?

15      A    No.  The only thing was any -- the only thing

16  that they did was provided any grammatical -- grammar or

17  spelling or typing errors.

18      Q    Okay.  And nothing substantive?

19      A    Nothing substantive.

20      Q    And if you could flip to the last page just so

21  the witness can verify it's his signature, I'd

22  appreciate it.

23          Is that your signature?

24      A    Yes.

25      Q    And you carefully reviewed the declaration

**COMPENDIUM OF EVIDENCE REDACTED PAGE  54**

1    before signing it?

2        A    Yes.

3        Q    And you signed it understanding you were

4    signing it under penalty of perjury?

5        A    Yes.

6        Q    Is everything, as far as you know, to date,

7    still accurate in the declaration?

8        A    Yes.

9        Q    Is there anything in the declaration that you

10   would like to modify or change in any way?  And you're

11   free to look at it if you want and read it.

12       A    No.

13       Q    Did you -- did you maintain the draft of the

14   declaration that you provided to Mr. Swigart and Shay

15   before they provided you what you characterized as

16   nonsubstantive comments?  Do you have that prior draft?

17       A    I don't believe so, unless there's, like, a

18   copy laying around somewhere.  But I don't believe so.

19   I usually try and get them out of the way so I don't

20   reuse it.

21       Q    So is the declaration that is executed here,

22   was -- was the prior one modified into this final

23   version and essentially superseded it --

24       A    Yes.

25       Q    -- on your computer?

**COMPENDIUM OF EVIDENCE REDACTED PAGE  55**

1      A     Yes.

2      Q     **So you don't have any prior -- you don't have a**

3   **prior draft?**

4      A     Right.  At least not at this time.

5      Q     **Go ahead.  I'm sorry.**

6      A     At least I don't believe I do.  My normal

7   practice is -- is to not -- not save the draft so I

8   don't reuse it.

9      Q     **How much time do you -- do you think you spent**

10  **preparing the declaration?**

11     A     I provided a time sheet.

12     Q     **Yeah.**

13     A     And that details -- that details my time on

14  there.

15           MR. SWIGART:  Okay.  The time sheet is marked

16  as Exhibit 7.  We want to pull that up for the witness.

17  Or I believe it's Exhibit 8.  I'm sorry.

18           (Exhibit 8 was marked for identification.)

19  BY MR. MARDER:

20     Q     **Is that your time sheet?**

21     A     Yes, it is.

22     Q     **And is there a reference there to an entry for**

23  **preparing the declaration?**

24     A     Yeah.  That would be the last entry there.

25     Q     **That's the one on 6/4 where it says two and a**

COMPENDIUM OF EVIDENCE REDACTED PAGE  56

1    half hours?

2      A    That's correct.

3      Q    So that -- that reflects a total amount of time

4    you spent preparing the declaration?

5      A    That's correct.

6      Q    In connection with preparing this declaration,

7    were you provided any information about the case from

8    the plaintiffs' lawyers?

9      A    I don't know if I understand your question.

10      Q    Well, did they provide you with any background

11    information about the case? Did they give you a copy of

12    the complaint? Did they give you a copy of any

13    pleadings? Did they give you any documents? That's

14    what I mean.

15      A    As far as -- as far as those things, the

16    complaint was actually kind of irrelevant to my -- they

17    might have sent -- I don't think they sent over the

18    complaint. If they did, I wouldn't have -- I would have

19    used it only for the caption on my report.

20      Q    Okay. Well -- here's what I'm getting at-

21      A    Okay.

22      Q    -- when you were engaged -- and we'll get into

23    this -- you undoubtedly spoke to the plaintiffs' lawyers

24    and they told you about the case.

25      A    Yes.

**COMPENDIUM OF EVIDENCE REDACTED PAGE 57**

1    move on.

2           And the same is true with respect to testimony

3    or transcripts from the third parties that I mentioned,

4    right, the debt collection agencies?

5        A    Correct.

6        Q    All right.  Let me just ask you for a minute

7    about the -- the deposition testimony that you did hear.

8           Was that of a witness named Bhaskar Patil who

9    appeared for deposition I think around May 21?

10       A    That would be correct.

11       Q    And where were you present when you listened in

12   on the deposition?

13       A    I was at the offices of Joshua Swigart.

14       Q    And were you in the same office as Mr. Swigart,

15   or in a separate office?

16       A    No.  I was in a separate office.

17       Q    And did you join that deposition at the outset

18   when it first commenced?

19       A    Yes.

20       Q    And did you listen in for the entirety of the

21   deposition?

22       A    Yes.

23       Q    Did you -- do you recall ever announcing your

24   appearance, announcing that you were listening in?

25       A    I'm pretty sure that I did.

1       Q    Okay.  Because I don't recall that.  And I --

2    that's why I'm asking you.  I'm a little surprised to

3    hear that you listened in.  But -- I don't think that's

4    anywhere in the transcript.  And I didn't recall you --

5    you announcing yourself.

6           Is there anything that occurred during that

7    deposition -- and I know -- well, let me back up.

8           Did you ever see the transcript of Mr. Patil's

9    deposition?

10       A    I haven't reviewed his transcript.

11       Q    Is there anything that you can recall that came

12   up -- the deposition lasted four or five hours.  Your

13   time entry is for, it looks like, four hours.  Do you

14   see that on Exhibit 8 next to 5/21?

15       A    Yes.

16       Q    All right.  So during the four hours of his

17   deposition, I mean, is there anything that particularly

18   you can recall that came up that is -- was important to

19   you in terms of you performing your analysis for the

20   plaintiffs' counsel with respect to trying to identify

21   class members?

22       A    Yes.  I wanted to know about the data and the

23   changes that were made in the data and the other

24   available data that was available.

25       Q    And what did you learn that was important for

**COMPENDIUM OF EVIDENCE REDACTED PAGE 59**

1  you in terms of performing your -- the scope of work

2  you've been asked to do?

3     A    That there was changes to the data that was

4  provided, that there exists other data that's available

5  that would shed more light on that.

6     Q    Okay.  Anything else?

7     A    No.  That's -- to summarize it, that's a -- you

8  know, I didn't -- I didn't prepare for today by going

9  over all the details for -- of -- of that deposition.

10    Q    Understood.  And I'm not -- I'm not going to

11  spend time racking you over the coals about what

12  happened at that deposition and what you recall.  I'm

13  just -- you -- you mentioned that you appeared at the

14  deposition.  You listened in on it.  So I'm going to ask

15  you a few questions about it.

16        So you said there were changes to the data.

17  What specifically are you referring to --

18    A    The recordings.

19    Q    -- do you recall?

20        The recordings?

21    A    Yes.

22    Q    And what kind of changes to the recordings?

23    A    File names.

24    Q    Okay.  Anything else that you recall?

25    A    You know, among other minor -- among other

1    details.

2        Q    But that was particularly important for you --

3        A    Yes.

4        Q    -- is that correct?

5        A    Yes.

6        Q    And -- okay.  And let me -- let me just ask you

7    this.  Do you -- are you -- I'm sure you -- given the

8    numbers of times you've testified as an expert -- I

9    think you say over 150 times -- I'm sure you're familiar

10   with the notion of a protective order.  Right?

11       A    Yes.

12       Q    Okay.  And you've seen those before?  And I'm

13   sure you've been asked to sign them before.  Right?

14       A    Yes.

15       Q    Okay.  Have you seen the protective order in

16   this case?

17       A    If I did, if -- if there was one, then I'm sure

18   I would have seen it.  I don't -- I sign a lot of

19   protective orders.  So I'm not going to try to and work

20   off of memory.

21       Q    Okay.  But you don't -- you don't have a

22   distinct recollection of being provided a copy of the

23   protective order in this case.  Correct?

24       A    To give you an idea, I did two protective

25   orders yesterday alone.  So I don't feel safe answering

1      Q     And have your engagements predominantly been by

2   Plaintiffs' counsel?

3      A     Yes.

4      Q     Out of 100 cases, what percentage of those

5   would be for the plaintiffs?   Over 90 percent?

6      A     Yes.

7      Q     And of the cases that -- how many cases do you

8   handle, your best estimate, in a given year?   I know it

9   could vary from year to year.   But just give me your

10   best estimate.

11      A     It does vary year to year.   And --

12      Q     I know.

13      A     You know, and keeping in mind some of these

14   cases go very, very quickly.   I'll say an individual

15   arbitration matter, for example, versus a multi-district

16   litigation, you know, case.

17      Q     Sure.

18      A     So it would be a pure guess to answer the

19   question the way that you asked.

20      Q     Fine.   Give me a guess.   I'm okay with that.

21      A     Maybe -- you know, maybe I can illustrate it.

22   If we look at my C.V., for example.   On my C.V., I've

23   listed -- because I'm not counting cases.   I quit

24   counting cases.

25          The only thing that I count is the number of

**COMPENDIUM OF EVIDENCE REDACTED PAGE 62**

1  cases that I've testified in, that I've provided

2  testimony either by deposition, final hearing, you know,

3  or whatever.  That -- that's 282.

4       I quit counting somewhere past 1,200 cases or

5  how many cases I've been engaged in.

6       Somewhere in between, that's how many --

7  somewhere between, let's say somewhere between the 300

8  and somewhere between the -- the 1200, that's how many

9  reports or declarations I've done.

10       Where in there, I have no idea.  Now --

11  **Q    Fair enough.**

12  A    Over -- over the --

13  **Q    You --**

14  A    And this is over the span of 13 years.

15  **Q    What I observe -- and you correct me if I'm**

16  **wrong, because you know your work better than anyone --**

17  **is that predominantly, the cases that you are retained**

18  **to assist in involve the TCPA.  Do you agree with that?**

19  A    A large portion of it, yes.

20  **Q    And there's very few cases, at least that I've**

21  **seen, where you have -- not that -- not that there**

22  **aren't any, but compared to the TCPA cases, very few**

23  **where you've been asked to testify in a CPC 632 or 632.7**

24  **case.  Isn't that true?**

25  A    There's actually -- there's actually been quite

1    a few of those.  I don't know what percentage.  You

2    know, maybe I can illustrate a little bit better.  The

3    analysis I do as far as the data goes is exactly the

4    same analysis as provided in those TCPA litigation

5    matters.  So from my perspective, the -- those cases

6    blend together.

7        **Q     Okay.**

8        A     So, for example, the only thing I had to do

9    today in preparation is to remind myself that this is a

10   call recording matter because the analysis is precisely

11   the same.

12            I've done many cases that -- on the call

13   recording cases.

14            But, again, it is just a fraction of what I do

15   in a TCPA matter, which is really identifying cell phone

16   numbers and analyzing the call detail records.

17       **Q     That's very helpful.  You just saved me about**

18   **20 minutes.**

19           **So if you look at your engagement letter that**

20   **memorializes your retention, it describes generally the**

21   **scope of the work, the scope of the engagement.**

22           **If you could bring that up on the screen,**

23   **Exhibit 7.  Under paragraph 2.  As e-discovery services**

24   **for a CPC 632 class action involving recording of phone**

25   **calls.**

1      A     Yes.

2      **Q     Okay. And you've done that many times?**

3      A     Several hundred at least.

4      **Q     What about the -- the topic of text**

5    **transcription. You mentioned that in your declaration.**

6    **Is there anything in your educational background you can**

7    **point to that qualifies you to offer testimony about**

8    **that subject?**

9      A     About transcribing?

10     **Q     Text transcription. Right. Transcription,**

11   **audio -- audio recording to text, what you're talking**

12   **about in your declaration.**

13     A     This is just another general IT function.

14   Keeping in mind the scope of the information technology

15   professional is anything computer related, which

16   actually includes the phone systems because they are a

17   computer.

18         Now, when it comes to -- you know, for example,

19   you did -- you know, when you -- well, let's just say

20   these phone systems. Right now, I'm setting up my own

21   phone system.

22         And one of the things that I want that phone

23   system to do is I want it to email my voicemail to me,

24   and I want it to transcribe it. So this becomes a --

25   this transcription is nothing new to this field. And

**COMPENDIUM OF EVIDENCE REDACTED PAGE 65**

1    you see it yourself if you have Vonage or even if your

2    regular cell phone carrier probably offers it as well.

3         So we can -- I don't know if you want me to get

4    in the weeds or what.

5    Q    No, I don't.  Nope, I don't want you to get

6    into the weeds.  I will bring you into the weeds when I

7    want to get you into the weeds.  And right now, your --

8    your general testimony is fine.

9         What -- what about specifically the IBM Watson

10   transcription platform.  Is there anything in your

11   educational background that you believe qualifies you to

12   offer testimony about the capabilities and use of that

13   specific platform?

14   A    Other than I used it?

15   Q    When did you use it?

16   A    Last I used it was a couple of weeks ago.

17   Q    And in what context?  For what purpose?

18   A    Transcribing phone calls.

19   Q    Was that in intersection with this case?

20   A    No.

21   Q    Was it in connection with another case?

22   A    Yes.

23   Q    How many times have you used it?

24   A    I've been bouncing around -- over the years,

25   I've been bouncing around between different engines.

 1  This is called an artificial intelligence engine.

 2  Google has one, you know, which is the one that Google

 3  uses.  They have an API that allows you to use theirs.

 4  IBM has an API.  I've been kind of going back and forth

 5  with those, writing my own programs and, you know, to

 6  interact with them.

 7      Q    I'm just -- fair enough.  I'm just trading to

 8  get a familiarity, sense of familiarity with your

 9  familiarity and use of this particular platform.  So I

10  appreciate your testimony.

11           Have you toyed around with it, used it, other

12  than the one time a few weeks ago?

13      A    Over the last couple of years or so, I've been

14  working on the -- I was writing software to interact

15  with it specifically for the purpose of transcribing

16  lists of phone numbers -- or lists of call recordings.

17      Q    How many times have you actually been given

18  access to use the IBM Watson transcription platform?

19      A    How many times?

20      Q    Yes.  How many times?  You mentioned a couple

21  week ago you were using it.

22      A    Oh, I can't go and itemize every day that I've

23  been -- that I've used it.

24      Q    Well, over the course of the last year, okay,

25  how often have you utilized the IBM Watson transcription

**COMPENDIUM OF EVIDENCE REDACTED PAGE  67**

1    platform?  Give me your best estimate.

2        A    I can't remember what I did last week.

3        Q    **I'm going to accept that as your answer if you**

4    **can't give me a best -- an estimate.**

5        A    Yeah.

6        Q    **I'm giving you the opportunity to give me an**

7    **estimate.  It could be five times, 100 times or --**

8        A    Yeah.

9        Q    **-- a thousand times.**

10       A    I -- you know, this was -- you know, because

11   my -- my days are -- I kind of -- I do multiple things

12   in a day.  So I wouldn't even feel safe doing that.  And

13   I have a hard enough time figuring out what I did last

14   week, you know, if we're getting into the specifics.

15       **Q    Well, I'm not going to accept that quite good**

16   **enough as the answer because I'm entitled to understand,**

17   **with your help, your familiarity with the IBM Watson**

18   **transcription platform.  And I'm trying to ask you --**

19   **and maybe I'm not doing a good job.  Okay -- what your**

20   **experience has been utilizing that platform so that I**

21   **have a good understanding of your familiarity with it.**

22           **So could you please help me with that.**

23       A    Over the last couple of years, I would use it

24   in spurts.  For example, you know, in -- you know,

25   again, this was in developing other software to interact

1   with it.

2          So if I had any slower periods of time, then I

3   would focus a lot of effort on it.  And maybe the last

4   time was maybe eight months ago.  I don't know.  That's

5   a guess.  That's all that that is is a guess.  You know.

6   But, like, then, you know, similar to this last time, I

7   spent basically a solid month working with this system.

8   In fact, I did spend a solid month working with this

9   system and developing software to interact with it.

10     **Q     Okay.  Thank you.  We'll talk about this a**

11   **little bit more.**

12          **Have you ever offered any expert testimony in**

13   **any matter that involved the IBM Watson transcription**

14   **platform?**

15     A     I've offered testimony, and I -- you know, in

16   other matters that involve the transcribing of the

17   audio.  A lot of the time, that transcribing was done by

18   vendors.  You know, again, it -- you know, basically

19   most everybody is using the same tools as far as this

20   goes.  But most of those cases, they involved other

21   vendors that were doing the transcribing.

22     **Q     That's understood.  But that's not quite what**

23   **I'm asking.**

24          **I'm asking whether you specifically, okay, in**

25   **connection with offering testimony in any case, have**

1    ever offered testimony that involved the subject of

2    utilizing the IBM Watson transcription platform to

3    transcribe audio recordings to texts.

4        A    Okay.  So --

5        Q    You talk about that -- you talk about that in

6    your declaration, something you want to do in this case.

7    And I would like to know if you've done it ever in any

8    other case?

9        A    In the other cases, I had somebody else

10   ultimately do the transcribing.

11       Q    All right.  Fair enough.  So you don't know if

12   they did it or not?

13       A    Yeah.  I know that they used a variety of

14   tools.  Some of them used possibly Watson.  There's not

15   a whole lot of different tools.  Some of them might have

16   used Google.

17       Q    Okay.  There's a discussion in your declaration

18   about semi random sampling.  Is there anything in your

19   educational background that you believe qualifies you to

20   offer testimony about that subject?

21       A    Can you -- can you point to the part in my

22   declaration that you're referring.

23       Q    Sure.

24            Well, let me just ask you are you planning on

25   offering any opinion in your declaration or otherwise in

**COMPENDIUM OF EVIDENCE REDACTED PAGE 70**

1    this case concerning the -- concerning the topic of semi

2    random sampling?

3        A    You know, I won't leave out the possibility.

4    My focus is to get -- my focus is to get the data that

5    is needed so that there is a sampling that is involved.

6    If a sampling is involved, it would be a simple sample.

7    I'm not -- you know -- you know, let's suppose, for

8    example, that the data that we get is un- -- is

9    incomplete.  That is considered a sample, you know.  But

10   more or less, that sample is to show the process works.

11       Q    So look at paragraph 30 of your declaration.

12       A    That's exactly what I was just saying just now.

13       Q    Pretty good.  You and I are on the same page.

14   So does that -- does that allude to the -- the notion of

15   semi random sampling?

16       A    Well --

17       Q    You don't use those -- you don't use those

18   words.

19       A    That's -- exactly.  I don't know what

20   semi-random sampling means.  So I'm not going to comment

21   on that.  I'm not saying yes or no.  That's why I wanted

22   to refer to my report, because I did not recall using

23   such terms.

24       Q    Have you ever used -- have you ever used that

25   term in any report that you can recall?

1    A    Not that I can recall offhand.

2    **Q    Okay.  Are you a statistician?**

3    A    No.

4    **Q    Do you have any background on doing statistical**

5    **sampling?**

6    A    No.  And that -- that's exactly my point.  I'm

7    not making any statistical projection.  I'm not

8    projecting something or trying to analyze future

9    forecasts.  I'm not trying to offer any analysis that

10   predicts a future outcome or a future anything.

11        I want hard data.  I want the actual call

12   records, and I want the actual recordings.  And with

13   that, I get the actual results, and there's no

14   statistics involved.

15   **Q    And just to be clear, you don't believe you**

16   **need to review each of the call recordings and you**

17   **haven't in order for you to carry out your task of**

18   **identifying potential class members.  Correct?**

19   A    Correct.  I don't need to listen to the --

20   **Q    In fact --**

21   A    -- to them to analyze the recordings.

22   **Q    I'm sorry.  I spoke over you.  Did you get the**

23   **last statement, Madam Court Reporter.**

24        THE REPORTER:  One moment.  The reporter has

25   the last statement or answer broken up as correct, I

1  don't listen to the -- to them to analyze the

2  recordings.

3  BY MR. MARDER:

4     Q    Just going back real quickly to Exhibit 8,

5  your -- that has your time entries, if we could bring

6  that up again.

7        Could you enlarge -- enlarge it for the witness

8  and me.  Thank you.

9        Jeff, what were you analyzing for 4.3 hours on

10  May 8th where it says analyze data?

11     A    See, I believe that was when we were given data

12  that was in improper format and I had to look to see

13  what it was.  And I had to do some comparisons with the

14  data, you know, to itself to try and identify what it

15  was that we were being given.

16     Q    And then on 5/20, you then analyzed the

17  reproduction of the data?

18     A    Right.

19     Q    Okay.

20     A    It was the same exercise all over again.

21     Q    All right.  Now is a good time to take a break.

22  We've been at it for little over an hour.

23        So let's go off the record for five or ten

24  minutes.

25            VIDEOGRAPHER:  Okay.  We're going off the

**COMPENDIUM OF EVIDENCE REDACTED PAGE 73**

1    record --

2          MR. MARDER:  And it's 10:15 -- 10:17.  We'll

3    resume at 10:30.

4          VIDEOGRAPHER:  Going off the record at 10:17.

5          (Recess from 10:17 a.m. to 10:34 a.m.)

6          VIDEOGRAPHER:  Back on the record at 10:34 a.m.

7    BY MR. MARDER:

8      Q    Welcome back, Mr. Hansen.  You know you're

9    still under oath?

10         MR. SWIGART:  I think you're muted.

11   BY MR. MARDER:

12     Q    Based on your testimony so far, I have a number

13   of questions I want to ask you, but I'm -- I'll ask you

14   to be patient with me because I need to ask them.  But I

15   suspect your answers are going to just be no.

16         But it's not that I didn't hear what you told

17   me.  Okay?  You've done this many times.  So I think I

18   under -- you know and you get it.

19         So I want to ask you -- well, first of all,

20   let's talk about the protective order.  So it looks like

21   you did locate it during the break?

22     A    Yes.

23     Q    And was this in your electronic file?

24     A    I have a copy of it.  Josh also had a copy of

25   it.  I think he probably sent the one that he had.

1      Q     And without marking this as an exhibit,

2    Exhibit A to the protective order looks like it was

3    signed by you on April 8, 2020.  Is that correct?

4      A     That sounds -- that sounds correct.

5      Q     Okay.  You -- during the break, you looked at

6    Exhibit A.  And does that appear to be your signature?

7      A     Yes.

8      Q     And do you believe that you signed it on or

9    about April 8th, 2020?

10     A     Yes.  I actually -- you know, having something

11   to trigger my memory, I actually remember when I signed

12   it.

13     Q     You have a specific recollection of signing it

14   that day?

15     A     Yes.

16     Q     Okay.  We'll move on.

17           I know that you told me this morning that you

18   spent less than 12 hours, around 12 hours on the

19   engagement, didn't review any audio recordings, don't

20   feel it's necessary that you do in connection with the

21   scope of your work.

22           But I'd like to get an understanding of what

23   you know about my client, okay.  This isn't your first

24   rodeo.  You've done hundreds of these.  And I'm sure

25   many of these blur into each other.

1          But do you know anything about American medical

2    response and what it does in its business?

3      A    Generally speaking, yes.

4      Q    What -- what do you know about them?

5      A    Well, AMR is a well-known ambulance service in

6    this area.

7      Q    Did you -- did you do any kind of diligence --

8    other than what you generally know about AMR, did you do

9    any kind of diligence concerning AMR in connection with

10   this engagement?

11     A    Well, my focus is on the systems that are used.

12   Whether it's AMR that is using it or not, it doesn't

13   make a difference.  For example, LiveVox quick connect

14   is the same product for everybody that uses it.

15          You know, the -- you know, so -- you know, any

16   knowledge that I might have of AMR is actually

17   irrelevant to my work.

18          So, no, I did not bother to look anything

19   beyond what I already know.

20     Q    All right.  And I thought that's what you were

21   going to say.  And so I'll -- I won't ask you more

22   questions about that.  So I figured you were going to

23   say it's irrelevant.  You did.

24          And is it similarly irrelevant for your work

25   who actually is making the calls to California patients

1   who may be members of the class?  Does it matter for

2   purposes of your analysis who's actually placing the

3   calls?

4        A    Yeah.  My -- my role was to identify which

5   calls are recorded and to identify, for example, those

6   that are recorded to people that may have not called in

7   or those that were called before a person was called in,

8   before a person called in.  That kind of stuff.

9             So my focus is on both the systems, the -- you

10  know, the computer systems that were used, specifically

11  the dialing system, which includes the recording, and

12  also the data.

13            And so my -- my role is the data analysis as

14  far as that goes is data analysis on historical data,

15  not future projections.  But a historical data.

16       Q    Okay.  And if AMR is contracting with third

17  parties like debt collection agencies to make the calls,

18  is that relevant at all to your analysis?

19       A    I would imagine that if they're relevant, that

20  the -- if those were going to be a part of this matter,

21  I'm -- I'm pretty confident that Plaintiffs' counsel

22  will seek and provide that.

23       Q    But it's not something you're aware of, as you

24  sit here today?

25       A    Correct.

1    Q    And since you haven't listened to the calls,

2    you don't know who actually made the calls to the over

3    22,000 putative class members, right, even though you've

4    been provided with the audio recordings?

5    A    Well, I don't see a need for that to know who

6    made the calls, but if I did want to know who made the

7    calls, listening to the audio recordings is not how to

8    do it.

9    Q    How would you do it?

10   A    For each and every one of those outgoing calls

11   using the LiveVox system, the user name of the actual

12   employee is used.

13   Q    Okay.  And is it your understanding that the

14   LiveVox reports from which you're going to obtain data

15   identifies the patient name?

16   A    No.  That would be the -- through the phone

17   number.

18   Q    Have you ever heard of an entity called

19   Integra?

20   A    I believe so.  But it's kind of a common name.

21   So --

22   Q    Are you aware of any relationship between AMR

23   and Integra -- and Integra as it relates to the issues

24   in this case?

25   A    I believe that was one of the topics, you know,

1  during the deposition of the gentleman in SABU.  But I

2  didn't -- for today, I did not commit anything to

3  memory.

4      **Q     All right.  So nothing about Integra is**

5  **meaningful to your analysis.  Correct?**

6      A     Well, again, my -- yeah, my focus is not about

7  the relationships between -- between AMR and any other

8  company.

9      **Q     Would it matter to you at all if I told you**

10 **that AMR contracts with three separate debt collection**

11 **agencies to make calls on its behalf to persons like**

12 **Mr. Mendell or others that are possible class members**

13 **and that each of those three debt collection agencies**

14 **uses their own different and separate script that they**

15 **follow for purposes of having discussions with patients**

16 **about their debts to AMR?  Would that matter at all to**

17 **you?**

18     A     It's -- I'm -- I'm assuming at that -- this is

19 just an assumption.  But I'm assuming that Plaintiffs'

20 counsel has decided a strategy and if they're interested

21 in that or not as to whether, you know, a third party

22 was making the calls or not.  I don't know.  I can't

23 speak for the Plaintiffs' counsel strategy or what it is

24 that they're -- but -- but what I can testify about is

25 the LiveVox system and the database and what that data

**COMPENDIUM OF EVIDENCE REDACTED PAGE  79**

1   is -- is for.

2          I don't know if that's going to be -- if it's

3   limited to that or if this is just going to be a small

4   piece of an overall -- you know -- if -- if those

5   databases are included as well, if those systems are

6   included, I can include that in my analysis as well.

7   It's just as easy.

8      Q    And if their -- the databases reflecting the

9   calls by the debt collection agencies to AMR customers

10  are not included in the LiveVox call reports and data

11  that you're going to get, would that impact at all your

12  methodology and analysis to identifying class members,

13  as you sit here today?  Do you know?  It's not included?

14     A    I think what you're asking me is actually kind

15  of summarized in that paragraph 30 -- 30 of my report.

16  And if that process stays the same no, matter if I have

17  a -- a -- you know, a database of 1,000 call recordings

18  or half a million, that process remains exactly the

19  same.

20     Q    So am I correct that for your purposes, it's

21  really not necessary for you to review any scripts

22  from -- that are utilized in making calls to AMR's

23  patients by the three debt collection agencies that I'm

24  mentioning?

25     A    Now, by script, do you mean what would be

**COMPENDIUM OF EVIDENCE REDACTED PAGE  80**

1    presented to the calling agent of what they're supposed

2    to say, or what they actually say.

3        **Q     That they're -- that they're supposed to say.**

4    **Exactly.**

5        A     Okay.  Again, I -- you know, my analysis is

6    not -- you know, as far as whether or not they disclosed

7    it was being recorded, my analysis is not whether they

8    were supposed to or not.  My analysis is whether or not

9    they did.

10       **Q     Well, assume for argument sake that they were**

11   **supposed to and they D and they're trained to follow the**

12   **scripts and -- and that unless there is human error,**

13   **they follow the scripts.**

14       A     Well, see, you know, I was kind of illustrating

15   earlier when I was saying that I'm in the doing any

16   statistics or any forecasting or projections or anything

17   like that, you know, I'm looking at -- what I'm looking

18   to look at is historical data that is concrete.

19            And when I transcribe those audio recordings

20   and I put those in a database as well, either the word

21   record or recording is there or it's not.  Whether or

22   not they're supposed to say it and they didn't say it or

23   they did say it, you know, whether or not they were

24   supposed to say it doesn't make a difference.  It's not

25   a part of the consideration.

1       My analysis is not about what was supposed to

2   be but what did occur.

3       **Q    Okay.  And your analysis, is it also dependent**

4   **upon a -- a dem -- a demonstration of when in fact it**

5   **did occur, when the notification of a recording was**

6   **made?  Is that important?**

7       A    Yes.  That's part of it too, yes.

8       **Q    Okay.  And how so?**

9       A    Again, those call detail records have the exact

10  date and time that the call was placed.

11      **Q    And does it need to be placed at any particular**

12  **time for your -- for purposes of your analysis in**

13  **ascertaining whether someone is an appropriate class**

14  **member?**

15      A    You know, without having a class definition in

16  front of me and also, you know, I understand sometimes

17  that might change or whatever, but it's very, very

18  simple.

19          Okay.  Those call detail records are an exact

20  accounting, a detailed accounting of each and every

21  phone call that was placed and every phone call that was

22  also received.  All right.  And there -- in with that, I

23  already hinted already that one of those columns is the

24  user name that logged in.  Okay.  So you have your own

25  unique user name to log into your system at work.  Well,

1   so do those calling agents.  So there's the name.  If we

2   were interested in the name, there it is.

3         It also has the recording.  So there's that.

4         It has a date and a time that the call was

5   placed.

6         The duration of the call.

7         The disposition of the call.

8         And it actually has dates and times for various

9   stages through the call.

10         It has very detailed information of what

11   happened with that call.

12         So all that information is there.  And because

13   this is just looking at historical data, the analysis is

14   extremely simple.  Okay.  And that is that it has a date

15   and a time.  So I could create a query that says

16   basically to identify all of those people that received

17   an outbound call where the word record never showed up

18   within the transcript and they never called, in they

19   never got on and made a recording on an inbound call.

20   And that would be -- I cannot even highlight how simple

21   that is.  It's -- how simple that is to do.  It's a

22   very, very basic database administration type of deal.

23     **Q**   **Do you know, as you sit here today, whether the**

24   **LiveVox data fields capture any information from the**

25   **debt collection agencies that were making calls on**

1  behalf of AMR?  Is that something you're aware of one

2  way or the other?

3      A    If they were using LiveVox, then it would be

4  there.

5      Q    Well, I'm -- assume for argument's sake they

6  were not using LiveVox.  Okay.  They also -- they also

7  were making calls to patients of AMR during the class

8  period.

9          Are you going to need the same type of

10 information from the debt collection agencies that

11 you're hoping to get from LiveVox in terms of call

12 reports in order for you to be able to ascertain the

13 identity of class members?

14     A    If we wanted to include calls made by other

15 dialers, then yes.  Then we would need that data as

16 well.

17     Q    And have you asked counsel to provide you with

18 that data in connection with carrying out your work?

19     A    I think that -- I think that this is the same

20 question that you asked me like three times earlier.

21 You know, I mean, I'll -- I'll check with them later on.

22 But it -- you know, or I am assuming that -- I'm

23 imagining that if you -- if you wanted to include those,

24 then we would be going down that road.  For all, I don't

25 even know if there's anything going on the background

**COMPENDIUM OF EVIDENCE REDACTED PAGE 84**

 1    trying to ascertain that.

 2           What I can say is if that data is provided to

 3    me, I can easily include it.  Just as I illustrated in

 4    paragraph 30, any other data I can include just as

 5    easy -- it does not change my process.  And I also gave

 6    kind of an estimate of how long it would take for I

 7    think 500 million -- or 500,000 records to illustrate

 8    that it's just a little bit more time but the same

 9    process.  And it's not much time.

10       Q    Let -- let's -- fair enough.  Let's -- thank

11    you for your patience with me as I walk you through this

12    area.  And I don't mean to go back and forth and repeat

13    myself.  But it's -- it's really important for us to

14    understand your scope of work and what it -- what you

15    need to carry out your assignment and what you have and

16    what you may not have.

17           So I want to ask you to look at Exhibit 3.  If

18    we can bring that up.

19           (Exhibit 3 was marked for identification.)

20    BY MR. MARDER:

21       Q    And just before I ask you that, Mr. Hansen,

22    just to be clear, as I understand it, then, you haven't

23    looked at -- you haven't been provided with or examined

24    any so-called call scripts, right, that call

25    representatives would use when co' AMR's patients

**COMPENDIUM OF EVIDENCE REDACTED PAGE  85**

1    about -- like Mr. Mendell about having a discussion

2    about collecting on outstanding invoices.  Correct?

3        A    I have -- I have not reviewed the call scripts.

4        Q    All right.  So here's one of them.  This is an

5    example of a call script from a debt collection company

6    called Credence that AMR contracted with to make calls

7    on its behalf to customers who received medical

8    emergency services from AMR and owed AMR money.  And

9    Credence in fact made such a call in this case to

10   Mr. Mendell.

11            So if you look at the call script, if we could

12   blow that up a little bit, enlarge it.  I know you

13   aren't familiar with it, you've never seen it.

14            But if you look at the very first line there,

15   it -- it says, you know, my name is so and so calling

16   you from a recorded line.

17            Do you see that?

18       A    Yes.

19       Q    Okay.  And then if you go down to a few

20   paragraphs, it has the fourth paragraph.  The person

21   says I'm calling you today with regard to an open

22   balance with American medical response.  It's kind of

23   hard to see.  But can you see that?

24       A    Yes.

25       Q    All right.  So just assume, if you will, for

COMPENDIUM OF EVIDENCE REDACTED PAGE 86

1  argument's sake that the representative from Credence

2  makes a call to an AMR patient utilizing this script,

3  and follows the script verbatim, and announces at the

4  outset the call is on a recorded line and they're

5  calling a California patient about an open balance with

6  American medical response.

7       Understanding the class definition, as you do,

8  is that someone that you think would be part of the

9  class, or would they not be part of the class?

10      A    Assuming somebody followed this script?

11      Q    **Yes, sir.  I want you to make that assumption.**

12      A    All right.  Number -- number one, I don't make

13  my assumption off of -- I don't -- you know, my approach

14  to analyzing the data is to make no assumptions.  So I'm

15  not interested in whether -- whether or not they even

16  had a script that -- that they were supposed to follow.

17      I'm wanting to answer the question of whether

18  or not they actually said what they -- you know, in this

19  case, does the word recorded or monitored show up

20  anywhere in the script.  Right.

21      Q    **And it does, the first sentence.**

22      A    Whether or not they say it in the first

23  paragraph or the fourth paragraph or whether or not they

24  said it at all or whether or not they were supposed to

25  say it in the first or fourth paragraph or whether or

**COMPENDIUM OF EVIDENCE REDACTED PAGE 87**

1    not they were supposed to say it at all is actually

2    completely irrelevant.

3            Now, to answer your question, I think, you

4    know, with that little clarification, if they actually

5    said -- in my analysis, if they actually said just the

6    word recorded, I would be underinclusive and including

7    people into that class.  You know, I might have --

8    whether it has let's, say, it might be a Boolean

9    expression where it has either record or recorded or

10   monitored contained within that, that person would be

11   excluded from the class.

12       Q      Okay.  Fair enough.

13           MR. MARDER:  You've answered my --

14           THE REPORTER:  And may the reporter -- I

15   apologize.  May the reporter clarify in the answer,

16   perhaps a vocabulary word, whether it has let's say it

17   might be a blank expression.

18           THE WITNESS:  A Boolean.

19           THE REPORTER:  Thank you.

20           MR. MARDER:  Boolean.  All right.  Thank you.

21   We're all done with that exhibit.

22           I want to go back to LiveVox and your

23   declaration at paragraph 7.  So if we could turn to that

24   for a minute.  If we can bring that up.

25           THE REPORTER:  That's Exhibit 2, John.

1          MR. MARDER:  Thank you, John.

2    BY MR. MARDER:

3       **Q    Let me just -- let me just ask you, Jeffrey,**

4    **just some general questions about LiveVox, because**

5    **you're obviously a lot more familiar with it than I am.**

6    **In fact, you say at paragraph 8 you're extremely**

7    **familiar with the LiveVox system.**

8               **Is this a proprietary system?**

9       A    I'm going to specify it as closed source, okay,

10   because too many people have too many definitions of

11   proprietary.

12      **Q    Okay.  Tell me what you mean by that.  So --**

13      A    This is a product that was developed by

14   LiveVox.  It is available for anybody likes to

15   purchase or -- or I'm going to call it more of a rental.

16   It's a -- you know, most software is a right to use --

17   right to use the software.

18               But you -- because, really, it's a web page for

19   you as the user.

20               But you're going to pay for the right to use

21   it.  You would have an account.  It's the same product

22   whether you use it, whether AMR uses it, whether a debt

23   collector uses it, telemarketer, scammer overseas.

24   Anybody who uses it, it will be the same exact product.

25               So it's not proprietary in that sense.  It's

1    needed.

2              What do you mean by back-end data fields,

3    Jeffrey?

4       A    I -- I -- I've got to be careful because some

5    of it might be under protective order.  All right.

6              But I can say that I have worked with LiveVox

7    in getting data from LiveVox in different matters.  And

8    I have learned that LiveVox has a lot of available data

9    that we can associate with each and every call.

10             You know, in the fields that I was referring

11   to, let's just say the basic fields, for example, that

12   we were talking about earlier, you have -- you have the

13   service that's being used.  You have the date and time

14   of the call.  You have the disposition of the call.  The

15   agent's log-in ID.  You have the -- the number that was

16   called.  The court of law ID that was used.  The

17   campaign.  Various columns in this imagine a

18   spreadsheet.  Yeah.  And this is just kind of throwing a

19   number out there that I know is accurate.  Probably a

20   whole lot more.  But there's many fields of data.

21             And one of them would be the actual recording.

22   The -- the -- we'll say the path-through recording.  And

23   the name of the file --

24             THE REPORTER:  I'm sorry.  May the reporter

25   hear again, please.  We'll say the -- was the word

1    pass-through --

2              THE WITNESS:  Path, P-a-t-h.  You know, one of

3    them will be the path to the actual recording, the

4    actual name, the file name of the recording.  That's why

5    the file names are critical on this.  And that allows me

6    to build that database and ultimately include the

7    transcription with the actual name and tie that into the

8    call detail records.

9    BY MR. MARDER:

10        Q    And is this -- all of this what you were

11   referring to as back-end data fields?

12        A    Yes.

13        Q    And you do -- and you base this on your

14   knowledge or awareness of LiveVox software from other

15   cases you've worked on?

16        A    Yes.

17        Q    In other words, it's not based on your actual

18   utilization of the system, because you told me you don't

19   have access to it.  Although, you -- you -- you utilized

20   it in some form, you know, back in the pre2014 time

21   period?

22        A    Yeah.  I mean, you know, to -- to -- to be

23   fair, I try not to make as many calls as possible.  I

24   still have an auto dialer, but I try to stay away from

25   making any calls.

1      Q      Yeah.  And I'm just trying to get a sense of

2   whether this 200 back-end data fields that you project

3   is -- is a real, you know, estimate or if it's, you

4   know, based on something that is more in the nature of

5   speculation.

6      A      No.  It's based on actual obtaining those

7   records from LiveVox and working with them to obtain

8   those.  And that includes many discussions, whether it

9   be conference calls or whether it be, you know, there's

10  been depositions and whatever, you know, through all of

11  that.

12          But it was actually in the obtaining of that

13  data to use in cases or working to obtain that data.

14     Q      You also say that in general only about 12

15  fields were available to LiveVox clients like AMR but

16  LiveVox maintains hundreds more fields on their servers

17  and is capable of generating very detailed reports using

18  those fields.  Are -- are you able to say that with a

19  high degree of confidence --

20     A      What I'm illustrating there -- and I don't want

21  anybody to get hung up on the numbers, so to speak.

22          The bottom line is when you go to the report

23  page to generate a call detail report as the user of

24  LiveVox, you're going to get basically a template that's

25  going to give you the basics of what generally people

1   would need.  All right?

2          And the reason being is, number one, you know,

3   there's -- as I mentioned earlier, I promote LiveVox for

4   my customers because it's so easy for them to use,

5   because I don't want them to call me up every day

6   because aim not charging them.  So I want them to use

7   something very easy.

8          Now, the key to it being easy is do not clutter

9   the screen.  For example, if you were presented a screen

10  with what columns do you want and you choose through 200

11  of them and you can't -- you know, and being the average

12  user, you don't know what that is.  Your head would

13  explode.  So it defeats it being user friendly.  So the

14  not -- you know, generally, for those extra things, you

15  go to LiveVox directly.

16     **Q     But let me -- let me just ask it this way, just**

17  **to get at to the heart of it -- as you sit here today,**

18  **not having received yet anything from LiveVox, do you**

19  **know what specific fields will be included in the call**

20  **detail records reports that have been requested of**

21  **LiveVox?**

22     A     Do I know what would be included?

23     **Q     Yes.  Do you know what specific fields would be**

24  **included?**

25     A     Are you asking for the names, or are you asking

1   for the content?

2   **Q    I'm asking -- let's -- both.  The name and**

3   **content.**

4       A    For starters, I don't remember right offhand if

5   they call it disposition or if they call it status.  I

6   remember right offhand if they call it a DID or

7   something else for the phone number.  I, you know,

8   because, you know, again, this is like trying to guess

9   how you label the folders for particular cases and --

10  and -- in your filing cabinet.

11          But, you know, I deal with them -- I happened

12  to memorize status column as being -- oh, no, not

13  status.  Service.  Okay.  For a different purpose, that

14  name comes up as being a specific name.

15          But did they use phone number?  Phone_number

16  for the phone number?  Did they just put NUM phone?  I

17  don't remember right offhand, you know, if they did

18  without either going to the report screen or --

19  actually, the report screen is not going to do it.  But,

20  you know, once I can see it yeah.

21          So but we've asked them for specific data that

22  I do know that they have.

23      **Q    All right.  Let me ask you --**

24          THE REPORTER:  I'm sorry.  If there was more to

25  the answer, the reporter didn't capture, with the

1    overlap, after "I do not know what they have" and maybe

2    if we could just allow more space between the speakers.

3              MR. MARDER:  Yep.  I apologize.

4              THE REPORTER:  Thank you.

5    BY MR. MARDER:

6         **Q    Did you com --**

7         A    Yeah, I guess -- I guess to -- you know, to

8    make sure that's kind of clean, you know, so

9    specifically, if they name the column phone versus

10   phone_number, I can't say as I sit here at the moment,

11   because I see different call detail records every day

12   from different dialers.  It's one of those that once I

13   get it, it's pretty darn obvious that, oh, they've chose

14   phone number versus phone for that phone column as being

15   the title of the column.

16             But as far as the data that I'm looking for, I

17   do know that they have -- I know that they have the firm

18   that was called, the time that it was called, the

19   disposition of the call, and so on.  So that

20   information, I do know that they have because I deal

21   with LiveVox call detail records nearly on a daily basis

22   for the last decade.

23        **Q    Thank you.  Let's take it a different way.  I**

24   **appreciate your answer.**

25             **What data are you looking for?  What specific**

1   fields are necessary in order for you to be able to

2   ascertain whether individuals are members of

3   Mr. Mendell's class?

4        A    I think I answered this one already.

5        Q    **Well, answer it again, then.  What are you**

6   **looking for?**

7        A    We need that information to illustrate the

8   call, such as the phone number that was called, the time

9   that it was called or the dates and time that it was

10  called.  We cover the possibility when you ask the

11  question do I know who made the call?  Well, if we

12  really want that, we want the agent, the log-in ID.  And

13  I'm giving you two possible column names there to

14  illustrate there, you know.  It could be user ID.  It

15  could be agent.

16           The disposition of the call, the length of the

17  call, the duration.  Whether or not the call was inbound

18  or outbound.  With those different data points, I can

19  formulate all the possible queries that I would need in

20  order to identify those people that were called that

21  never called in that never -- or were called before ever

22  calling in or however we want to draw that up.  But at

23  that point, we have all of the data points to make those

24  queries.

25       Q    **And you're confident, as you sit here today,**

1    that LiveVox has all of those data fields.  Is that

2    correct?

3        A    I know for a fact that they have all of those

4    fields.

5        Q    All right.  Thank you for that.  Are you -- are

6    you asking -- I know that you talked about dates and

7    times.  Are you asking for information from LiveVox as

8    to coverage over a particular time period?

9        A    I had spoken with -- with counsel and what I

10   need.  I don't know -- you know, I haven't seen the -- I

11   haven't been into negotiations with counsel for -- for

12   LiveVox.  So -- so, you know, I don't want to speak

13   about what actually -- what deals were being made or

14   whatever, you know, as far as what was being agreed to

15   or not.

16       Q    Well, don't you need information from LiveVox

17   that covers the start and end of the class period?

18       A    I don't know if they -- for all I know, it's

19   every call for that client for the last 20 years, you

20   know, versus the class period.  I have -- if I get an

21   overabundance of data that covers beyond the class

22   period I have, it's trivial to limit the data in my

23   analysis.

24           So if I get more data than what's necessary,

25   great.  So I did not say -- specify anything to limit

1    the data.

2        Q    So would it be helpful for you to get data for

3    a particular customer that comes up with respect to all

4    calls having to do with that customer, whether it's

5    before the class period, during the class period, or

6    after the class period?

7        A    Well, that was -- you know, it could.

8        Q    And how might that be helpful?

9        A    If we wanted to look at any calls that were

10   made to that customer or received by that customer

11   previously or after.

12       Q    Well, right.  Like, hypothetically, say that

13   customer, the word recorded doesn't pop up during the

14   class period but it does before the class period or

15   after the class period.  Is that something that would be

16   important for you to know in ascertaining whether or not

17   they should be included in the class?

18       A    It could be if that's a requirement.

19       Q    You -- you talked about identifying whether the

20   call was inbound or outbound.  And is it your testimony

21   you anticipate the production from LiveVox will include

22   that data?

23       A    Yes.

24       Q    And you -- you base that on your prior

25   experience in other cases?

**COMPENDIUM OF EVIDENCE REDACTED PAGE  98**

1      A     Yes.  And also -- and also because I know that

2    that information is available on every dialer.

3      Q     Will the production also include information

4    about whether a person ever initiated a call to AMR that

5    would be reflected in the LiveVox system?

6      A     Yes.

7      Q     Okay.  And you also say in paragraph 8 that

8    call detail records can be utilized to identify whether

9    a person-to-person conversation was a first-time or

10   subsequent conversation.  Could you explain what you

11   mean by that.

12     A     From the data set identifying when the first

13   call was.

14     Q     I see.  So that information should be available

15   from LiveVox?

16     A     Yes.

17     Q     Understood.  So if someone like our prior

18   example had had a call during the -- preceding the class

19   period, that should show up in the LiveVox data.  Is

20   that correct?

21     A     It can be -- it can be -- it can be produced.

22     Q     Okay.  If we went over this already, I

23   apologize.

24           But will the call detail reports from LiveVox,

25   as far as you know, include a field identifying what

**COMPENDIUM OF EVIDENCE REDACTED PAGE  99**

1   script was used by call representatives?

2      A    I do believe so, yes.

3      Q    And are you aware of the fact that the persons

4   who are making calls from -- on behalf of AMR were

5   utilizing different scripts over different time periods?

6      A    I would assume that. The reality is is you

7   could change a script every few minutes or the person

8   may not follow a script at all, as I was kind of

9   illustrating earlier. And -- and, you know, to kind of

10   illustrate -- this is exactly one of the things that I

11   hate about working at a call center, because I've done

12   that, is when you have live agents, they do whatever

13   they do. They don't necessarily follow the script. If

14   they've got somebody that's -- they're receiving a phone

15   call that really wants to hang the phone up really

16   quick, I can almost guarantee that from my experience

17   that the caller is not going to go by the script.

18   They're going to try and keep them on the phone or try

19   and get right to whatever it is that they want to.

20      Q    Yeah. That's what I've come to learn, that

21   even if they're given a script and you train them to

22   stick with it, there can be a lot of variation,

23   depending upon how the call goes.

24      A    Right. So --

25      Q    -- who is on the other --

1    A     And that's kind of -- that's kind of my point.

2  So you're asking me a lot of questions about the

3  relevance of a script.  And I'm trying to -- I'm trying

4  to say that from my analysis, from what I'm looking at,

5  I want to know sure things what actually did happen.

6  I'm not -- you know, you know, I'm -- I'm looking to

7  establish the facts in the data, not guess on -- based

8  on what somebody was instructed to do.

9    **Q     Understood.**

10    A     Because it's no more than a guess of whether or

11  not that person actually followed the script or not.

12          But what does say whether or not they followed

13  the script or not is whether or not the word record

14  shows up in there.

15    **Q     Okay.**

16    A     And that's giving them a lot of leeway.

17    **Q     Okay.  So someone could be instructed to give**

18  **the notification the call is being recorded but they**

19  **place a call and the other person on the line doesn't**

20  **give them the chance to say anything because they**

21  **interrupt them and they start asking questions.  Right?**

22  **That's one scenario where a record notification may not**

23  **occur at the outset.  But they may get it in at some**

24  **point.  Isn't that a possible scenario?**

25    A     The variation of what kind of things could take

1   place during the conversation with an auto-dialed call,

2   there's a myriad of things.

3       And let me just put it this way, one of my

4   customers after 20 years of doing this, he's still

5   entertained every time because every conversation is

6   totally different.

7   **Q    Yeah.  So doesn't that make it pretty difficult**

8   **to group calls depending upon the time when a**

9   **notification is given the call is being recorded,**

10  **because of that variation of variability?  It's hard to**

11  **group them?**

12      A    I don't understand what you're trying to say.

13  Are you trying to say whether they say it in the first

14  paragraph or the fourth paragraph?

15  **Q    Correct.**

16      A    I have absolutely no care of whether or not it

17  was in the first or the fourth paragraph for my

18  analysis.  I'm looking at did they make -- did they say

19  the word record or monitor anywhere.

20  **Q    Got it.**

21      A    In the conversation.  Whether it's the first

22  two seconds or the first 20 minutes into the

23  conversation.

24  **Q    And -- and you're going to be as conservative**

25  **as you can.  And if it's said, then they get excluded?**

1    A    Exactly.

2    Q    All right. So let's -- let's turn to IBM

3 Watson. We talked about that some. And I just -- I

4 want to go back to that. And, again, not -- me not

5 being a technical person, I appreciate your indulgence.

6 And I'll try not to ask you what I already have.

7       But as I understand your declaration, the plan

8 is to use the -- this -- this IBM Watson platform to

9 transcribe audio recordings into text transcription,

10 correct, and that this is a speech-to-text program --

11    A    Yes.

12    Q    -- that you can use? And it's -- it's Cloud

13 based. Is that right?

14    A    Yes.

15    Q    All right. And I take it you've never -- I

16 didn't see in your employment history -- you've never

17 worked with -- at IBM. Have you? Maybe you have.

18    A    That's like asking the -- that's -- that's kind

19 of like an odd question. I'm sorry. Because it's like

20 asking the race car -- the race car driver have you ever

21 worked for Ford Motor Company? What does that have to

22 do with anything?

23       I've used IBM products for three -- 30 years,

24 I've been using IBM products.

25    Q    Okay.

1      A     And I've been making -- I've been working in

2   the industry with IBM products for 30 years.

3      **Q     Fair enough.  And what about -- sorry, Madam**

4   **Court Reporter.  Go ahead.**

5           THE REPORTER:  In the answer, may the reporter

6   confirm "And I've been making -- I've been working in

7   the industry with IBM products for 30 years" was the

8   answer?

9           MR. MARDER:  Well, that was his answer.  I

10  didn't ask my next question.  I think that was the end

11  of his answer.

12          THE REPORTER:  From the witness, may I hear.

13          THE WITNESS:  Yes.  And -- and I did say also

14  that, you know, I've been working with those products

15  in -- in -- and administering systems with those

16  products for 30 years.

17          MR. MARDER:  Thank you.  Thank you.

18  BY MR. MARDER:

19     **Q     In your 30 years of working with IBM products,**

20  **have you ever been granted administrative rights to use**

21  **the IBM Watson system?**

22     A     Well, I guess you're going to have to define

23  that a little bit more.  Okay.  This is a -- this is

24  something that they give you -- they allow you to use

25  with an API.

1    Q    So have you been allowed to use it in your --

2    previously?

3    A    Yeah.  I think we covered that earlier too, and

4    you were trying to have me guess and try and -- you

5    know, remember when was the last time and how often I

6    use it.

7    Q    Have -- have you ever -- have you ever run --

8    well, strike that.

9         Have you ever conducted any kind of studies on

10   the accuracy of the IBM Watson transcription in the

11   context of telephone recordings?

12   A    Yes.

13   Q    Tell me about that.

14   A    I've taken some -- recently, I did some -- you

15   know, for example -- and I've done things before.  But

16   recently, I've looked specifically on accuracy will it

17   capture what I want, how well does it capture, you know,

18   different variations of it, and also how well does it

19   handle that ringing that takes place before the

20   conversation begins.

21   Q    And what did you find --

22   A    I found --

23   Q    -- based on your diligence?

24   A    I found that when I was doing a side-by-side

25   comparison with Google, Google's API, and I'm kind of --

1   you know, the -- the most significant thing was is that

2   IBM was handling the ringing -- ringing aspect a lot

3   better than Google was.

4        And so, you know, they both perform the same

5   function.  They both perform very, very well.  But the

6   thing that's kind of pushing IBM over the edge for me is

7   that it handled the ringing, at -- at the beginning of

8   outbound calls a bit better.

9   **Q    Okay.  So in the context of transcribing**

10  **telephonic recordings I mean, do you have any -- do you**

11  **know what statistically the confidence level is in the**

12  **platform in terms of accuracy?**

13  A    It's been my experience that -- in dealing with

14  these that -- I don't have any reason to doubt -- I

15  don't have any reason to doubt the accuracy of these

16  systems.  And, yes, I have looked for any problems.

17  I've considered some of the other things such as the --

18  say, like on a debt collection call, sometimes the

19  recipient of the call mumbles.  That is exactly why I'm

20  looking at is the word record or monitor, is that ever

21  mentioned anywhere, because that's not the -- something

22  that the recipient of the call will be saying.

23        Typically, the agents that are making the

24  calls, well, their job also is to speak clearly.  And

25  they -- I found that they do.  They don't necessarily

1    follow the script, but they speak clearly, unlike the

2    recipients of the call.  But I'm not running the -- the

3    transcription to capture what the recipient said.  I'm

4    running it to capture what the caller said.  So --

5        **Q    So you --**

6        A    -- a very high degree of accuracy.

7        **Q    You -- you gave us a number of examples of**

8    **different types of words that you might search for in**

9    **your declaration.  We're going to get into that.  But my**

10   **sense is -- and you confirm this if I'm correct -- that**

11   **the word recording or record is -- is -- is a -- has a**

12   **high level of importance to you.  Correct?**

13       A    Yes.

14       **Q    And -- and can you comparing the other words**

15   **say that that has -- that is the single-most important**

16   **word in doing your keyword search --**

17       A    Well --

18       **Q    -- in whether the word record -- whether the**

19   **word record comes up or not?**

20       A    In the past when I've done this specific

21   analysis to -- to -- to look -- to query the transcribed

22   recordings, I've used -- you know, usually through

23   counsel, we would -- you know, we would agree on what

24   terms would be used.

25            But, for example, I can recall having made it

1   very, very simple.  If the word record, recorded, or

2   monitor show up anywhere, that person is excluded from

3   the class.  I've done that in the past.

4       **Q     Okay.**

5       A     So it may be more than one word.

6       **Q     And that word --**

7       A     It usually --

8       **Q     Sure.  And we're going to get -- we're going to**

9   **get into the other words.**

10      **But that word is -- is -- is extremely**

11  **important.  Correct?**

12      A     Well, it -- you know, for -- for our discussion

13  here, that's obviously the first thing that comes to

14  mind is, you know, the word record.

15      **Q     All right.  And getting back to the IBM Watson**

16  **platform I mean, did -- I guess I want to know more -- I**

17  **know you -- you have confidence in it.  But I'd like to**

18  **know just using that term of art what your confidence**

19  **level is in -- does it have to be 100-percent accurate**

20  **for your purposes, 80-percent accurate?  What's a**

21  **sufficient confidence level as an expert in this area?**

22      A     I'm confident that that system will give in the

23  high nineties for what we're looking at.  You know,

24  keeping in mind I'm not interested in the recipient --

25  what the recipient says.  All right.  I'm looking at

1  what the things that would be transcribed clearly.  So

2  high nineties.  Close to 100 percent.  And I'm just

3  going to say high nineties because, theoretically,

4  nothing is 100 percent.  Okay.

5         You know, the -- through a third-party -- there

6  are third-party transcriptions that are 100 percent, you

7  know, because they aren't even using AI.  So that

8  remains an option.  So if it's agreed on by any of the

9  parties or whatever, we can use such an option with that

10  and having a third-party transcribe it, you know.  It

11  would be a guaranteed 100 percent.  Okay.  But --

12     **Q     Are you -- are you looking for -- are you going**

13  **to use word searches to determine if the -- you said**

14  **you're not interested in what the call recipient has to**

15  **say.  But what if the call recipient says something like**

16  **I consent or I agree or okay with me, acknowledging**

17  **they're consenting to the call being recorded.**

18     A     I --

19     **Q     -- does that matter at all?**

20     A     I think we covered this pretty well earlier,

21  and that is that I'm being extremely conservative.  In

22  that, you know, if -- if the call, conversation carried

23  on for 30 minutes before they said the call can be

24  recorded and mon- -- or monitored and the person hung up

25  on them, you know what, it would actually result in that

1    person being excluded from the class.

2            Okay.  You know, I -- I think that we kind of

3    established earlier that I'm erring on the side of being

4    ultra conservative.

5    **Q    Okay.  You're right.  We did.  A couple more**

6    **questions on IBM.  I don't think any of them will**

7    **surprise you.**

8            **Have you ever submitted an expert report or**

9    **given expert testimony about your use of the IBM Watson**

10   **transcription technology in the context of telephone**

11   **recordings?**

12   A    I haven't covered specifically IBM Watson in

13   any of my reports.

14   **Q    All right.  And in order to use the IBM Watson**

15   **system, do you -- do you have to -- do you have to pay a**

16   **fee or a subscription?**

17   A    Yes.

18   **Q    And have you done that?  Do you have an account**

19   **where you're paying a fee or subscription?**

20   A    I'm having to reestablish it.  But, yes, you

21   know, that's because it expired.  But --

22   **Q    Okay.  And I take it you haven't loaded, then,**

23   **any audio files that have been produced into the IBM**

24   **Watson system yet.  Correct?**

25   A    Not the audio files from this case.  I've

**COMPENDIUM OF EVIDENCE REDACTED PAGE  110**

1  loaded other audio files into the system.

2      **Q     No.  From this case.  And so you haven't loaded**

3  **any files or run any -- run the transcription process**

4  **that you've outlined in your declaration, right, in this**

5  **case?  You haven't done it yet?**

6      A     Part of my analyzing data was to take -- so,

7  for example, assuming that these are mp3s, because that

8  was what was produced earlier, mp3s versus waves, or,

9  you know, whatever CODECs.  So what I did is I made sure

10  that I had some sample files that were, you know, a

11  whole directory of -- of audio files, mimicking exactly

12  what we have here, mp3s, compressing the same CODEC.

13  That's C-O-D-E-C.  Making -- you know, and transcribing

14  that data and loading it in the database.  All right.

15  It -- and doing the searches there, keeping in mind that

16  as far as the searches, once it's in the database, once

17  it's even formed as a CSV file, those recordings, those

18  transcriptions, that data analysis I do every day for

19  the last 20 years.

20          So that -- so the only -- so the only -- so I'm

21  assuming then that your only question is only limited to

22  the transcription itself.  And, yes, I've tested it

23  specifically for this case with audio files that are

24  formatted exactly the same way with varying degrees of

25  quality so that I can properly test this -- you know,

1  the system to see if I'm confident with it.  And I am.

2  And I also did some comparisons with Google's AI as

3  well.

4      Q    And you've tested it utilizing this specific

5  IBM Watson platform?

6      A    Yes.

7      Q    How are you able to do that if you don't have

8  access rights to it?

9      A    I do.

10      Q    Oh, I thought you said --

11      A    No.  Currently, I need to regenerate my keys.

12  That's it.

13      Q    Okay.  I misunderstood.  Forgive me.

14          Is this -- IBM Watson, is it a HIPAA-compliant

15  platform?

16      A    I don't think I can say on that.

17      Q    Why not?

18      A    Because I'm not giving a -- a -- you know --

19  I'm not in a position to determine legally speaking if

20  something is HIPAA compliant or not.

21      Q    Fair enough.  All right.  Let's take a break.

22  We've been at it for well over an hour.  It's 11:35.

23  Let's -- let's take a 10-minute break, and we'll come

24  back somewhere around 11:45.

25          VIDEOGRAPHER:  Okay.  We're going off record at

**COMPENDIUM OF EVIDENCE REDACTED PAGE 112**

1    11:36.

2           MR. MARDER:  We're making progress.

3           VIDEOGRAPHER:  We're going off the record at

4    11:36 a.m.

5           (Recess from 11:36 a.m. to 11:57 a.m.)

6           VIDEOGRAPHER:  We're back on the record at

7    11:58 a.m.

8    BY MR. MARDER:

9      Q    Just getting back to IBM Watson, you said that

10   you've run -- I think I heard you say that you've run

11   some tests simulating what you would do here.  Do -- do

12   you have records of those tests that you've run?

13     A    No.

14     Q    Why not?

15     A    There was no need to keep it.

16     Q    Have you ever looked at any, you know,

17   scientific studies that talk about the accuracy of IBM

18   Watson?  We were talking about confidence level, and you

19   said you thought it would be in the nineties.

20           Have you ever looked at any of those scientific

21   studies?

22     A    No.  I -- that's why I wanted to create data

23   that was -- very much resembles the data that we were

24   going to be using in this matter to test that.

25           So I was actually using data from actual phone

COMPENDIUM OF EVIDENCE REDACTED PAGE  113

 1  calls.

 2      Q    Actual phone calls related to this particular

 3  case?

 4      A    No.

 5      Q    All right.  So you didn't feel a need to check

 6  studies because you did your own -- basically, you did

 7  your own test, and you were satisfied that it was

 8  similar enough to what you intended to do here?

 9      A    Yes.

10      Q    And is it your testimony that the IBM Watson

11  platform will be able to distinguish which person on the

12  call said the word record?

13      A    It does do that, but then, again, as I was

14  illustrating earlier, I may not even -- even really

15  consider that.  And the example that I gave earlier,

16  even if the recipient of the call said record or

17  monitored, it would show up, and they would be excluded.

18          So, again, I was -- I was planning on erring on

19  the side of being ultra conservative.

20      Q    Okay.  And you're not saying that the IBM

21  Watson can tell you with 100-percent accuracy if a word

22  appears, but in your view, if it's in the nineties,

23  that's a sufficient level of confidence for your

24  purposes?

25      A    I think what I was illustrating earlier is that

1  from my experience with it and dealing with it, I find

2  no indication of any inaccuracy for the purpose of what

3  we're using it for.  And I gave just the small qualifier

4  that sometimes the recipients of the calls, especially

5  on debt collection, they may be more likely to mumble,

6  and -- you know, in which it would actually show up as

7  basically inaudible.

8          But, you know, that wasn't even an issue.  So

9  in my test, I had 100-percent accuracy as far as what I

10 needed it to be accurate for.  And, you know, so -- and

11 then I kind of specified that, yeah, I'm not going to

12 say 100 percent, because, theoretically, right, I want

13 absolutely sure what I say.  So, yeah, it's in the high

14 nineties.  Okay.  But to be fair, I have not seen a

15 single instance where it would pose a problem, where

16 there would be a problem of inaccuracy.

17     **Q     And I appreciate that you're feeling very**

18 **confident about utilizing the IBM Watson platform with**

19 **respect to the process of transcribing calls to text.**

20 **But are there other methods that are available for you**

21 **to be able to identify class members?**

22     A     What?  As far as the transcribing?

23     **Q     Yep.**

24     A     There are other options available.  There

25 are -- I know of people who do it locally that have

1  their own software.  For example, somebody -- I know

2  of -- I've worked with somebody before that has his own

3  software, and it has proven to be very, very accurate.

4  So that remains an option.

5          I also mentioned earlier that there are

6  services where people actually have -- where they

7  transcribe, you know, where I mentioned earlier that

8  could be 100-percent accurate, even theoretically.

9  But -- so there are other options available.

10          And, you know, quite honestly, I'm not married

11  so -- so to speak specifically to IBM Watson.  It just

12  happens to be one that, yeah, that's one of the many

13  options that are actually available at hand.  There's

14  other options that we can use as well.

15      Q    All right.  But, as you sit here today, this is

16  the one that you intend on using.  Correct?

17      A    Yeah.  At the very -- at the -- well, at the

18  very moment.

19      Q    Yeah.  At the moment.

20      A    Yeah.  At the -- at the moment.

21      Q    And this is intended to short circuit the

22  process of -- I mean, I suppose someone could take the

23  time to review every single audio recording.  Right?

24  Every one of the over 22,000 audio recordings and listen

25  to them in their entirety of what is said?

1      A      And in fact there are services that do exactly

2   that where they have a whole Army of people do it.

3      Q      Right.  But your -- your method is to come up

4   with key search words that you intend to use to identify

5   persons that you think are going to be similarly

6   situated to Mr. Mendell as far as the criteria that he

7   has and identify them as class members.  Is that

8   correct?

9      A      Right.

10     Q      All right.  Well, let's go through that and --

11  and talk about what those criteria are.  So I think you

12  lay it out in paragraph 16, Jeff, of your declaration,

13  where you -- you say -- I'll give you a minute to find

14  it.  Okay.  If you could blow that up some.  There you

15  go.

16           You say that class members will be determined

17  to be persons in California and patients of Defendant

18  who suffered the same harm in the same manner as

19  Mr. Mendell, in that Defendant audio recorded the first

20  outgoing call to Mr. Mendell and the absent class

21  members without a recording advisement at the outset of

22  outgoing calls.

23           So I just want to walk you through that, first

24  of all.  And I'm just going to focus on the words you

25  used.  You told me that this is your declaration

1  although counsel gave you comments that were not

2  substantive.

3      So what do you understand the harm is that

4  suffer -- that Mr. Mendell suffered, since you say that

5  you're going to determine class members to be persons in

6  California and patients of Defendant who suffered the

7  same harm?  What is that?

8      A    That follow -- that has the same -- same

9  circumstances.  Right.  So he's in California.

10  Identifying the people in California is trivial.

11      You know, there's that one.

12      If he received a phone call or a -- he received

13  an outgoing call from AMR, did not disclose it, and he

14  never called in and, you know, from the first call, he

15  never was -- we'll say the word record or monitor never

16  shows up, they -- you know, that would be very easy to

17  identify those same set of circumstances in all the

18  calls.

19      Q    So if someone got a call, California patient,

20  and in the first call the word recorded did show up in

21  that first call, as I understand your testimony, they

22  would not be similarly situated to Mendell or class

23  members.  Correct?

24      A    Correct.

25      Q    All right.  And the criteria that you mentioned

COMPENDIUM OF EVIDENCE REDACTED PAGE 118

1      A    Right.

2      Q    Correct?

3      A    That's correct.

4      Q    So if the first call a person received from AMR

5   or its agent was before the class period, before July 1,

6   2018, as I understand your criteria, that person should

7   not be included as a member of the class, correct, using

8   your conservative approach?

9      A    Yes.  Say -- yeah.  If they -- yeah.  Say

10  again?  I'm sorry.

11     Q    I said using your conservative approach, if

12  a -- if the first call a person received from AMR or

13  someone on its behalf was before the class period,

14  before July 1, 2018, that person you would exclude from

15  the class.  Correct?

16     A    That's correct.

17     Q    All right.

18     A    Or actually --

19     Q    So --

20     A    Yeah.

21     Q    All right.  So you've kind of given me already

22  a pretty good run-down on the word searches.  But I just

23  want to -- I -- I want to make sure I've exhausted it,

24  Jeffrey.

25          So we talked about how important the word

1    record is -- or record is or a derivation of that.

2              And in paragraph 19, if we can turn to that,

3    you -- if you can enlarge that a little bit for the

4    witness, you -- you mention a couple of other words you

5    would want to search like patient business services or

6    customer care.  Those are some examples.

7              Are there -- as you sit here today, are there

8    any other example of words that understanding that this

9    is something that would evolve, as you pointed out, any

10   other words that you could -- you would contemplate

11   using?

12       A    Well, let's say -- let's say, for example,

13   in -- in -- in rare cases where I had to try and

14   identify incoming calls through the recordings, I would,

15   you know, through a process of querying the data,

16   discover what it is that they're, what they're going to

17   say or combinations of what they're going to say on an

18   incoming call, you know.  Say, for example, thank you

19   for calling AMR.  Ah, that's obviously an inbound call.

20   Okay.  Now, in this matter, I intend to get the call

21   detail records that show the direction of the call.  So

22   that may not be an issue, you know.

23              But then, again, that kind of highlights

24   that -- you know, the specific key words that's

25   something that's dynamic, just like your specific words

**COMPENDIUM OF EVIDENCE REDACTED PAGE 120**

1   that you use in a question that you ask me is going to

2   be dependent on the answer that I give you, even if you

3   very much follow your depo outline.

4      **Q      Mm-hmm.  So the focus, as I understand it, is**

5   **on persons whose first call was received from AMR, an**

6   **outbound call.  Correct?**

7      A    Yes.

8      **Q      Why -- why in your judgment, given your**

9   **extensive experience, okay, in these type of cases and**

10  **others, isn't an inbound call relevant, where that same**

11  **person called AMR and that was the first call and the**

12  **first thing that is said from AMR is you're calling on a**

13  **recorded line?  Why isn't that relevant?**

14     A    In that -- in that paragraph 16, I was -- I was

15  actually encapsulating that into paragraph 16.  Right.

16  So I was intending on eliminating -- you know, by saying

17  those who received the first outbound call, I guess that

18  would be more accurate to say the first call, period,

19  was an outbound call that did not have a disclosure.

20        And the reason why I was doing that is because

21  I'm anticipating the possibility that -- we talked about

22  the expectation.  All right.  I consider the expectation

23  of privacy thing, and without regard to any legal

24  definition of that.  And I'm considering well, you know,

25  the possibility exists that if somebody called into AMR

 1   BY MR. MARDER:

 2       **Q      In reviewing the transcripts --**

 3       A    Right.

 4       **Q      Forgive me.**

 5            THE REPORTER:  I'm sorry.  Can we back up.  I

 6   apologize.  With the overlap, I'd recommend we back up

 7   and get the question in clearly.

 8            THE WITNESS:  So as I was saying there, that

 9   is -- I'm not reviewing all of the transcripts, number

10   one.  And I want -- and -- and I cannot emphasize enough

11   that we're dealing with very small numbers.  Okay.

12   Right now, we're looking at, say, 22,000 recordings.

13   You don't -- you may not have -- it sounds like a big

14   number.  But when we're talking databases, this is

15   extremely tiny.  By the time we get through just that

16   first queries to eliminate -- you know, we're

17   eliminating already those that, say, called in previous.

18   All right.  That's going to eliminate -- that's going to

19   knock that 22,000 down.

20            Those that had the word record or monitored

21   within that on the first call, that is going to be

22   eliminated.  That's going to be the majority of it.

23            The reality is as we get through here, I'm

24   looking at -- let me put it this way.  I think in the

25   last time I did this exercise on a much larger database,

1  after that first initial query that I already defined, I

2  only had, like, 20 or so records that had to look at

3  anything.  And I just look at the first couple, and I'd

4  say, ah-hah, it's outgoing messages on answering

5  machines.  Let's put in a query to wipe those out of the

6  equation.  Then I'm down to three.

7          So I'm not reviewing each and every one of

8  these.  By far, I'm not.

9  BY MR. MARDER:

10     **Q    So it sounds like what you're saying is once**

11  **you put in the word recorded or monitored, most of**

12  **your -- your work so done?**

13     A    Yeah.  It's -- you know, so what I'm saying

14  it's like when you tune that radio station and you're on

15  that radio station, you hear the music, it's actually

16  coming in good, it's coming in in stereo, but the

17  old-fashioned dial, you know, you're just going to tweak

18  it just a little bit because you want it right on, you

19  know.  You're already there.  You're not, like,

20  reinventing the wheel here and starting from scratch or

21  reviewing every single record in there.  It is so

22  minimal that I'm not actually reading the transcripts

23  because it's so little that just a simple eyeball on it

24  spots it.

25     **Q    You -- you -- you talked a little bit about the**

1   false positives and referenced error checking.  Can you

2   explain what exactly you will do step by step to check

3   for errors in the process.

4        A    That's what our conversation has been about for

5   the last 45 minutes.  I don't know how any more I can

6   elaborate on that.  It's actually -- it's a very, very

7   simple process.  And we -- you -- I don't know how I can

8   explain it further.

9        Q    Well, summarize for me and -- and then I'll see

10  if I have to ask you anything else.

11       A    So when we're talking about those keyword

12  searches -- and that's the only -- the only thing in

13  here that requires any of this, you know, keeping in

14  mind that the call detail records have none of these

15  variations in it.  So once we --

16            THE REPORTER:  I'm sorry.  May we back up a

17  little bit.  Keeping in mind that the call detail

18  records --

19            THE WITNESS:  The call detail records are

20  precise.  There is no compensating for false errors or

21  anything like that or false positives in the call detail

22  records.

23            The only thing that requires any tweaking of

24  keyword searches is when you're down to the part of

25  looking at the transcription of the calls.

1          Now, the reason why that part is last, because

2    I'm going to knock down -- in the process of the call

3    detail records and narrowing things that way, you know,

4    limiting it to calls that did not have an inbound call

5    beforehand and things like that, I'm going to knock that

6    22,000 down to something extremely small.

7    BY MR. MARDER:

8         Q    **Okay.**

9         A    And the bottom line is once you get to that

10   point, if you eyeball a spreadsheet and you limit it to

11   the one call that you're interested in, just for one

12   call, just to review it, and you've got 12 lines on it,

13   you're not reading everything one by one.  In fact,

14   you're not even reading every one of those on that 12

15   lines.  Just your eyes resting on that page reveals to

16   you what little tweak you're going to do.  To -- to --

17        **Q    I -- I apologize.**

18        THE REPORTER:  And there was some --

19   BY MR. MARDER:

20        **Q    It's okay.  I apologize.  And I'm stopping you**

21   **because I just think that there's a disconnect between**

22   **you and I as we wrap this session up.**

23        **I -- I was talking about your testimony that I**

24   **thought you gave that there's -- there's always going to**

25   **be some error in the transcription process.  And what**

1    I, the undersigned, a Certified Shorthand Reporter of

2    the State of California, do hereby certify:

3    That the foregoing proceedings were taken before me

4    at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10    testimony given.

11    Further, that if the foregoing pertains to the

12    original transcript of a deposition in a federal case,

13    before completion of the proceedings, review of the

14    transcript ( X ) was (  ) was not requested.

15    I further certify I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney or party to this action.

18    IN WITNESS WHEREOF, I have this date subscribed

19    by name.

20    Dated:  July 9, 2020

21

22    _____

23    Margaret A. Smith

24    RPR, CRR, CSR No. 9733

25

**COMPENDIUM OF EVIDENCE REDACTED PAGE 126**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
NEAL ROSS MARDER (SBN 126879)
REBECCA A. GIROLAMO (SBN 293422)
BRETT M. MANISCO (SBN 318351)
nmarder@akingump.com
bgirolamo@akingump.com
bmanisco@akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:  310.229.1000
Facsimile:   310.229.1001
*Attorneys For Defendant*
*American Medical Response, Inc.*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MENDELL, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN MEDICAL RESPONSE, INC.<br><br>Defendant. | CASE NO. 3:19-cv-01227-BAS-KSC<br><br>[Judge:  Hon. Cynthia Bashant]<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT**<br><br>**REDACTED**<br><br><br>Date Action Filed: July 1, 2019 |

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# **TABLE OF CONTENTS**

I. Qualifications ................................................................................487

II. Background ..................................................................................490

III. Summary of Opinions.................................................................491

IV. Plaintiff's Class Definition ........................................................492

  A. Mr. Hansen's Declaration and Deposition.............................. 495

V. Deficiencies with Plaintiff and Mr. Hansen's analysis...................496

  A. Plaintiff offers no details regarding the "semi random" analysis or any support as to why he claims this approach can reliably assess class-wide impact. ................................................................................... 496

VI. Deficiencies in Plaintiff's Class Definition .................................498

  A. Plaintiff improperly truncates the data to create the class period, thus introducing selection bias............................................................ 499

    1. Plaintiff's methodology and data cannot identify prior calls to AMR or its agents from prospective class members....................................501

    2. Plaintiff's truncation of data and specification bias.............................503

      a) Truncation with respect to time .........................................504

      b) Truncation with respect to scope .......................................508

  B. Mr. Hansen's methodology is inconsistent with Plaintiff's putative class definition............................................................................. 508

  C. In addition to keywords, Mr. Hansen's methodology includes an arbitrary and unreliable call duration-based exclusionary criterion. .................................... 511

  D. Plaintiff's class identification methodology suffers from measurement error ............................................................................................ 516

    1. Mr. Hansen's methodology ignores ambiguity and would not detect keyword differences in homonyms that are homographs. ..............................519

    2. Mr. Hansen's approach to identifying California plaintiffs is susceptible to errors. ....................................................................................522

    3. Mr. Hansen's method improperly assumes that the IBM speech-to-text transcription service would have an error rate of nearly zero.........................524

4.    Mr. Hansen's methodology with regard to speaker of relevant keywords during call also suffers from shortcomings....................................................528

E.   Prohibition on the use of IBM Watson to transcribe data that includes personal health information. ........................................................................ 529

486

TABLE OF CONTENTS

# DECLARATION OF TED TATOS

I, TED TATOS, hereby declare and state as follows:

1.    I am over the age of 18. I have personal knowledge of the facts attested to below and, if called to testify, could and would competently testify to such facts.

## I.    QUALIFICATIONS

2.    I am a consultant and testifying expert with EconONE Research. I have a B.A. in Economics from Duke University and an M.S. in Statistics with a focus in Econometrics from the University of Utah.

3.    I have also been an Adjunct Professor in the economics department at the University of Utah, where I also co-taught the graduate econometrics class from 2004 through 2006. Prior to and during that time period, I also taught undergraduate econometrics and undergraduate statistics for economics majors at the University of Utah.

4.    I have approximately twenty-four years of experience in economic, statistical, and econometric analysis for both public and private sector clients. Prior to my positions at EconONE Research and Empirical Analytics, I was a consultant with North Harvard Group, an information technology and strategic consulting firm. Before that time, I was employed as a Managing Economist with the global expert services firm of LECG in the Washington, D.C. and Salt Lake City, UT offices.

5.    I have published on economic and statistical issues in various journals, including the Antitrust Bulletin, the Appraisal Journal, the Harvard Journal of Sports and Entertainment Law, and others. I continue to publish research on a regular basis and currently serve on the editorial board of the Antitrust Bulletin journal as its Associate Economics Editor. My editorial duties include reviewing articles submitted for publication to the journal, particularly

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

papers involving econometric and statistical analysis. I have also presented on economic and statistical issues to the Utah Bar Association at its annual summer conventions.

6.     I have performed statistical sampling and other analyses for both private and public sector clients. As an economist at LECG and as statistical analyst with DynCorp's Healthcare Information Technology Services (HITS), I performed statistical sampling analyses and created statistical models to explain healthcare outcomes. I regularly consult on statistical sampling issues both within and outside of litigation.

7.     I regularly analyze text information both to inform content and pattern information and to merge and create databases. As part of my analysis, I often rely on data from a variety of databases and enterprise resource planning (ERP) platforms, including Oracle, JD Edwards, SAP, and other more industry-specific database systems.

8.     I have performed and continue to perform such analysis both in my published research and in my consulting work. My research based on extracting textual information from a large corpus of documents was recently published in the Journal of Scientific Practice and Integrity[1] and subsequently formed the basis for a documentary released in October of 2019.[2]

9.     I have also been retained as an expert and worked on matters involving keyword advertising on search engine results pages (SERPs). Examples of such cases include *1-800 Contacts v. Lens.com*[3] where I was engaged to analyze keyword bidding, impressions, click-through-rates (CTRs) and conversions

---

[1] Ted Tatos and Don Comrie. *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*. Journal of Scientific Practice and Integrity 1(1), 2019.
[2] Andrew Muscato, Armen Keteyian, and Alan Goldberg. Failure to Disclose: The mysterious absence of critical data from UNC's renowned concussion research, The Athletic, available online at https://theathletic.com/video/21-adhd/.
[3] 755 F.Supp.2d 1151 (2010), https://h2o.law.harvard.edu/cases/4400

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  involving trademarked words, and *Luxe Hospitality Co. v. SBE Entertainment*

2  *Group*[4], where I analyzed keyword bidding in a trademark infringement matter. I

3  was also involved in analyzing online advertising, including keyword bidding for

4  paid search advertising during my consulting work while I was at the North

5  Harvard Group.

6      10.    I have studied machine learning (ML) techniques in the course of my

7  graduate curriculum, and I have applied both supervised and unsupervised ML

8  methods in both my research and my work. I wrote my graduate thesis in statistics

9  on the topic of applying statistical techniques that fall under the ML rubric to the

10  identifying comparable benchmarks within the market approach to valuation. My

11  thesis was subsequently published in Intellectual Property Damages: Guidelines

12  and Analysis, 2004 Supplement – Applying Statistical Analysis to the Market

13  Approach.[5] I was also engaged by a forensic accounting and valuation firm to write

14  code and implement a process to perform this type of analysis in the background

15  using SAS software and generate reports in Excel based on user inputs.

16      11.    I have testified on statistical issues and damages in both state and

17  federal court. I have consulted and continue to consult on multiple class action

18  matters, both as a testifying and as a consulting expert.

19      12.    Exhibit 1 to this declaration contains a copy of my Curriculum Vitae,

20  which details my qualifications, publications, speeches, and testimony (both

21  deposition and trial) that I have offered. The hourly rate that EconONE Research

22  charges for my work on this matter is $450.  No part of my compensation depends

23  on the outcome of this case.

24  / / /

25  

26  [4] Luxe Hospitality Company, LLC v. SBE Entertainment Group, LLC et al., 1:2017mc21043, US District Court for the Southern District of Florida.

27  [5] Mark A. Glick, Lara A. Reymann, Richard Hoffman, Intellectual Property Damages: Guidelines and Analysis, John Wiley & Sons, Dec 30, 2002, 2004 Supplement.

28  

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## II.    BACKGROUND

13.    In preparing this declaration, I have reviewed the following documents:

- ➤ Plaintiff's Second Amended Complaint
- ➤ AMR's Answer to Plaintiff's Second Amended Complaint
- ➤ Plaintiff's Motion for Class Certification & Declaration of Joshua Swigart
- ➤ Scripts used by Omega
- ➤ Declaration of Jeffrey Hansen
- ➤ Deposition transcript of Jeffrey Hansen
- ➤ Deposition transcript of Michael Mendell
- ➤ Deposition transcript of Bhaskar Patil
- ➤ Deposition transcript of Karan Negi
- ➤ Deposition transcript of Kelly Wilson
- ➤ Various recordings of telephone calls between AMR or its agents and patients
- ➤ Defendant AMR's answers to Plaintiff's Interrogatories, Set One.
- ➤ LiveVox production of call detail records (CDR) – LV-Mendell-00001 to 000013.
- ➤ LiveVox-Omega call download records: AMR_MEN_VOL022262
- ➤ Relevant literature and public documents as cited in this declaration

14.    I am aware of the following facts and allegations regarding the case, based on information provided by the parties and publicly available information.

15.    American Medical Response (AMR) is a medical transportation company that provides vehicle and air ambulance transport in emergencies and disaster response situations. In many cases, AMR receives direct remuneration from recipients of its services. To ensure payment, either AMR or third parties working ("agents") on its behalf such as Omega, Credence, Bay Area Credit

Services, or Wakefield & Associates, call recipients to confirm insurance information, remind them that payment is due, and in some cases, to arrange payment collection. AMR or its agents have also used LiveVox, a provider of cloud-based contact center solution, whose calling system represents a particular focus of Plaintiff's attention in this litigation.

16.     I understand that Michael Mendell, lead plaintiff for the putative class, received such calls from AMR or its agents, including from at least Omega and Credence in 2017 and 2018. Plaintiff alleges that such calls that Mr. Mendell received during the period from July 2018 through July 2019 did not include a notice at the outset that the call was being recorded. Plaintiff also contends that his experience was common to a class of other recipients of calls from AMR during this period. As a result, Plaintiff claims that a class of such plaintiffs should be certified. To support his motion for class certification, Plaintiff has included a declaration from Mr. Jeffrey Hansen (Mr. Hansen), who I understand is expert litigation consultant engaged by Plaintiff's counsel.

17.     I have been asked to review Mr. Hansen's declaration and his deposition testimony and offer any response to the opinions he has expressed and intends to offer.  I have also been asked to analyze, among other things, Plaintiff's Motion for Class Certification, Plaintiff's class definition, as well as its representation by Mr. Mendell in this matter.

**III.     SUMMARY OF OPINIONS**

18.     The following summarizes the opinions and the bases for the opinions that I provide in this declaration.

19.     Plaintiff and Mr. Hansen offer inconsistent and opposing methodologies for identifying members of the putative class. Both methodologies suffer from shortcomings and errors that render their approaches unreliable as a means of identifying such class members.

1    20.    Plaintiff and Mr. Hansen's errors and shortcomings fall into two broad
2    categories: conceptual and analytical. A key conceptual error that Plaintiff commits
3    is that he truncates call histories as of July 1, 2018 and thus fails to consider the
4    relevance of calls to Plaintiff himself and prospective class members prior to that
5    date. Another such conceptual error is Plaintiff's mistaken belief that the LiveVox
6    data for Omega contains information detailing when an individual first received a
7    call from AMR or its agents. I understand that such a date field is not available in
8    the LiveVox system and that the LiveVox data for Omega will only contain calls
9    made to prospective class members by Omega beginning on July 1, 2018.

10    21.    Plaintiff and Mr. Hansen also commit several analytical errors. Mr.
11    Hansen's methodology introduces measurement error, which he fails to address or
12    to attempt to quantify. Mr. Hansen ignores keyword ambiguity and his
13    methodology applies arbitrary exclusionary criteria. The sparse details he offers
14    regarding his approach to identifying class members indicate that his approach
15    lacks rigor and reliability. Further, the literature on the subject of speech-to-text
16    transcription and automatic speech recognition (ASR) is inconsistent with Mr.
17    Hansen's unsupported opinion that the transcription service he plans to use has an
18    error rate of nearly zero.

19    **IV.    PLAINTIFF'S CLASS DEFINITION**

20    22.    Plaintiff identifies a class and a sub-class thereof, which he claims is
21    "clearly defined" and based on "objective criteria":[6]

22        (1) Whether the caller was a first time call recipient from Defendant whose
23        call was recorded without notice of recording at the outset of the call before
24        recording commenced (the HIPAA Confidential Communication Class) and

25

26    _____

27    [6] Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification (Plaintiff's
Memorandum) at 23.

28
DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

(2) The subclass of those individuals who were called on their cellular phone (The Cellular Phone Communication Sub-Class).

Specifically, Plaintiff defines the classes as follows:[7]

"The HIPAA Confidential Communication Class: All persons in California, that never called Defendant, whose first call from Defendant was recorded without their consent by Defendant and/or its agent/s from July 1, 2018 through July 31, 2019 (the date when AMR modified its practice to notify callers of recording at the outset of the call.)"

"The Cellular Phone Communication Sub-Class: All persons in California, that never called Defendant, whose first call from Defendant to their cellular phone was recorded without their consent by Defendant and/or its agent/s from July 1, 2018 through July 31, 2019 (the date when AMR modified its practice to notify callers of recording at the outset of the call.)"

23. Plaintiff notes that he seeks certification of the class "only for the time period in which the Patient Business Services Ver 2 script was used which was from July 2018 to July 2019, when this case was filed."[8] As such, Plaintiff's construction of the relevant time period is predicated upon the use of this specific script.

24. Plaintiff also offers three additional characteristics that form the basis of the allegations of class membership:

- "[D]uring the Class Period all outbound calls from AMR to Class Members originated from the same AMR number 800-913-9106 and followed a standardized script which emphasized that "Outbound Call Scripts should start and end in a standardized manner."[9]

---

[7] *Id.* at 8.
[8] *Id.* at 7.
[9] *Id.* at 2.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

- "During the Class Period, all AMR outbound call agents identified themselves as calling from 'Patient Business Services' and did not provide any notice of possible recording at the outset of the call. Notice of possible recording was provided only after the caller had verified certain confidential information."
- "uniform outbound call scripts which were followed without substantial variation (and no variation as to the timing of the recording advisement")" to 100% of the class members.

25.    I understand that Plaintiff seeks to identify a class of individuals who were called by AMR or its agents[10] during the period from July 1, 2018 and July 31, 2019, and whose first call did not include a notice of recording at the outset. I also understand that Plaintiff chose July 1, 2018 as the start of this period because AMR began using the script to which Plaintiff refers as "Patient Business Services Script Ver 2" ("PBS Type 2")[11] after July 2018.[12] This script provided the notice after the caller verified certain information with the AMR customer. The script indicates that such information consisted of the patient's billing address and date of birth. Once verification occurred, the script indicates that the caller would tell the patient "Thank you for the information. By the way, this call is recorded for quality purposes."[13]

26.    I understand that the use of this script was phased out beginning in April 2019, and ended in approximately July 2019, which represents the end of Plaintiff's proposed class period.[14]

---

[10] Second Amended Complaint ("SAC") at 9, paragraph 46. Plaintiff make repeated reference to AMR and its agents throughout the SAC.
[11] SAC at 6; Declaration of Joshua Swigart ("Swigart Decl.") at 4.
[12] Deposition of Bhaskar Patil, Vice President of Operation at Omega Healthcare ("Patil Depo.") at 137, 127-8.
[13] Exhibit 2 - Swigart - AMR_MEN_VOL000044
[14] Patil Depo. at 128; *id.* at 165-166

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## A.    **Mr. Hansen's Declaration and Deposition**

27.    Plaintiff has offered Mr. Hansen's declaration ("Hansen declaration") in support of his class definition. I have reviewed Mr. Hansen's declaration and I attended his July 3, 2020 deposition virtually via Zoom. At his deposition ("Hansen deposition"), Mr. Hansen indicated that he was retained "to analyze the call detail records, the recordings, the identification of wireless numbers…and…ultimately identify those that fall within the class definition."[15]

28.    In his declaration and at his deposition, Mr. Hansen explained that to do so, he would analyze the approximately 22,239 mp3 recordings of phone conversations from LiveVox that have been produced in this matter. He further indicated that to do so, he would not need to listen to the recordings.[16] Rather, he would use the IBM Watson speech-to-text transcription service and search the resulting transcripts for specific keywords.[17]

29.    Mr. Hansen further indicated that the script, insofar as it included a notice of recording, would not be relevant to his analysis.[18] Rather, his focus would be on the transcription of the audio recordings and whether certain keywords, such as the words "record" or "monitor"[19], appeared.

30.    Mr. Hansen indicated also that the location or timing of such keywords within the transcript would be irrelevant to his analysis because any such occurrences would result in the individual's elimination from the putative class.[20]

---

[15] Hansen deposition at 38.
[16] Hansen deposition at 24-25 "…and my analysis won't be to listen to these files individually."
[17] Hansen deposition at 101:
Counsel: "…Your method is to come up with key search words that you intend to use to identify persons that you think are going to be similarly situated to Mr. Mendell as far as the criteria that he has and identify them as class members. Is that right?"
Mr. Hansen: "Right."
[18] Hansen deposition at 63, "My analysis is not about what was supposed to occur but what did occur."
[19] Hansen deposition at 87, "I'm looking at did they make – did they say the word record or monitor anywhere." Also see Hansen deposition at 92, "For our discussion here, that's obviously the first thing that comes to mind, you know, the word record."
[20] Hansen deposition at 87.

---

At his deposition, Mr. Hansen explained that "If the call, conversation carried on for 30 minutes before they said the call can be recorded or monitored and the person hung up on them, you know what, it would actually result in that person being excluded from the class."[21]

31.    I now turn to the fundamental deficiencies in Plaintiff's class definition and Mr. Hansen's proposed analysis, as well as the inconsistencies between them.

## V.    DEFICIENCIES WITH PLAINTIFF AND MR. HANSEN'S ANALYSIS

A.    **Plaintiff offers no details regarding the "semi random" analysis or any support as to why he claims this approach can reliably assess class-wide impact.**

32.    Mr. Swigart's declaration, which Plaintiff submitted in support of their motion for class certification, includes the claim that "A semi random analysis of eighty-four (84) call recordings showed eight (8) calls using the Patient Business Services Script Ver 1, fifty-one (51) calls within the class period using the Patient Business Services Script Ver 2, and twenty-five (25) calls using the Customer Care Script."[22]

33.    Mr. Swigart offers no explanation of what he means by "semi random analysis." Plaintiff's expert, Mr. Hansen, testified at his deposition that he would not "leave out the possibility" of offering an opinion regarding "semi-random" sampling[23] although he also testified that he did not know what "semi-random sampling" means.[24] Mr. Hansen also testified that he is not a statistician, has no

---

[21] Hansen deposition at 94.
[22] Swigart declaration at 6.
[23] Hansen deposition at 52.
[24] Hansen deposition at 53.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

background on doing statistical sampling, nor does he recall ever using the term "semi-random sampling" in any report he has authored.[25]

34.     Mr. Hansen also appears to confuse the concepts of statistical sampling with what he calls "statistical projection" or "trying to analyze future forecasts."[26] Projections or forecasting often rely on statistical concepts and method, but the field of statistics includes many other analytical tools, including statistical inference, explanation rather than projection, classification tools, sampling design, and others. Further, statistical sampling is not a method used to forecast, but rather to generalize from the particular to the whole, without undergoing the effort of analyzing the entire population. The statistician William Cochran explains that "If the data are secured from only a small fraction of the aggregate, expenditures are smaller than if a complete census is attempted. With large populations, results accurate enough to be useful can be obtained from samples that represent only a small fraction of the population."[27]

35.     Statistical sampling is an inductive exercise. It is concerned with reasoning from the particular to the general. That is, if the researcher applies methodologically sound sampling techniques, the results from the sample can be extrapolated to offer insight about the population as a whole.

36.     As a statistician, although I have performed many sampling analyses including simple random samples and stratified sampling designs, I am unclear about what Mr. Swigart means by the term "semi-random analysis".[28] Mr. Swigart

---

[25] *Id.*

[26] *Id.*

[27] William G. Cochran. Sampling Techniques, 3rd ed. John Wiley & Sons.(1977) at 1.

[28] While Mr. Swigart does not use the term "semi-random sampling", to the extent that he refers to "quasi-random sampling", a term often used to refer to sampling every nth observation, he offers no details to explain why he chose this approach, why he did not extract a simple random sample (SRS), or what steps he took in extracting this sample. See e.g., OECD glossary of statistical terms: https://stats.oecd.org/glossary/detail.asp?ID=3810#:~:text=OECD%20Statistics,to%20as%20quasi%2Drandom%20 sampling. See also, P.T. Harris, Opinion and Market Survey Methodology, Journal of the Royal Statistical Society. Series D (The Statistician), Vol. 21, No. 2 (June 1972), pp. 114-125, ("There is also a semi-random

COMPENDIUM OF EVIDENCE REDACTED PAGE 140

1  provides no details on how these records were chosen. As such, I do not find any

2  valid statistical basis for extrapolating the results of this "semi random analysis" to

3  the set of 22k records.

4      37.    Mr. Hansen's testimony that the contents of the script are irrelevant,

5  and that he would only analyze transcripts of the recordings appears to render Mr.

6  Swigart's analysis irrelevant. Moreover, Mr. Hansen's analysis would not

7  distinguish between these scripts, as they all include a notice of recording, and he

8  testified that where the notice occurred did not matter. As such, to the extent that

9  Plaintiff intends to use Mr. Swigart's "semi-random analysis" as support of class-

10  wide impact, this approach is neither reliable nor even relevant in light of

11  Plaintiff's expert's deposition testimony.

12      38.    Further, Mr. Swigart's analysis appears to undermine Plaintiff's claim

13  of "uniform outbound call scripts which were followed without substantial

14  variation (and no variation as to the timing of the recording advisement)" to 100%

15  of the class members. Of the three scripts mentioned in Mr. Swigart's semi random

16  analysis, two included a notice of recording before verifying patient information.

17  The third, Script 2, also included a notice, but it was delayed until after patient

18  confirmation of billing address and date of birth.[29] Thus, variation as to the timing

19  of the notice of recording did exist.

20  **VI.    DEFICIENCIES IN PLAINTIFF'S CLASS DEFINITION**

21      39.    Analytical and conceptual shortcomings plague Plaintiff's proposed

22  class definition. While Plaintiff claims that the issues in this case are "simple and

---

sampling procedure used in market research surveys, which goes under such names as 'random walk' sampling, 'random route' sampling and 'point and route' sampling. The principle of the method is that the interviewer is given a random address at which to conduct the first interview, and thereafter a set of rules to follow to obtain other addresses. Basically, the interviewer continues to interview at every 10th address in the street, alternatively turning left and right into other streets when she meets them.") As noted previously, to the extent that this is the approach Plaintiff has taken, no explanation of why this is the appropriate procedure, or any methodological details have been provided.

[29] Mr. Swigart's semi random analysis also indicates that he found several calls using Script 2 that had no notice. However, his analysis offers no explanation why this is the case.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

straight-forward"[30] and Mr. Hansen claims that the analysis needed to identify prospective members would be "simple"[31], both gloss over fundamental difficulties that render the proposed class definition inaccurate.

40. The inconsistencies between what Plaintiff claims in his class certification memorandum and second amended complaint and Mr. Hansen's deposition testimony also undermine Plaintiff's class definition. I address these issues below.

A. **Plaintiff improperly truncates the data to create the class period, thus introducing selection bias.**

41. Plaintiff's definition of the class period is based on two possible assumptions regarding calls from AMR or its agents that putative class members may have received before the class period:

    i.    What happened prior to the start of the class period or outside the LiveVox system used by Omega is immaterial or irrelevant,

           OR

    ii.    Nothing relevant happened outside the class period or outside of the LiveVox system used by Omega – none of the potential class members were ever called outside of these two criteria by AMR or its agents using a script that included the notice of recording.

42. The first assumption improperly truncates data as to time and improperly excludes scripts whose contents Mr. Hansen indicated were irrelevant to his analysis, making Plaintiff's analysis unreliable.

43. Neither Plaintiff nor Mr. Hansen have provided any evidence of which I am aware to support the second assumption, which can be rebutted using records of calls that AMR or its agents made to putative class members prior to

---

[30] Plaintiff's Motion for Class Certification at 1.
[31] Hansen deposition at 65.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    July 1, 2018, the start of the proposed class period. Evidence indicates that calls

2    were made to Plaintiff prior to the start of the class period. I understand that other

3    third parties, including Bay Area Credit Services (BACS) and Credence also made

4    calls on behalf of AMR prior to the class period.

5          44.    I understand that Plaintiff has not requested any such data and that his

6    requests have only focused only on the LiveVox data from Omega during the July

7    1, 2018 – July 31, 2019 period. When asked at his deposition whether he would

8    need the same type of information from third parties as that requested from

9    LiveVox in terms of call records to identify class members, Mr. Hansen testified

10    that "[i]f we wanted to include calls made by other dialers, then yes. Then we

11    would need that data as well."[32] However, when asked if he had requested such

12    data from Plaintiff's counsel, Mr. Hansen indicated that he did not know whether

13    such data were even part of the discussion: "I'll check with them later on…I'm

14    assuming that – I'm imagining that if you – if you wanted to include those, then

15    would be going down that road. For all, I don't even know if there's anything

16    going on in the background trying to ascertain that."[33] Mr. Hansen also testified

17    that a) he could not speak for Plaintiff's strategy but could only testify about the

18    LiveVox data;[34] and b) he was not aware of whether AMR had contracted with

19    third parties to make calls or who actually made the over 22,000 calls to putative

20    class members that were produced from the LiveVox system.[35]

21    / / /

22    / / /

23

---

[32] Hansen deposition at 65-6.

[33] Hansen deposition at 66. Mr. Hansen also testified that

[34] Hansen deposition at 61. "I'm assuming that Plaintiffs' counsel has decided a strategy and if they're interested in that or not as to whether, you know, a third party was making the calls or not. I don't know. I can't speak for the plaintiffs' counsel strategy or what it is that they're -- but what I can testify about is the LiveVox system and the database and what that data is for."

[35] Hansen deposition at 59. Mr. Hansen also testified that "…my focus is not about the relationship between – between AMR and any other company." (Id at 60).

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1. **Plaintiff's methodology and data cannot identify prior calls to AMR or its agents from prospective class members.**

45.     Plaintiff's data truncation also undermines his class definition with respect to calls from potential members to AMR or its agents. Plaintiff's class definition excludes individuals who called AMR or its agents prior to being called during the class period. Two factors render Plaintiff's methodology unable to reliably implement this criterion.

46.     First, Plaintiff's approach, according to Mr. Hansen, requires call data from LiveVox or other system(s) that would identify inbound calls from individuals to AMR or agents working on its behalf. These calls would then have to be matched to prospective class members. I understand that LiveVox has produced thirteen files containing records of all calls made by Omega on behalf of AMR in the US during Plaintiff's proposed class period (the Omega-LV data).[36] I examined these data and they do not include a field that identifies inbound calls. I have also confirmed with AMR's counsel that these data include only outbound calls.

47.     To my knowledge, Plaintiff has not requested nor is currently scheduled to receive any third-party data that would contain inbound call records. Thus, Plaintiff would have neither data from Omega nor AMR nor any other party that made calls on behalf of AMR. However, Mr. Hansen testified at his deposition that he would need such data to generate the class definition. When asked for what data is he looking, Mr. Hansen testified,

/ / /

/ / /

/ / /

---

[36] CONFIDENTIAL-LV-MENDELL-00001 to CONFIDENTIAL-LV-MENDELL-00013. Each file appears to correspond to a month of the proposed class period.

501

We need that information to illustrate the call…whether or not the call was inbound or outbound. With those different data points, I can formulate all the possible queries that I would need in order to identify those people that were called that never called in…[37]

48.     Mr. Hansen testified that "I know for a fact that they have all of those fields"[38] that he identified and that he anticipated that LiveVox production will include a field identifying whether a call was inbound or outbound.[39] However, the data produced do not include the inbound calls.

49.     The ability to identify inbound calls is relevant, as noted in AMR's answers to Plaintiff interrogatories, where AMR responded that it "notifies consumers similarly situated to Plaintiff and/or encompassed by Plaintiff's class definition that a call is audio recorded (1) as to outbound calls, pursuant to a call script provided to customer services representatives, and (2) as to inbound calls, via an automated notification provided to inbound callers prior to being connected with a live customer service representative."[40] Thus, prospective class members who called into AMR would receive a recording notice prior to the commencement of any conversation with a customer service representative.

50.     Mr. Patil of Omega, testified that ███████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

51.     I understand that Laurence Siegel, Executive Vice President of Product Development for LiveVox, has issued a declaration in this matter, which I have reviewed. Mr. Siegel responded to the claim that Mr. Hansen makes in his declaration that "By utilizing Call Record Detail reports which are readily

_____

[37] Hansen deposition at 81.
[38] Id.
[39] Hansen deposition at 83.
[40] Defendant AMR's responses to Plaintiff's Special Interrogatories, Set One at 12-3.
[41] Patil deposition at 59.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  available from the LiveVox system, it is a comparatively straightforward process
2  to identify which of the Call Records were first time outbound calls, to patients that
3  never called AMR, and identify the subset of such first-time outbound calls to
4  wireless numbers."[42] Mr. Siegel states that Mr. Hansen's statements are incorrect
5  and that "Live Vox does not have any system-created data markers or other
6  information in its call records that would show whether a call made by or to a
7  customer was the first call to any particular call recipient or phone number."[43]

### 2. Plaintiff's truncation of data and specification bias

8  52.    The broader methodological error that plagues Plaintiff's class
9  definition is specification bias, which results from an inappropriate method of
10 selecting study subjects.[44] The issue in this matter is whether individuals received a
11 call without notice of recording such that this call was their first from AMR or its
12 agents (i.e., they had no previous notice). However, to select this group, Plaintiff's
13 methodology truncates events prior to the start of the class period, thus removing
14 the possibility of ascertaining previous notice and biasing his selection process.

15 53.    In this case, Plaintiff truncates the data in two ways: 1) he ignores
16 calls by AMR or its agents to putative class members before July 1, 2018, and 2)
17 he ignores all third-party calls made to putative class members during their class
18 period, other than those made by Omega through LiveVox. Thus, Plaintiff
19 truncates both prior and contemporaneous data.

20 / / /

21 / / /

---

[42] Hansen declaration at 14, paragraph 19.
[43] Declaration of Laurence Siegel (Siegel Declaration) at 3.
[44] Ref. Manual on Scientific Evidence, 3rd ed. at 583. This issue also appears in public health settings within cohort studies: "selection bias can result when the selection of subjects into a study or their likelihood of being retained in a cohort study leads to a result that is different from what you would have gotten if you had enrolled the entire target population." Boston Univ. School of Public Health: https://sphweb.bumc.bu.edu/otlt/MPH-Modules/EP/EP713_Bias/EP713_Bias2.html

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

a)  **Truncation with respect to time**

2    54.    Truncation with respect to time, which is one error Plaintiff commits,

3    means that we only have the data from the period beginning on July 1, 2018 but

4    nothing before that time. This date, for all intents and purposes, is an artificial

5    construct. Its sole basis appears to lie in Plaintiff's understanding that PBS Script

6    Type 2 came into use in LiveVox sometime during July 2018. However, as noted

7    above, Plaintiff's own expert, Mr. Hansen, rejected any reliance on scripts,

8    choosing instead to focus on whether the transcripts indicate a notice or recording.

9    This approach renders the script-based July 1, 2018 class period start moot. Using

10   a cutoff of July 1, 2018 not only has no apparent substantive basis and is also

11   rendered irrelevant by Mr. Hansen's methodology, but it also artificially ignores

12   data that exist from other third-party collection agencies such as Credence.[45]

13   55.    Mr. Hansen does not appear to appreciate the importance and

14   relevance of such data. He testified at his deposition that if the additional data from

15   third-parties calling on behalf of AMR "is provided to me, I can easily include

16   it…any other data I can include just as easy – it does not change my process."[46]

17   But, this issue is not simply about more data, it is about the relationship such data

18   prior to July 1, 2018 might have with the putative class period data that Mr.

19   Hansen already plans on including. By excluding such data, Plaintiff ignores

20   potential calls that would have been made prior to the class period to putative class

21   members that may have excluded them from the class.

22   56.    Plaintiff and Mr. Hansen err by treating the putative class in similar

23   fashion to a class of purchasers, where membership is determined by having

24   purchased a particular product during a given period. In such a case, having

25

26   [45] Karan Negi testified that Credence ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27   ▇▇▇▇▇▇▇▇ Negi deposition at 55.
     [46] Hansen deposition at 66.

28

504

1  purchased a product during the relevant class period is both a <u>necessary</u> AND a

2  <u>sufficient</u> condition for class membership. Plaintiff and Mr. Hansen's application

3  of this same logic in this context reflects a fundamental conceptual error.

4      57.    In the current case, if what happened prior to the class period matters

5  (i.e., if a call from AMR to a potential class member where notice was given

6  precludes class membership), receiving a first call with PBS Script Type 2 within

7  the class period is a necessary <u>but not sufficient</u> criterion. This is because the

8  prospective class member could have received a call from AMR or one of its

9  agents that included notice of recording before the start of the class period, as Mr.

10  Mendell did.

11      58.    Thus, Plaintiff's proposed approach to defining the class can lead to

12  incorrect classification and an overly inclusive class. The amount of

13  misclassification is defined by the intersection of the two groups: those called

14  BEFORE the class period and given notice of recording and those called DURING

15  the class period with no notice of recording.[47] To the extent that members in the

16  former overlap with members in the latter, Plaintiff's approach would incorrectly

17  classify the intersection as class members when they are not. The Venn diagram

18  below illustrates this issue.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  _____

27  [47] I refer to the notice of recording at the outset as this was included in the Plaintiff's class definition. However, as I discuss in this report, Mr. Hansen indicated that the location of the notice was not relevant to his analysis.

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**Figure 1. Two Groups – no overlap**



59.     Other things equal, if these groups do not overlap, then limiting the data to Plaintiff's class period would not lead to incorrect classification. However, we know from Mr. Mendell's case that these groups do overlap, and the groups represented by the circles above intersect. Plaintiff lies at the intersection of these groups.

60.     Figure 2 below illustrates a representation of the intersection of the two categories I described above.

**Figure 2. Two groups - with overlap**



61.     Thus, to determine class membership, one would have to identify the individuals who lie at the intersection of these two circles. However, Plaintiff makes no attempt to do so. By truncating his analysis as of July 1, 2018, he

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    implicitly assumes that the intersection either does not matter or does not exist.
2    Because we know it exists, given the fact that it includes Mr. Mendell, then the
3    remaining assumption upon which Plaintiff appears to rely is that the intersection
4    is irrelevant.

5         62.    Further, Mr. Hansen testified at his deposition that any California
6    patient who received a call and the word "recorded" appeared in the call transcript
7    on the first call, would not be similarly situated to Mr. Mendell or class members.[48]
8    Because he also testified that scripts are irrelevant, then there would be no reason
9    to limit the evaluation of the first call to whether or not it occurred after July 1,
10   2018. As I noted earlier, when we consider calls that occurred before July 1, 2018,
11   Plaintiff received such a call. He was notified of a recording, and acknowledged
12   that he understood it, because he testified that █████████████████████████
13   ████████████████████ By Mr. Hansen's definition, Plaintiff could not be part
14   of the class. The broader problem with Plaintiff's arbitrary truncation of the data as
15   of July 1, 2018 is that he entirely ignores how many would likewise be excluded
16   from the class because they fall in the intersection of the two groups discussed in
17   Figures 1 and 2.

18        63.    The intersection represents the classification error inherent in
19   Plaintiff's class identification strategy. We do not know the size of the intersection.
20   The greater the number of individuals in the Omega LiveVox system who were
21   called during Plaintiff's class period and who were also called and given notice
22   before that period, the smaller the class. However, the data that LiveVox has
23   produced from Omega are silent regarding any prior calls from before July 1,
24
25

---

[48] Hansen deposition at 103. Mr. Hansen appears unaware that Mr. Mendell also received such a call from Credence on May 17, 2017.
[49] Mendell deposition at 132.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1   2018.[50] As we observe in the case of Plaintiff, who was contacted and given notice

2   during call prior to July 1, 2018, the exclusion of such information results in an

3   overly-inclusive class.

b) **Truncation with respect to scope**

5   64.    Plaintiff also truncates the data with respect to scope. That is, he

6   ignores all calls made by AMR or its agents other than those made by Omega

7   during their proposed July 1, 2018 – July 31, 2019 class period. To the extent that a

8   class member may have been called by AMR or its agents through another third

9   party during this time, Plaintiff's analysis would miss such calls entirely I

10  understand that Plaintiff has only requested data from Omega but not from other

11  third-party collectors that also called on AMR's behalf.

12  65.    The problem reveals itself in the same manner as Figures 1 and 2

13  above. Not only does Plaintiff not attempt to identify and quantify the intersection

14  of putative class members who received calls from AMR's third party debt

15  collectors before receiving calls during the class period, he ignores it entirely,

16  undermining his approach's reliability for determining class membership.

B.   **Mr. Hansen's methodology is inconsistent with Plaintiff's putative class definition.**

19  66.    As noted above, the timing of the notice of recording represents a key

20  component of Plaintiff's definition of class membership and period. While

21  Plaintiff's class definition includes individuals who were recorded without their

22  consent, they clearly indicate that the timing of the notice matters. Indeed, the PBS

23  Type 2 script required callers to give notice of recording. The other two scripts

---

[50] Mr. Hansen testified that call detail records from LiveVox could be used to identify calls made to individuals prior to the class period and that such information should be available. (Hansen deposition at 84). However, I understand that, Plaintiff never requested such data from third parties nor does the LiveVox data produced by Omega include information indicating when the first call to a prospective member occurred if it did so prior to July 1, 2019.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

discussed in the Declaration of Joshua Swigart ("Swigart Declaration"), PBS Type

Scripts 1[51] and Customer Care ("CC") Script[52], also gave notice of recording.

67.     Thus, for Plaintiff's purposes, the critical distinction lies in the timing of the notice. However, Mr. Hansen indicated at his deposition that the timing was irrelevant to his analysis. Mr. Hansen testified that "I have absolutely no care of whether or not it was in the first or fourth paragraph for my analysis. I'm looking at did they make – did they say the word record or monitor anywhere…in the conversation. Whether it's the first two seconds or the first 20 minutes into the conversation."[53]

68.     Further, Mr. Hansen testified that, for his analysis, where the recording notice occurred in the script itself was irrelevant: "Whether or not they say it in the first paragraph or the fourth paragraph or whether or not they said it at all or whether or not they were supposed to say it in the first or fourth paragraph or whether or not they were supposed to say it at all is actually completely irrelevant."[54]

69.     Mr. Hansen's methodology stands at odds with Plaintiff's class definition and arguments. Plaintiff argues that the definition of the class depends on the timing of the notice, leveraging Omega's use of PBS Script 2 to delineate the class period. However, if both the script contents and the timing of the notice are irrelevant, as Mr. Hansen claims, then his analysis would not support either Plaintiff's class definition or his class period.

70.     Mr. Hansen then testified that if the words "record" or "monitor" are said anywhere in the transcript, the individual customer would be excluded from

---

[51] Exhibit 1- Swigart - AMR_MEN_VOL000042
[52] Exhibit 3 -Swigart - AMR_MEN_VOL000043
[53] Hansen deposition at 87.
[54] Hansen deposition at 69.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

the class.[55] However, assuming the callers followed any of these three scripts, a reasonable expectation would be that all accurate transcripts of the corresponding phone calls would include the term "recorded". PBS Script 1 and the CC Script both included the sentence, "All calls are <u>recorded</u> for quality purposes" (emphasis added) at the outset, while PBS Script 2 included the sentence, "By the way this call is <u>recorded</u> for quality purposes" (emphasis added) after the customer verified the billing address and date of birth. As such, if callers followed the three scripts, then Mr. Hansen's method would result in a class of zero members, and the only way an individual could be a member of the class would be if the caller happened to not follow the script, or if a call was abruptly ended before the caller had an opportunity to provide the disclosure.[56] Such an analysis would point to individualized differences among class members, as class membership would be a matter of chance, not the reflection of a common practice.

71.     Mr. Hansen justifies his criteria for excluding potential members if keywords such as "record" or "monitor" appear anywhere in the transcript as a reflection of his being "extremely conservative" or "ultra conservative."[57] However, as I noted above, his "conservative" approach would result in few, if any, class members if callers followed the three scripts PBS Type 1 and 2 and CC and gave notice of recording. Certainly, an expert may make assumptions or judgments that yield conservative estimates of damages. However, in this case, such an assumption would eviscerate the very class that Plaintiff seeks to certify. If the timing of the notice matters, as Plaintiff clearly indicates in his class certification papers, then Mr. Hansen's methodology would not support such a class definition. To wit, to the extent that Plaintiff seeks to use Mr. Hansen's

---

[55] Hansen deposition at 87.
[56] Even in this case, the script may not have been followed because the customer did not allow the caller to do so or ended the conversation early.
[57] Hansen deposition at 94.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

methodology, his position supports an analysis of individualized differences and not a class that can be defined by a common pattern of behavior on the part of AMR.[58]

### C. In addition to keywords, Mr. Hansen's methodology includes an arbitrary and unreliable call duration-based exclusionary criterion.

72.     While neither Plaintiff's class action memorandum nor Mr. Hansen's declaration discuss any criteria for including or excluding calls based on duration, Mr. Hansen indicated that his methodology calls for such a criterion. Mr. Hansen testified that,

> If it's a very short duration call, I'm not even going to include that in reality. Again, I'm erring on the side of being overly conservative and the reason is because if it's a short duration call, a couple of things can happen. It can be a pick-up and a hang-up. And – and maybe they didn't give them a chance to say that the call is being recorded.[59]

73.     Aside from acknowledging that his approach would introduce error but justifying it on the basis of being conservative, Mr. Hansen's approach is arbitrary. He offers no definitive criteria for what represents a call of a very short duration and thus exclusion under his methodology. He offers only opaque guidelines as seen in his deposition testimony where he states that,

> The last time I did this on a transcription part, I think I chose -- I found the happy medium to be if the conversation lasted more than 100 characters, then it was considered. If it was under 100 characters, it's not considered. But using the duration of the call and the dispositions of the call, we can weed it out that way.[60]

74.     This methodology does not represent a reliable means of identifying class members for several reasons.

75.     First, suppose, for example, that a customer whose first call from AMR or its agents occurred on July 15, 2018. Suppose also that the customer was

---

[58] At his deposition, Mr. Hansen testified that "Let me just put it this way, one of my customers after 20 years of doing this, he's still entertained every time because every conversation is totally different." Hansen deposition at 86.
[59] Hansen deposition at 106.
[60] Id.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

COMPENDIUM OF EVIDENCE REDACTED PAGE 154

1  notified of a recording at the outset of a call whose transcript indicates that it lasted
2  less than 100 characters. Based on the methodology Mr. Hansen describes in his
3  deposition, he would not consider this call at all, allowing the individual to still be
4  considered for class membership. However, based on Plaintiff's own class
5  definition, the example above would exclude the individual from the class. This is
6  because the first call the individual received during the class period that Plaintiff
7  defined included a notice of recording at the outset. Mr. Hansen proposes to
8  potentially ignore the very calls that would exclude members from the putative
9  class.

10      76.    Two examples highlight why this issue renders Mr. Hansen's
11  methodology unreliable as a means of identifying class members: PBS Script Type
12  1 and the May 17, 2017 call by Credence[61] a collection agency, on behalf of
13  AMR[62] to lead plaintiff Michael Mendell.

14      77.    First, if contact is made with a person using PBS Script Type 1, which
15  was still in use but being phased out during the class period, the call representative
16  would begin the call as follows: "Hello, this is (Agent). All calls are recorded for
17  quality purposes."[63] Assuming the agent gives both her/his last name, the word
18  "recorded" is the ninth (9th) word in the script. Based on the average surname
19  length in the United States of 6.3 characters[64] and first name length of 6
20  characters[65,] and rounding up their sum to 13 characters, the word "recorded"

---

[61] ██████████████████████████████████████ Deposition of Karan Negi at 20
22  ███████████████████████████████████████████████ Id at 21-2.
[63] Exhibit 1- Swigart - AMR_MEN_VOL000042
[64] To calculate this figure, I downloaded the name genealogy file from the US Census Bureau
(https://www.census.gov/topics/population/genealogy/data/2010_surnames.html). This is an MS Excel file that
contains a list of the 162,253 US surnames based on the 2010 Census that appear at least 100 times. The file also
contains the frequency of their occurrence. Weighted by the frequency of occurrence, the average surname length is
6.31 characters. The unweighted surname length average is 6.95 characters.
[65] To calculate this figure, I again relied on the US Census data. The 2010 census does not have genealogy file for
first names that corresponds to the one provided for first names. However, the 1990 Census does provide such
information at https://www.census.gov/topics/population/genealogy/data/1990_census/1990_census_namefiles.html.
From this location, I downloaded the two separate first name files provided: one for males and one for females.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  would begin and end with the 45th and 52nd characters, respectively. Thus, if the

2  respondent hung up the phone, or if the call were terminated before an additional

3  48 characters were recorded in the transcript, Mr. Hansen would not consider this

4  call at all, even though notice of recording had been given. If, as in the example

5  above, this had been the first call to the putative class member during the

6  Plaintiff's class period, Mr. Hansen's methodology would have ignored the call

7  entirely, and the next call would have been considered the first, despite the fact that

8  the first call should have excluded the recipient from class membership.

9       78.    Second, I understand that a third-party debt collection service,

10  Credence, placed a call on behalf of AMR to Mr. Mendell on May 17, 2017.[66]

11  Counsel for AMR has provided me with a recording of this conversation. I have

12  listened to it and transcribed it by hand as follows:

13  ███████████████████████████████████████████

14  ███████████████████████████████████████████

15  ███████████████████████████████████████████

16       79.    Mr. Mendell confirmed at his deposition that ████████

17  ███████████████████████████████████████████

18  ███████████████████████████████████████████

19  ████████████████████ The notice of recording at the outset of the

20  call. Based on my transcription of the call, the word "recorded" is the 11th word in

21  the transcript and occurs between the 49th and 56th characters. Suppose this had

22  been the first call Mr. Mendell had received during the Plaintiff's class period and

23  he had not even responded but had immediately hung up the phone. Mr. Hansen

24  _____

25  From these files, I calculated that the weighted average first name length for males was 5.7 characters (same unweighted). The corresponding character length for female first names was 5.9 (6.0 unweighted).

26  [66] I understand from Mr. Mendell's deposition that Credence placed another call to Mr. Mendell in May 2017, but that call went to his voicemail. Mr. Mendell confirmed that both calls from Credence were placed to his cell phone. See Mendell deposition at 137.

27  [67] Mendell deposition at 132. See also preceding pages, esp. 130-131.

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1   would not have even considered this call, despite the fact that Mr. Mendell

2   received notice of recording at the outset.[68]

3         80.    Further, if Plaintiff's class period had begun earlier, such that it

4   included the May 17, 2017 call, Mr. Mendell would be excluded from the class.

5   This is because, even if Mr. Hansen were to use his proposed 100 character cutoff,

6   the call transcript shows its length was 136 characters.[69] Further, not only was

7   notice of recording given generally within the transcript, as is Mr. Hansen's

8   criterion for exclusion, he was given notice at the outset of the call, which would

9   exclude him from the class by Plaintiff's own definition.

10        81.    At his deposition, Mr. Hansen was asked a hypothetical question that

11   mirrored the aforementioned call that he received from Credence on May 17,

12   2017.[70] He was asked if he would exclude such a call lasting less than a minute "if

13   it was a really short call". Mr. Hansen responded that "Well, if it's a really short

14   call, it will get excluded that way."[71]

15        82.    Mr. Hansen's answer may be interpreted as indicating he would

16   exclude the call entirely from analysis if it was a short call. The actual May 17,

17   2017 call lasted a total of 29 seconds, less than half of the hypothetical example of

18   one minute given to Mr. Hansen at his deposition. Further, the 29 seconds included

19   the time the phone was ringing, prior to Mr. Mendell picking up the phone and

20   commencing the call. The caller begins speaking approximately seventeen (17)

21   seconds into the call. Thus, the actual phone conversation lasted approximately

22   twelve seconds. In that time, Mr. Mendell was given notice that the call was being

23

24   _____

[68] Mr. Hansen testified with respect to Mr. Mendell that "…you know, from the first call, he never was – we'll say

25   record or monitor never shows up…" (Hansen deposition at 102.) Yet, the apparent first call that Mr. Mendell
received from AMR or its agents was from Credence on May 17, 2017, and recording notice was provided.

26   [69] Even if all spaces, including those between words, were removed, the call transcript would still be 112 characters
long.

27   [70] Hansen deposition at 107, lines 3-12.
[71] *Id.* at lines 13-14.

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  recorded. Thus, we can observe that even on a call with a minimal duration of

2  twelve seconds and even where the respondent hung up, recording notice was

3  given.

4      83.    Further, as Mr. Mendell indicated that he did in his testimony[72], a

5  respondent can hang up and terminate the call shortly after its inception if notified

6  of recording but if she/he does not want to be recorded. In such cases, by excluding

7  calls of short duration, Mr. Hansen would ignore the very calls that should exclude

8  customers from the putative class and thus artificially inflate class membership.

9      84.    The call may also be terminated shortly after inception by the caller.

10  For example, Karan Negi testified at his deposition that,

11

12

13      85.    Thus, to the extent that Plaintiff claims that Mr. Mendell is a typical

14  representative of the putative class, then his interaction with AMR and its agents

15  would indicate that:

16          a) putative class members were likely to be called and given

17          recording notice at the outset of the call before the start of the class

18          period;

19          b) the calls may have lasted a short time even if notice was given; and

20          c) after being notified that the call was being recorded, class members

21          were inclined to end the calls early precisely to avoid being recorded.

22

23  _____
    [72] In addition to previous cites to Mr. Mendell's deposition, see Mendell deposition at 133:

24          lso see Mendell deposition at 134.

25

26

27

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

86.     Leaving these problems with Mr. Hansen's methodology aside, Mr. Hansen offers no support as to why the first 100 characters are a reliable cutoff for the determining whether a call should be included other than the fact that he claims that found it to be a "happy medium" during the last time he worked on a transcription issue.

87.     Such calls could be substantially longer than a "pick-up and a hang-up" call. Plaintiff proposes to allow Mr. Hansen to apply vague criteria he has not even defined to establish class membership. Mr. Hansen has not explained in detail what those criteria are, let alone provide support as to why they are reasonable.

### D.     **Plaintiff's class identification methodology suffers from measurement error**

88.     Plaintiff's keyword search class identification methodology also introduces the potential for substantial measurement error. Measurement error, or observational error, occurs when the response recorded differs from the response that occurred.[74] For example, a measurement error would occur if a survey respondent says the word "three" (3) but the amount recorded is "thirty" (30).[75] To the extent possible, measurement error should be evaluated and taken into consideration.[76] This caution applies to the use of keywords in in document searches. As the Sedona Conference's Best Practices Commentary on the Use of

---

[74] *See, e.g.*, Statistics Canada Quality Guidelines, 4th Ed.  "Measurement errors occur when the response provided differs from the real value; such errors may be attributable to the respondent, the interviewer, the questionnaire, the collection method or the respondent's record-keeping system. Such errors may be random, or they may result in a systematic bias if they are not random." https://www150.statcan.gc.ca/n1/en/pub/12-539-x/12-539-x2003001-eng.pdf?st=EdaviqcB

[75] See, US Census Bureau, American Community Survey, Accuracy of the Data (2018), "Measurement error can arise if the person completing the questionnaire or responding an interviewer's questions responds incorrectly…An interviewer could introduce error by: 1. Misinterpreting or otherwise incorrectly entering information given by a respondent." Available online at https://www2.census.gov/programs-surveys/acs/tech_docs/accuracy/ACS_Accuracy_of_Data_2018.pdf

[76] National Research Council. 2011. Reference Manual on Scientific Evidence ("Reference Manual"): Third Edition. Washington, DC: The National Academies Press. https://doi.org/10.17226/13163 at 269, "measurement error must be reckoned with" and at 327, "It is important for any source of measurement error to be carefully evaluated."

---

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Search and Information Retrieval Methods in E-Discovery[77], notes, "The application of simple keyword searching, while still a valuable tool, has well-documented deficiencies."[78]

89.     This Sedona Conference report also includes a section titled "The Reigning Myth of 'Perfect' Retrieval Using Traditional Means" which cautions against the assumption that keyword-driven approaches, such as the one Mr. Hansen proposes, would yield perfect results. The report notes,[79]

> It is not possible to discuss this issue without noting that there appears to be a myth that manual review by humans of large amounts of information is as accurate and complete as possible – perhaps even perfect – and constitutes the gold standard by which all searches should be measured…

> Moreover, past research demonstrates the gap between lawyers' expectations and the true efficacy of certain types of keyword searches. The Blair and Maron study (discussed below) shows that human beings are far less accurate and complete than they believe themselves to be when searching and retrieving information from a heterogeneous set of documents (i.e., in many data types and formats), using ad hoc, simple keywords as the sole means to identify potentially relevant documents.

90.     I understand the Sedona Conference report on this matter has been cited in litigation, as noted in the Reference Manual on Scientific Evidence.[80] For example, in *US v. O'Keefe*, the court noted the difficulties in using keywords to identify relevant documents,

> Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics, and linguistics. Indeed, a special project team of the Working Group on Electronic Discovery of the Sedona Conference is studying that subject and their work indicates how difficult

---

[77] The Sedona Conference, The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery, 15 SEDONA CONF. J. 217 (2014), Online at: https://thesedonaconference.org/publication/Commentary_on_Search_and_Retrieval_Methods.
[78] *Id*. at 223.
[79] *Id*. at 230.
[80] Ref. Manual on Scientific Evidence, 3rd ed. at 34.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

this question is.[81]

91.     The Court's observation in *O'Keefe* above is consistent with my own experience. In my own research, I have had to rely upon writing extensive programming code, my training in statistics, as well as contextual knowledge both to extract information from a large repository and to combine data from multiple sources. In addition to previous work I have cited here, I describe some of the work I performed in my research to extract information in my forthcoming article in the Texas Review of Entertainment & Sports Law.[82] I have also applied various techniques such as text-parsing and using fuzzy matching to extract information and to link data records. This work is far from being "simple", as both Plaintiff and Mr. Hansen incorrectly portray it to be.

92.     Published literature addresses some of the procedures used and the complexities involved in applying them. Blair and Maron's evaluation of a document-retrieval system containing 350,000 pages of text showed that the system retrieved only twenty percent of the relevant documents, despite the fact that the users (lawyers and paralegals) believed they were retrieving seventy-five percent of such documents.[83]

93.     Mr. Hansen's unreliable methodology appears to be partly a byproduct of his and Plaintiff's failure to acknowledge the complexities of performing a keyword analysis in a manner such that it yields accurate results. Keywords often must be interpreted with the proper context. Glossing over or ignoring the complexities involved risks introducing significant measurement error, resulting in an unreliable classification algorithm. In my opinion, this is

---

[81] *U.S. v. O'Keefe*, 537 F. Supp. 2d 14 (D.D.C. 2008) at 8, paragraph 24.
[82] Ted Tatos. Abuse and Mistreatment of Athletes at US Universities: Legal Implications for Institutional Duty-to-Protect, Texas Review of Entertainment & Sports Law (forthcoming), Summer/Fall 2020. Pre-publication draft available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3497110.
[83] David L. Blair & M.E. Maron, An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval System, 28 Comm. ACM 289 (1985).

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    exactly the problem with Plaintiff's approach. Worse yet, neither Plaintiff nor Mr.

2    Hansen offer any means to measure this error.

3        94.    Indeed, Plaintiff's proposed analysis, as explained by Mr. Hansen,

4    suffers from multiple sources of potential measurement error, which he neither

5    addresses nor quantifies with any reasonable degree of precision.  I address each in

6    turn.

7            1.  **Mr. Hansen's methodology ignores ambiguity and would
                 not detect keyword differences in homonyms that are
8                homographs.**

9        95.    Ambiguity is "understood as a type of uncertainty which allows for

10   more than one plausible interpretation of utterances."[84] Homonyms, words that can

11   either be homophones or homographs, introduce such ambiguity. Homophones,

12   words with identical pronunciations but with context-dependent spellings can

13   create problems for speech-to-text transcription performed by automatic speech

14   recognition (ASR).[85] For example, "there"-"their" and "colonel"-"kernel" are two

15   examples of homophone pairs. Their spelling within a document transcribed from

16   speech depends algorithm used to infer the context. For example, oronyms, phrases

17   that sound the same but which have different meanings,  such as "considerate" or

18   "consider it", "I scream" and "ice cream", "stuffy nose" and "stuff he knows"

19   create difficulty for computerized speech-to-text transcription systems.[86] To

20   mitigate such difficulties, ASR systems usually involve the application of machine

21   learning methods, such as those used by Google Cloud.[87]

22

---

23   [84] J. Hosier, V. K. Gurbani and N. Milstead, "Disambiguation and Error Resolution in Call Transcripts," 2019 IEEE
     International Conference on Big Data (Big Data), Los Angeles, CA, USA, 2019, pp. 4602-4607, doi:
24   10.1109/BigData47090.2019.9005993. (Hosier et al.)
     [85] Gaur, Yashesh, Walter S. Lasecki, Florian Metze and Jeffrey P. Bigham. "The effects of automatic speech
25   recognition quality on human transcription latency." W4A (2016). ("Automatic Speech Recognition aims to
     generate text from human speech with the help of computers… Most ASR systems in use today, are statistical
26   systems trained on huge amounts of audio and corresponding texts. These systems learn a mapping from the audio
     signal to phonemes, words and sentences.")
27   [86] Hosier et al., supra note 40.
     [87] https://cloud.google.com/speech-to-text

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**COMPENDIUM OF EVIDENCE REDACTED PAGE  162**

96.     The need to account for ASR errors in the presence of homophones is well-recognized in the literature.[88] Even if a processor like IBM Watson, which Mr. Hansen proposes to use, correctly identifies the context in 100% of cases involving relevant homophones, the problem remains with a group of homonyms known as homographs.

97.     As cited above, Mr. Hansen focuses on the presence of two keywords as exclusionary criteria for class membership: "record" and "monitor". Importantly, both of these words are examples of homographs, words with identical spelling but different meanings and/or pronunciations.

98.     For example, the word "record" carries different meanings in these three contexts, and, in the first context, it is pronounced differently from the latter two:

    i.   "We *record* this conversation for quality purposes." – pronounced \ ri-ˈkȯrd\, record in this case means that the conversation will registered permanently by mechanical means.[89]

    ii.   "I don't have any *record* of this." – pronounced \ˈre-kərd\ or also \ˈre-kȯrd\, record in this case means something that recalls or relates past events.

    iii.   "She set the world *record* in the 100M butterfly" – pronounced \ˈre-kərd\ or also \ˈre-kȯrd\, record in this case means an unsurpassed statistic.

99.     However, in all of these cases, an accurate transcript will show the word "record", even though only the first context would be relevant for Mr. Hansen and the Plaintiff's analysis, as I understand it. Including the latter two

---

[88] Rena Nemoto, Ioana Vasilescu, and Martine Adda-Decker. Speech Errors on Frequently Observed Homophones in French: Perceptual Evaluation vs Automatic Classification, Proceedings of the International Conference on Language Resources and Evaluation, LREC 2008, 26 May - 1 June 2008, Marrakech, Morocco
[89] Merriam-Webster online dictionary at https://www.merriam-webster.com/dictionary/record

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  cases in the absence of the first will likely result in a faulty determination of class
2  membership. This is because, even though it appears as a keyword in all three
3  instances, the word "record" is used in an entirely different context in the latter two
4  cases.

5       100.   The problem reveals itself by examining the scripts, which Mr.
6  Hansen testified he did not do, because he felt they were irrelevant to his analysis.
7  If he had examined them, he would have noticed, for example, that the CC script
8  also contains the second variant of the word record, namely definition ii above. For
9  the contingencies described as "Collection Plan 400BA – PRIVATE PAY BAD
10 ADDRESS", and "Collection Plan 100AB - MEDICARE AUTO BAD
11 ADDRESS", the script includes the sentence, "Can you please provide your
12 mailing address for updating our records."[90] (emphasis added). Thus, for example,
13 if no notice of recording had been given, but the caller asked the customer for the
14 mailing address using the sentence above, Mr. Hansen's methodology would still
15 remove the customer. Under his approach, the customer would be removed from
16 the class because the word "record" appeared in the transcript, even though its
17 presence would have nothing to do with the call being recorded.

18      101.   Although the word "monitor" does not appear in any of the three
19 scripts referenced in the Swigart declaration, Mr. Hansen indicated that he would
20 also include it as a keyword. As with the word "record", the meaning of the word
21 "monitor" varies in the three following contexts:

22      i.    "We *monitor* this call for quality purposes." – meaning "to watch,
23            keep track of, or check usually for a special purpose"[91]
24      ii.   "This doesn't show up on my *monitor*." – meaning "an electronic
25            device with a screen used for display (as of television pictures or

26 _____

27 [90] Exhibit 3 -Swigart - AMR_MEN_VOL000043
   [91] Merriam-Webster online dictionary at https://www.merriam-webster.com/dictionary/monitor

28
DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1   computer information)"

2    iii.   "She is the *monitor* responsible for ensuring payment was registered."

3     – meaning "one that warns or instructs."

4   102.   As noted above, Mr. Hansen's approach would treat the mere

5 presence of the word "monitor" in a phone call transcript as an exclusionary

6 criterion for class membership. However, as with the word "record", the varying

7 meanings of the word monitor undermine its reliability for this purpose. Its usage

8 in other contexts unrelated to the monitoring of a phone conversation would

9 exclude any potential class members. Such an approach is not "conservative", as

10 Mr. Hansen claims, it is inaccurate and introduces measurement error. To wit, Mr.

11 Hansen testified that he "even if the recipient of the call said record or monitored,

12 it would show up, and they would be excluded."[92]

13   103.   Further, neither Mr. Hansen nor Plaintiff offers any means of

14 quantifying the accuracy of their keyword-based exclusion methodology. They

15 offer no quantification of the potential error rate of this approach. So, while we can

16 expect that their proposed methodology will introduce error, they offer no plan or

17 means of ascertaining the amount of error introduced.

18    2.   **Mr. Hansen's approach to identifying California plaintiffs is**
19     **susceptible to errors.**

20   104.   At his deposition, Mr. Hansen testified that identifying California

21 plaintiffs, a requirement under Plaintiff's class definition, would be "trivial."[93]

22 Initially, in his declaration, he indicated that he could "ascertain the patient phone

23 number that AMR called along with the date etc. I can then compare the area code

24 to a list of California area codes..[list omitted]…to determine if the call was placed

25

26 _____

27 [92] Hansen deposition at 98.
  [93] Hansen deposition at 102.

28

522

1  to a California number."[94] However, at this deposition, Mr. Hansen was asked and

2  testified that:

Counsel:     I mean, knowing the area code doesn't necessarily enable you to
3               determine if the call recipient was physically located in California or a
4               resident of California?

5
Mr. Hansen: Yeah. While that's – that's possible, yeah, I wouldn't say that it
6               accounts for a whole lot. But also, I could point out that that could be
7               overcome because I understand that a database exists that actually
                 do(es) have the patients' name and address. [95]
8

9       105.    Mr. Hansen testified that the possibility exists that individuals may

10  have relocated to another state but kept their California number.[96] Indeed, in 2016,

11  the Pew Research Center estimated that ten percent (10%) of U.S. adults have a

12  cellphone number from another state.[97] The data indicated that approximately 8%

13  of individuals with a California cellphone number do not live in the state.[98]

14      106.    Mr. Hansen proposes to address this potential source of classification

15  error by comparing the number to the patient's address to ensure it is located in

16  California. I understand that LiveVox has produced thirteen files containing

17  records of all calls made by Omega on behalf of AMR in the US during Plaintiff's

18  proposed class period (the Omega-LV data).[99] However, these data do not include

19  any name or address information. Nor has Plaintiff pointed to any other specific

20  data they plan to use to address this issue.

21  / / /

22  / / /

23  _____
    [94] *Id.* at 17, paragraph 31.
24  [95] *Id.* at 135.
    [96] *Id.* at 136.
25  [97] Meredith Dost and Kyley McGeeney, Moving Without Changing Your Cellphone Number: A Predicament for
    Pollsters, August 1, 2016. Online at https://www.pewresearch.org/methods/2016/08/01/moving-without-changing-
    your-cellphone-number-a-predicament-for-pollsters/
26  [98] *Id. See* https://www.pewresearch.org/pm_2016-08-01_undercoverage-00-01/
    [99] CONFIDENTIAL-LV-MENDELL-00001 to CONFIDENTIAL-LV-MENDELL-00013. Each file appears to
27  correspond to a month of the proposed class period.

28
           DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
                    PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

3. **Mr. Hansen's method improperly assumes that the IBM speech-to-text transcription service would have an error rate of nearly zero.**

107.    Mr. Hansen indicated at his deposition and in his declaration that he plans to use the IBM Watson speech-to-text transcription service to create transcripts of the over 22k phone call recordings that Omega made to prospective class members in California who used AMR services and who were called during the putative class period. He then plans on relying on the transcripts of the phone call recordings, which he proposes to generate using IBM Watson to identify the presence of specific keywords to determine class membership.

108.    In his declaration, Mr. Hansen describes his methodology as follows:

> At the same time, I will take all the mp3 audio files produced and have them electronically transcribed through the use of an artificial intelligence engine, specifically employing IBM Watson. This will create a full transcription of all the call recordings. The transcriptions will be loaded into a database and analyzed by automated searching for specific text such as "patient business services" or "customer care" or "recorded" etc. I can search all the recordings for any term requested in a matter of seconds.[100]

109.    As he indicates, Mr. Hansen intends to search the texts of the transcripts generated from IBM Watson after the final transcripts have been generated and he has loaded them into a database. However, IBM specifically cautions against the methodology Mr. Hansen proposes:

> Keyword spotting is necessary to identify keywords in an audio stream. <u>You cannot identify keywords by processing a final transcript because the transcript represents the service's best decoding results for the input audio</u>. It does not include tokens with lower confidence scores that might represent a word of interest. So applying text processing tools to a transcript on the client side might not identify keywords. A richer representation of decoding results is needed, and that representation is available only at the server.[101] (emphasis added)

---

[100] Hansen declaration at
[101] IBM Cloud Docs: Speech-to-Text, Output features. https://cloud.ibm.com/docs/speech-to-text?topic=speech-to-text-output

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    110.   Further, when asked about the transcription accuracy of IBM Watson,

2    Mr. Hansen testified that "I'm confident that the system will give in the high

3    nineties for what we're looking at…You know, keeping in mind I'm not interested

4    in what the recipient says. All right. I'm looking at what the things that would be

5    transcribed clearly. So high nineties. Close to 100 percent."[102]

6    111.   However, Mr. Hansen offers no supporting evidence for his opinion.

7    He testified that he had not looked at any scientific studies that discuss IBM

8    Watson's speech-to-text transcription accuracy.[103] He further testified that he felt

9    no need to check any studies because, he was satisfied with the results of his own

10   test.:[104]

11   Counsel:    …So you didn't feel a need to check studies because you did your
12               own – basically you did your own test and you were satisfied that it
                 was similar enough to what you intended to do here?
13
14   Mr. Hansen: Yes.

15   112.   To my knowledge, Mr. Hansen has provided no results of any tests,

16   diagnostic or otherwise, or any checks that he performed on IBM Watson's

17   transcription accuracy. Indeed, he testified that he kept no records of any such

18   tests.[105] As such, he offers no quantifiable error rate that is based on objective

19   standards.

20   113.   The literature does not support Mr. Hansen's claims. For example,

21   Errattahi et al.[106] (2018) note that:

22       Even though Automatic Speech Recognition (ASR) has matured to the point
         of commercial applications, high error rate in some speech recognition
23       domains remain as one of the main impediment actors to the wide adoption

---

24   [102] Hansen deposition at 93.
25   [103] Hansen deposition at 97-8.
     [104] Hansen deposition at 98.
26   [105] Hansen deposition at 97.
     [106] Rahhal Errattahi, Asmaa El Hannani, Hassan Ouahmane, Automatic Speech Recognition Errors Detection and
27   Correction: A Review. Procedia Computer Science 128 (2018) 32–37. Online at:
     https://www.sciencedirect.com/science/article/pii/S1877050918302187

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

of speech technology, and especially for continuous large vocabulary speech recognition applications. The persistent presence of ASR errors has [sic] intensified the need to find alternative techniques to automatically detect and correct such errors. The correction of the transcription errors is very crucial not only to improve the speech recognition accuracy, but also to avoid the propagation of the errors to the subsequent language processing modules such as machine translation"

114.   Such ASR systems include offerings from IBM Watson, Google, and others. Filippidou and Moussiades (2020)[107] provide a benchmarking of the most well-known systems, including IBM Watson and Google using the word error rate (WER) and match error rate. WER is defined as:

$$WER = (S + D + I)/N1 = (S + D + I)/(H + S + D)$$

Where:

I = total number of entries, D = total number of deletions, S = total number of replacements, H = total number of successes, and $N_1$ = total number of reference words.

115.   The authors found that IBM Watson generated an error rate inconsistent with Mr. Hansen's claims of IBM Watson's "close to 100%" accuracy and that the overall average error rate was 38.1% for IBM, 20.63% for Google, and 36% for Wit. IBM Watson's error rate implies an accuracy rate well below Mr. Hansen's claim of "high nineties." In a test of 60 sentences, IBM showed the lowest accuracy of the three ASR engines compared with 26.7% for IBM, 43.3% for Google, and 36.7% for Wit.[108] The WER of 38% for IBM Watson raises significant accuracy concerns, as do other studies that have generated ASR word error rates in the same range.[109]

[107] Filippidou F, Moussiades L. A Benchmarking of IBM, Google and Wit Automatic Speech Recognition Systems. Artificial Intelligence Applications and Innovations. 2020;583:73-82. Published 2020 May 6. doi:10.1007/978-3-030-49161-1_7

[108] I do not intend to opine on whether or not IBM Watson is the appropriate or best tool to transcribe phone call recordings from LiveVox. My opinion here is that Mr. Hansen's claims about the accuracy of IBM Watson are not supported by the literature I cite here. I have found no studies that support his claims of accuracy, nor does he indicate that he examined any.

[109] Yashesh Gaur, Walter S. Lasecki, Florian Metze, and Jeffrey P. Bigham. 2016. The effects of automatic speech recognition quality on human transcription latency. In Proceedings of the 13th Web for All Conference (W4A '16).

116.   IBM Watson researchers have also noted the distinction between the keyword error rate (KER) and word error rate (WER). Park et al. observe that "ASR systems are typically evaluated in terms of WER. Many speech analytics applications, however, rely on identifying keywords in the transcripts—thus their performance can be expected to be more sensitive to keyword errors than regular word errors."[110] This issue is relevant in light of Mr. Hansen's testimony that he intended to "formulate other queries to overcome any false positives where the end result is no false positives."[111]

117.   To the extent that Mr. Hansen would search for additional keywords that he and/or Plaintiff's counsel intend to determine at a later time, the process of making such a determination is not simple and can be prone to error. Indeed, the same IBM Watson researchers explain that "It is very difficult to define and collect keywords for an unconstrained domain such as contact center calls." Their results suggest that "…the ASR system misrecognizes keywords and non-keywords at almost same rate when the ASR has about 25% WER. When the ASR's recognition accuracy is lower than the point, it makes more mistakes for keywords…KER increases more rapidly than WER as the transcription accuracy deteriorates." These results are of particular concern given the research I cited above from the literature. Findings of 38% - 50% WERs for IBM Watson imply,

---

Association for Computing Machinery, New York, NY, USA, Article 23, 1–8. ("If the WER is high enough (45% in our study), then workers identify how bad it is, erase the text generated from the ASR, and simply type from scratch." See also Kalliroi Georgila, Anton Leuski, Volodymyr Yanov, David Traum, Evaluation of Off-the-shelf Speech Recognizers Across Diverse Dialogue Domains, Proceedings of the 12th Conference on Language Resources and Evaluation (LREC 2020), pages 6469–6476. Marseille, 11–16 May 2020 Online at: https://www.aclweb.org/anthology/2020.lrec-1.797.pdf.(Based on different configurations, IBM Watson's WER ranged from 12.81 to 41.21.) Also see Kim, Joshua Y., Chunfeng Liu, Rafael A. Calvo, Kathryn McCabe, Silas Taylor, Björn W. Schuller and Kaihang Wu. "A Comparison of Online Automatic Speech Recognition Systems and the Nonverbal Responses to Unintelligible Speech." ArXiv abs/1904.12403 (2019). (IBM Watson generated approximately a 50% WER on video transcriptions.)

[110] Youngja Park, Siddharth Patwardhan, Karthik Visweswariah, Stephen C. Gates. An Empirical Analysis of Word Error Rate and Keyword Error Rate, Proceedings of the International Conference on Spoken Language Processing, Brisbane, Australia, September 2008

[111] Hansen deposition at 122.

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

based on Park et al., that the KER would be even higher. Thus, Plaintiff's keyword identification and search tasks are not the "straight-forward" and "simple" tasks they claim, nor are they likely to generate results in the "high-nineties" or "nearly 100%" as Mr. Hansen claims.

118. Neither Mr. Hansen's declaration nor his deposition offers any indication that he plans on checking for transcription errors. As such, the accuracy of his approach cannot be verified because he proffers no means of ascertaining the error rate. For all intents and purposes, his methodology assumes that either the transcripts are an "almost 100%" reflection of the words spoken on the call and that any differences are irrelevant.

### 4. **Mr. Hansen's methodology with regard to speaker of relevant keywords during call also suffers from shortcomings.**

119. Mr. Hansen's testimony is inconsistent with regard to the relevance of whether the caller or the recipient spoke one of the keywords. At his deposition, he testified that "[b]ut I'm not running the – the transcription to capture what the recipient said. I'm running it to capture what the caller said."[112] Yet, later in the same deposition he testified that "even if the recipient of the call said record or monitored, it would show up, and they would be excluded."[113]

120. Leaving this inconsistency aside, IBM Watson speech-to-text raises several issues with regard to speaker labels. IBM highlights the need to consider several performance issues.[114]

➤ The service produces better results when participants speak for longer amounts of time, at least 30 seconds per speaker.

➤ Performance can degrade for the first 30 seconds of speech. It usually

---

[112] Hansen deposition at 91.
[113] Hansen deposition at 98.
[114] https://cloud.ibm.com/docs/speech-to-text?topic=speech-to-text-output

1    improves to a reasonable level after 1 minute of audio, as the service

2    receives more data to work with.

3    ➤ As with all transcription, performance can also be affected by poor audio

4    quality, background noise, a person's manner of speech, overlapping

5    speakers, and other aspects of the audio.

6        121.   Based on my review of the several calls in this case, it does not appear

7    that the first condition is met, namely that speakers talk for thirty seconds or more

8    at a time. The conversation is set up as a question and answer, such that speakers

9    can alternate every few seconds.

10        122.   The degradation of performance for the first thirty seconds poses a

11   potential problem in this case, as a key issue is whether the recipients of the call

12   were notified that a call was being recorded. Further, the actual conversation

13   within the call can often last less than thirty seconds or a minute. The first call to

14   Plaintiff Michael Mendell, on May 17, 2017 lasted twenty-nine seconds, but the

15   conversation began seventeen seconds into the call. This is because the call

16   duration includes the time during which the phone rang prior to the recipient's

17   answering the phone. Likewise, the second call to Mr. Mendell, on November 12,

18   2018 lasted a total of one minute and nineteen seconds. Mr. Mendell answered the

19   phone nineteen seconds into the call, leaving the total duration at one minute.

20        E.    **Prohibition on the use of IBM Watson to transcribe data that**

21   **includes personal health information.**

22        123.   I understand that one of the potential issues in this matter that may

23   affect the viability of using the IBM Watson platform to transcribe the calls at

24   issue lies in the degree to which this platform is HIPAA-compliant. The IBM

25   Watson Speech-to-Text information security information page specifically notes,

26   "Do not include personal health information (PHI) in data that you pass to the

27

28

DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  service."[115] Given this warning and lack of any explanation from either Plaintiff or
2  Mr. Hansen as to how they plan on removing such data prior to using the IBM
3  Watson service, it appears that this warning precludes the use of Mr. Hansen's use
4  of this platform to transcribe the recordings.
5
6      I declare under penalty of perjury and the laws of the United States and of
7  the State of California that the foregoing is true and correct to the best of my
8  knowledge and ability.
9  Respectfully submitted this 3rd day of August, 2020,

_____
Ted Tatos

[115] https://cloud.ibm.com/docs/speech-to-text?topic=speech-to-text-information-security

530
DECLARATION OF TED TATOS IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# Exhibit 1



**Ted P. Tatos**
**Testifying Expert and Consultant – EconONE Research**

Ted Tatos is a testifying expert and consultant with EconONE Research and specializes in quantitative economic analysis and antitrust. In addition to his consulting practice, Mr. Tatos is an Adjunct Professor of economics at the University of Utah, where he has taught both graduate and undergraduate economics and statistics classes. He is also the Associate Economics Editor of the *Antitrust Bulletin* journal. Mr. Tatos has an M.S. in Statistics with a focus in Econometrics from the University of Utah and has B.A. in Economics from Duke University. He has over twenty-three years of experience in litigation and non-litigation consulting, with a focus in antitrust, data analytics, intellectual property, labor, and commercial damages. Mr. Tatos has advised both government and private sector clients on matters requiring complex economic and statistical analysis. He has published on various matters including antitrust issues, intellectual property matters, the use of econometric analysis to estimate property values and investigate value diminution, labor rights and athlete safety, as well as issues in concussion research.

| | |
|---|---|
| Email: | ttatos@econone.com |
| Web: | https://www.econone.com/staff-member/ted-tatos/ |
| Office: | (213) 612-7510 |
| Mobile: | (801) 541-669 |
| Research: | https://utah.academia.edu/TedTatos |
| | https://www.researchgate.net/profile/Ted_Tatos |

*Professional Experience*

| | |
|---|---|
| Present | EconONE Research, Los Angeles, CA, Salt Lake City, UT |
| January 2010 to August 2019 | Empirical Analytics Director, Salt Lake City, Utah |
| July 2008 to January 2010 | Wasatch Economics Partner, Salt Lake City, Utah |
| January 2007 to July 2008 | North Harvard Group Statistician, Salt Lake City, Utah |
| September 2001 to January 2007 | LECG, LLC Managing Economist, Washington DC & Salt Lake City, UT |
| January 2000 to September 2000 | DynCorp – Healthcare Information Technology Services Statistical Analyst, Reston, Virginia |
| March 1997 to January 2000 | LECG, LLC Research Analyst, Associate Washington, DC |

Duke University, Durham, NC
A.B. Economics, 1995 (*double major, Economics, Psychology*)

University of Utah, Salt Lake City, Utah
M.S. Statistics - Econometrics, 2005 – Thesis published in <u>Intellectual Property Damages: Guidelines and Analysis, 2004 Supplement</u> – *Applying Statistical Analysis to the Market Approach*

*Publications*

Ted Tatos, Troy Lunt, and Mark Glick. *Property Value Impacts from Transmission Lines, Sub-Transmission Lines, and Substations*. The Appraisal Journal Summer 2016 (featured article).

Ted Tatos. *Relevant Market Definition and Multi-Sided Platforms Post Ohio v. American Express: Evidence from Recent NCAA Antitrust Litigation*. Harvard Journal of Sports and Entertainment Law, 10.2, May 2019.

Ted Tatos. *NCAA Amateurism as an Anticompetitive Tying Restraint*. The Antitrust Bulletin, September 2019; 64(3).

Keith Leffler and Ted Tatos. *Competitive Injury and Damages Under the Robinson-Patman Act - Morton Salt and Statistical Analysis*. The Antitrust Bulletin. December 2015 vol. 60 no. 4 318-344

Ted Tatos, Troy Lunt, and Mark Glick. *Taking a Closer Look at Proximity Damages. –Results from Large Data Analytics*. Right of Way Magazine, March/April 2016.

Hal Singer and Ted Tatos. *Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies*, Antitrust Chronicle, Jan. 23, 2020.

Mark Glick, David Mangum, and Ted Tatos. *The 'Book of Wisdom' Contains Little Wisdom and Creates Significant Risk of Bias*. The Federal Circuit Bar Journal, 2017, Vol. 27, No. 1.

Ted Tatos. *Deconstructing the NCAA's Pro-Competitive Justifications to Demonstrate Antitrust Injury and Damages: The Evidence Against NCAA Amateurism*. The Antitrust Bulletin. March 2017; 62(1). (Special symposium guest editor).

Ted Tatos. *An Empirical Evaluation of EADA and NCAA College Sports Financial Data: Applications for Research and Litigation*. Marquette Sports Law Review, Vol. 29, No. 2 (May 2019.

Ted Tatos. *Abuse and Mistreatment of Athletes at US Universities: Legal Implications for Institutional Duty-to-Protect*, Texas Review of Entertainment & Sports Law (forthcoming), Summer/Fall 2020.

Ted Tatos and Don Comrie. *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*. Journal of Scientific Practice and Integrity 1(1), 2019.

Á

Ted Tatos and Rick Hoffman. *Applying Statistical Analysis to the Market Approach.* Intellectual Property Damages: Guidelines and Analysis, 2004 Supplement

Ted Tatos and Stephen Casper. *Using College Athletes as Concussion Test Subjects Makes Nobody Safer*, The American Prospect, Aug. 27, 2019.

Ted Tatos. *College Athletes Should Be Able to Earn Money From Their Likeness*, The American Prospect, Sept. 16, 2019.

Ted Tatos. *Playing Games with College Athletes' Lives*. The American Prospect, May 20, 2020.

### Presentations

Relevant Market Definition and Multi-Sided Platforms After Ohio v. American Express: Evidence from Recent NCAA Monopsony Antitrust Litigation – Presentation at the University of Utah Antitrust Conference, October 2019.

Advanced Patent Litigation: *Maximizing Returns and Protecting Core Technologies* (CLE presentation), Santa Clarita, CA. Oct. 2018. With Bret Bocchieri, Aaron Fahrenkrog, Christine Yun Sauer of Robins Kaplan, LLC.

Clear Law Institute presentation. *Statistics in Class Certification and at Trial: Leveraging and Attacking Statistical Evidence*, with Paul Karlsgodt of BakerHostetler, LLC, Feb. 25, 2019.

Paul Seabright and Ted Tatos. Presentation before the European Commission – Director General of Competition - Chief Economist's team pursuant to a white paper co-authored with Mark Glick and Paul Seabright regarding competition and antitrust issues in the computer mainframe industry. August 2009.

Presentation to the Utah Bar Association Annual Summer Convention, Jul. 15-18, 2009. *Economics and the Theory of Your Case*. With Hon. Clark Waddoups, Hon. Deno Himonas, Mark Glick, Steve Hill.

Steve Waters and Ted Tatos. *Determining the Choice Set in a Random Utility Model* - Presentation to American Agricultural Economics Association, Toronto, Ontario, Canada, July 1997

### Teaching Credentials

- Adjunct Professor – Spring 2006 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2005 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2004 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2005 – Economics 3640 – University of Utah

- Guest Lecturer – Summer 2004 – Executive MBA Program – University of Utah
- Guest Lecturer – Spring 2003 – Industrial Organization – University of Utah

- Adjunct Professor – Spring 2002 – Undergraduate Econometrics - University of Utah

### *Testifying Credentials*

- Deposition testimony in the matter of Ademola Adetula and Homer Strickland v. United Parcel Service, January 2020.

- Hearing testimony – Cruz v. Chunga. August 2017.

- Trial testimony – Young Living Essential Oils v. doTerra. June 2017.

- 2nd deposition in the matter of Young Living Essential Oils v. doTerra. October 2016.

- Deposition in the matter of Kinum v. American Agencies. April 2016.

- Deposition in the matter of Young Living Essential Oils v. doTerra. February 2015.

- Deposition in the matter of the Utah Jazz NBA team v. individual members of the Jazz 100. October 2014.

- Deposition in the matter of California College, Inc. v. In Contact. September 2014.

- Testimony in arbitration hearing in Robinson-Patman price discrimination antitrust matter. MB Signal v. AT&T Wireless. June 2014.

- 2nd Deposition testimony in Robinson-Patman price discrimination antitrust matter. Cellular Cellutions/MB Signal v. AT&T Wireless. April 2014.

- Trial testimony in Robinson-Patman price discrimination antitrust matter – 3rd District Court, district of CO. Western Convenience Stores, Inc. v. Suncor Energy USA., March 2014.

- Deposition testimony in Robinson-Patman price discrimination antitrust matter. Cellular Cellutions v. AT&T Wireless. January 2014.

- Trial testimony in breach of contract involving alleged loss of employees to competitor, Layton Construction v. SIRQ, February 2013.

- Trial testimony in breach of contract claim involving purchase of residential and commercial development. Traverse Mountain Enterprise v. Fox Ridge Investments, November 2012

- Deposition testimony in breach of contract claim involving purchase of residential and commercial development. Traverse Mountain Enterprise v. Fox Ridge Investments, February 2011

- Presentation to Utah Public Service Commission on behalf of Utah Industrial Energy Consumers (UIEC) regarding Rocky Mountain Power's use of statistical sampling in estimating cost allocation among consumer classes.  July 2010.

- Deposition testimony in matter involving alleged damages to an internet-based entertainment shopping site.  PrizeWise v. Oppenheimer, November 2009.

- Presentation before the European Commission – Director General of Competition - Chief Economist's team pursuant to a paper co-authored with Mark Glick and Paul Seabright regarding competition in the computer mainframe industry. t3 Technologies v. IBM, August 2009.

- Deposition testimony in matter involving paid search advertisement bidding on competitor keywords on the Google search engine – 1-800 Contacts v. Lens.com, November 2008

- 2nd District Court, District of Utah.  Trial testimony in breach of contract matter involving transfer of insurance agents to a rival firm.  Farm Bureau v. American National Insurance Company, August 2008

- Testified before Administrative Law Judge on the use of the Consumer Price Index as an measure of inflation and offered testimony on inflationary pressure on fuel prices – July 2008

- Deposition testimony on statistical sampling issues, Catholic Healthcare v. Blue Cross/Blue Shield of California – March 2008

- Trial testimony in breach of contract matter involving transfer of insurance agents to a rival firm.  Farm Bureau v. American National Insurance Company, November 2006

- Testified before Administrative Law Judge on the matter of whether taxicab rates in Salt Lake City should be increased as a result of increased gasoline prices resulting from Hurricanes Katrina and Rita. – January 2006

- Testified before Administrative Law Judge on the matter of whether taxicab rates in Salt Lake City should be increased to reflect inflationary trends – January 2005

- Testified before Administrative Law Judge on the matter of whether Salt Lake City should issue additional taxicab licenses – November 2004

COMPENDIUM OF EVIDENCE REDACTED PAGE  178

**Selected Antitrust and Intellectual Property Matters**

- <u>Lenhoff Enterprises, Inc. v. United Talent Agency, Inc. & International Creative Management Partners, LLC</u>:  Prepared statistical analysis and submitted declaration in the matter of regarding antitrust issues in the scripted television market.

  *Client:  Lenhoff Enterprises*

  *Firm:    Blecher Collins & Pepperman, Los Angeles, CA*

- <u>Luxe Hospitality Co. v. SBE et al</u>. - Prepared two expert reports and declaration in matter regarding trademark dispute.  Prepared critique of consumer confusion and secondary meaning surveys prepared by SBE experts.

  *Client:  Luxe Hospitality Company*

  *Law Firm: Robins Kaplan, Los Angeles, CA*

- <u>Western Convenience v. Suncor</u> - Prepared expert reports and testified in deposition and trial on Robinson-Patman price discrimination matter dealing with competitive injury and antitrust damages in retail gasoline industry.

  *Client:  Western Convenience Stores*

  *Firms:  Polsinelli. Denver, CO*

  *Bennington Johnson, Biermann & Craigmile, Denver, CO.*

- <u>1-800 Contacts v. Lens.com</u> - Prepared expert report, declaration, and gave deposition testimony in matter involving trademark dispute and keyword bidding on online search engines.  Prepared critique of reports prepared by 1-800 Contacts' damages and survey experts.

  *Client: Lens.com*

  *Firm: Ray Quinney & Nebeker, Salt Lake City, UT*

- <u>Sport Court v. Rhino Sports</u>: Prepared expert report in matter of in matter involving trademark dispute and keyword bidding on online search engines.

> Client: SportCourt, Inc.
>
> Law Firm: *Ray, Quinney & Nebeker, Salt Lake City, UT*

- J.D. Fields, Inc. v. Nucor - Retained as expert & prepared analysis on competitive injury in Robinson-Patman antitrust price discrimination matter in steel industry.

  > Client: *J.D. Fields, Inc.*
  >
  > Firm: *Hill Rivkins, Houston, TX.*

- Cellular Cellutions v. AT&T, M.B. Signal v. AT&T: Prepared expert reports, declaration, and gave testimony at arbitration hearing in Robinson-Patman antitrust case involving price discrimination in retail cellular telephone industry.

  > Client: *Cellular Cellutions, M.B. Signal*
  >
  > Firm: *Plunkett Cooney, Bloomfield Hills, MI.*

- Prepared econometric and statistical analysis in price-fixing matters in the following matters:

  > *In Re Industrial Silicon Antitrust Litigation*
  >
  > *Contact Lens Antitrust Litigation*
  >
  > *Commercial Tissue Antitrust Litigation*
  >
  > *Flat Glass Antitrust Litigation*
  >
  > *Vitamins Antitrust Litigation*
  >
  > *Window Blinds Antitrust Litigation*

- Co-Authored report with Prof. Paul Seabright and Prof. Mark Glick regarding customer lock-in in the mainframe market. Presented results to European Commission-DG Comp Chief Economist's team. Matter: *t3 v. IBM litigation*.

- Prepared analysis of online advertising market pursuant to investigation of potential competitive effects of Google-DoubleClick merger.

- Prepared analysis of click-through rates, impressions, search terms, and usage rates for online search advertisements pursuant to proposed merger between Microsoft and Yahoo.

- Prepared geographic market analysis for various clients involving mergers in the defense, healthcare, explosives, aircraft engines, and others.

**Employment Discrimination, Fair Labor Standards Act, and Benefits Consulting**

- Melissa Roberts v. Tim Dahle Imports – Prepared expert report in matter involving the calculation of commissions on new and used automobiles.

  Client: *Tim Dahle Imports*

  Law Firm: *Ray Quinney & Nebeker, Salt Lake City*

**COMPENDIUM OF EVIDENCE REDACTED PAGE 180**

- <u>Gutierrez v. Stericycle</u> - Prepared declaration in matter involving class action wage and hour claims for Stericycle employees in California.

  *Client: Stericycle*

  *Law Firm: Parsons Behle & Latimer, Salt Lake City, UT*

- <u>Land v. EG&G (and other cases in UT, OR, AL)</u> - Retained as expert to prepare analysis on wage and hour matters for various client locations in Utah, Oregon, Arkansas, and Alabama.

  *Clients: EG&G division of URS; Battelle Memorial Institute*

  *Law Firm: Holland & Hart, Salt Lake City, UT*

- <u>Jordt v. Federal Express</u> - Retained as consulting expert to advise on statistical matters involving claims of age discrimination.

  *Client: Federal Express Freight*

  *Law Firm: Ray Quinney & Nebeker, Salt Lake City, UT*

- <u>Gray v. Oracle</u> - Retained as consulting expert to analyze claims of age discrimination in layoff of employees from major information technology firm.  Reviewed layoff records and performed logistic regression to analyze relevant factors in the layoff.

  *Client: Oracle, Inc.*

  *Law Firm: Parsons Behle & Latimer*

- Developed regression models to test for statistically significant differences in pay rates among men and women for big four accounting firm.

- Used parametric and nonparametric statistical techniques to compare promotion rates among men and women in employment discrimination litigation case.

- Developed statistical models to ensure a company undertaking layoffs is conducting the process randomly without discriminating with respect to gender, race, or age.

**Selected Breach of Contract, Non-Solicitation Provisions, and Fraud Matters**

- <u>Securities & Exchange Commission v. Colin McCabe/Elite Stock Report</u> – Prepared analysis of stock touting and impacts on stock prices. Issued expert report.

  *Client: Securities and Exchange Commission*

  *Law Firm: Securities and Exchange Commission-Nancy Ferguson-Denver Office*

- <u>Young Living Essential Oils v. doTERRA</u> – Prepared expert report, declaration, two depositions, and gave trial testimony in matter involving breach of non-solicitation agreement.  Prepared statistical model of lost profits.

  *Client: Young Living Essential Oils*

Á

*Law Firm: Ray Quinney & Nebeker*

- LIMU v. Zija – submitted expert disclosure detailing calculation of lost revenues – case ongoing.

  *Client: LIMU*

  *Law Firm: Ray Quinney & Nebeker*

- <u>SIRQ, Inc. v. Layton Companies</u> – Prepared expert report, gave deposition and trial testimony in matter involving breach of non-solicitation agreement and breach of contract.

  *Client: Layton Companies*

  *Law Firm: Parr Brown Gee & Loveless, Salt Lake City, UT*

- <u>Traverse Mountain Enterprises v. Fox Ridge, LLC</u>. – Prepared expert reports, gave deposition testimony, and testified at trial in issue involving breach of contract. Valued property and investments at Traverse Mountain.

  *Client: Traverse Mountain Enterprises*

  *Law Firm: Durham Jones & Pinegar, Salt Lake City, UT*

- <u>Farm Bureau v. American National</u> – Gave deposition and trial testimony in matter involving non-solicitation and breach of contract.

  *Client: Farm Bureau Life Insurance*

  *Law Firm: Morgan Minnock Rice & James, Salt Lake City, UT*

- Prepared statistical and economic analysis in breach of contract/breach of non-solicitation matters in direct sales/multi-level marketing industry for clients including: Neways, Organo Gold, Max International, LIMU and others.

Á

## DECLARATION OF DR. BHASKAR PATIL

I, Dr. Bhaskar Patil, declare:

1.     I am the Vice President of Global Services at Omega Healthcare Management Services ("Omega"). I have been in this position since January 2017. In this role, I oversee the operations and management of several of Omega's call centers located in India and the Philippines.

2.     I have personal knowledge of the facts set forth herein and, if called upon as a witness, I could and would testify competently thereto under oath.

3.     Omega works with a number of clients that use its off-shore call centers for services such as billing and collections operations. One of Omega's clients is Centrex Revenue Solutions, LLC, a subsidiary of Integra Connect, LLC, which has hired Omega to operate and manage call center operations related to billing and collection campaigns for its client American Medical Response, Inc. ("AMR").

4.     One of my responsibilities as Vice President of Global Services is supervising and overseeing the call center operations and campaigns for AMR's billing and collections services.

5.     A typical billing cycle begins once an individual's transport is complete and his or her Patient Care Report ("PCR") is electronically uploaded into Integra's proprietary billing system, Jaguar, for coding purposes and bill plan assignment. The Jaguar system contains an individual's complete account information, including name, address, phone number, trip details, and account comments. Once an account is coded and assigned a billing plan, correspondence is sent to AMR customers seeking insurance information and/or payment information. If an individual's unpaid balance is not resolved via attempts made through correspondence, the account may be added to an outbound dialer list for follow up by one of Omega's call centers. Generally, once a phone number is in the outbound dial queue, several call attempts are made to individuals to either obtain insurance information or otherwise resolve

**COMPENDIUM OF EVIDENCE REDACTED PAGE 183**

1 unpaid balances for use of AMR's services. If it is determined that an account cannot
2 be collected, the account is closed and sent to one of AMR's collection agencies.

3       6.     Omega representatives that handle AMR's billing and collections cycle
4 undergo extensive training to ensure compliance with relevant laws and AMR's high
5 standard of customer service, including on scripts to be used for calls to and from
6 AMR's customers. These scripts have a standardized opening script that notifies a
7 call recipient that the call is being recorded and verifies the individual's identity.
8 There are also standard scripts associated with each potential billing plan, and a
9 standard closing script.

10       7.     On July 15, 2018, the Omega call centers began training call center
11 representatives on and rolling out a modified opening script at Centrex's direction,
12 which reversed the order of the recording notification and the identity verification.
13 Use of the two scripts overlapped as call representatives were trained in phases
14 through the end of July 2018.

15       8.     In April 2019, Omega was notified that it was to roll out another
16 modified opening script, which again reversed the order of the recording notification
17 and identity verification, placing the notification before the verification. As with the
18 earlier modifications, use of the pre-April 2019 script and post-April 2019 script
19 overlapped for several months as call representatives were trained in phases through
20 the end of July 2019.

21       9.     Since April 2019, no further changes to the opening script have been
22 made. I am not aware of any plan or strategy to modify the opening script in the
23 future.

24       10.     Based on my understanding and use of the LiveVox system that Omega
25 employs to make and receive calls on behalf of AMR, there are no fields available
26 in the call detail records that would enable identification of individuals who received
27 their first call between July 1, 2018 and July 31, 2019. Nor am I aware of any other

28

1  system that Omega employs on behalf of AMR, including the Jaguar system that

2  contains individual account information, which would enable identification without

3  reviewing every potential class member's individual account in Jaguar.

4      11.    Similarly, based on my understanding and use of the LiveVox system

5  that Omega employs to make and receive calls on behalf of AMR, there are no fields

6  available in the call detail records to determine which individuals made an inbound

7  call to AMR via an Omega call center between July 1, 2018 and July 31, 2019. Nor

8  am I aware of any other system that Omega employs on behalf of AMR, including

9  the Jaguar system that contains individual account information, which would enable

10  identification without reviewing every potential class members' individual account

11  in Jaguar.

12      12.    In addition, I am not aware of any system or searchable data base that

13  Omega uses on behalf of AMR that would indicate whether a potential class member

14  was contacted by a collection agency seeking resolution of unpaid balances related

15  to AMR's services prior to or during the period July 1, 2018 to July 31, 2019.

16      13.    Attached hereto as Exhibit P1 is a chart identifying true and correct

17  copies of audio recordings that were produced during this litigation. These audio

18  recordings were downloaded both manually by a team of quality auditors and call

19  center agents that I supervise at Omega's call centers and by an automated process.

20  The chart identifies dates and times of each call based on the call detail records

21  associated with each individual recording. Also attached as Exhibits P1.A-X hereto

22  are true and correct copies of the audio recordings corresponding to those identified

23  in the chart.

24      I declare under penalty of perjury and the laws of the United States of

25  America that the foregoing is true and correct.

26  / / /

27  / / /

28

DECLARATION OF DR. BHASKAR PATIL

Executed on the 3rd day of August, 2020.

_____

Dr. Bhaskar Patil

PATIL DECL. "
EXHIBIT P1A

LODGED WITH
THE COURT'""'
EQP F KVKQP CNN[ '"'
WP F GT "UGCN

RC VKN DECL. ""

EXHIBIT R3B

LODGED WITH

THE COURT'""'

EQP F KVKQP CNN[ ""

WP F GT "UGCN

RC VKN DECL. '"'

EXHIBIT R3C

LODGED WITH

THE COURT'""'

EQP F KVKQP CNN[ '"'

WP F GT "UGCN

RCVKN DECL. '"'
EXHIBIT R3D

LODGED WITH
THE COURT'""'
EQP F KVKQP CNN[ '"'
WP F GT "UGCN

RC VKN DECL. '''

# EXHIBIT R3E-X

LODGED WITH

THE COURT'''''''

EQP F KVKQP CNN[ '''

WP F GT ''UGCN

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL MENDELL, on behalf of himself
and all others similarly situated,

      Plaintiff,

vs.

AMERICAN MEDICAL RESPONSE INC.,
a Delaware Corporation,

      Defendant.

Case No.: 3:19-cv-01227-BAS-KSC

## DECLARATION OF LAURENCE SIEGEL

I, Laurence Siegel, hereby declare under the penalty of perjury that the following is true and correct pursuant to 28 U.S.C. § 1746:

1.      My name is Laurence Siegel. I am the Executive Vice President of Product Development for LiveVox, Inc. ("LiveVox") and a co-founder of the company. I have been employed by LiveVox since February 2000. I make this Declaration based on my personal knowledge and my review of business records maintained by LiveVox. I am over the age of eighteen, am of sound mind, and have personal knowledge of the facts and matters set forth herein (unless noted as based on information and belief) and such are true and correct to the best of my knowledge.

2.      As part of my duties as LiveVox's Executive Vice President of Product Development, I am required to understand and do understand LiveVox's outbound dialing systems and call records databases. I oversee both the engineering and product teams at LiveVox, and as part of my management function, I have provided direction and oversight to the engineering team at LiveVox regarding the design, construction, and implementation of

547

outbound dialing systems and call records databases. Further, I direct and oversee the teams conducting call record searches and reviewed countless results of those searches for records of calls made using one or more of LiveVox's outbound dialing systems.

3. LiveVox provides hosted contact center services, meaning that it hosts the hardware and software for its outbound dialing systems at its own data centers. LiveVox's customers access the software through a secure online portal. LiveVox's customers do not install any LiveVox system on their own computers nor do they have access to LiveVox's servers, code, or the other elements of the back end of LiveVox's systems.

4. All of LiveVox's dialing and other systems were developed specifically by LiveVox using proprietary code. No one has access to that code or may review it or the back end of LiveVox's systems other than LiveVox developers, engineers, database administrators, and other employees with a business need to access or review that information. LiveVox is not aware of Jeffrey A. Hansen (or anyone else other than the LiveVox employees described in the previous sentence) ever receiving access to any of LiveVox's systems, databases, or proprietary computer code.

5. I have reviewed the Declaration of Jeffrey A. Hansen in support of plaintiff's motion for class certification pursuant to Fed. R. Civ. P. 23(B)(2) and (B)(3). In paragraph 17 of his declaration, Mr. Hansen states that LiveVox call detail records for calls made using one or more LiveVox outbound dialing systems will include information by which a person can "identify whether a person to person conversation was a first time or subsequent conversation." Similarly, in paragraph 18 of his declaration, Mr. Hansen says that call detail records from LiveVox include information by which it is possible "to identify which of the Call Records were first time outbound calls, to patients that never called AMR[.]"

548

DocuSign Envelope ID: 3928A52E-B16D-4BDA-A204-79043F553A3C

6.     These statements by Mr. Hansen are not accurate. LiveVox does not have any system-created data markers or other information in its call records that would show whether a call made by or to a customer was the first call to any particular call recipient or phone number. Although it may be technologically possible for a LiveVox customer to have created a special data marker for its first call to a particular call recipient, I am not aware of any LiveVox customer asking that LiveVox create any such marker or process, nor, of course, LiveVox ever actually creating any such marker or process. And because creating that data marker would require substantial modification of LiveVox's systems and processes, if it had occurred, I am confident I would have known that it did.

Executed on the 28th day of July, 2020 in San Francisco, California.



Laurence Siegel

**COMPENDIUM OF EVIDENCE REDACTED PAGE 194**